1  UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
2  EASTERN DIVISION

3

TRADITIONALIST AMERICAN KNIGHTS
4  OF THE KU KLUX KLAN, et al.,

5  Plaintiffs,

6  vs.  Cause No. 4:13CV810 NAB

7  CITY OF DESOLOGE, MISSOURI,

8  Defendant.

9  ================================================

10  TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

11  BEFORE THE HONORABLE NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE
12
SEPTEMBER 11, 2013
13
================================================
14

15  APPEARANCES ON THE NEXT PAGE

16

17

18

19

20  Transcribed by:

21  Alison M. Garagnani, CCR #475, CSR, RMR
Official Court Reporter
22  United States District Court
555 Independence, Room 3100
23  Cape Girardeau, MO 63703
(573) 331-8832
24

25  Proceedings Recorded by Electronic Recording

```
1                    APPEARANCES

2
     For Plaintiffs:
3
     MR. ANTHONY E. ROTHERT
4    MR. GRANT R. DOTY
     American Civil Liberties Union of
5    Eastern Missouri
     454 Whittier Street
6    St. Louis, MO 63108

7

8    For Defendant:

9    MR. JOHN YOUNG, JR.
     MR. NEAL B. GRIFFIN
10   Stinson and Morrison
     7700 Forsyth Boulevard
11   Suite 1100
     St. Louis, MO 63105
12
              And
13
     JOSEPH L. GOFF, SR.
14   Reeves and Goff, P.C.
     550 Maple Valley Drive
15   P.O. Box 189
     Farmington, MO 63640
16

17

18

19

20

21

22

23

24

25
```

1                       I N D E X

2                                              Page

3                   September 11, 2013

4

5   FRANK ANCONA:
      DIRECT EXAMINATION BY MR. ROTHERT          8
      CROSS-EXAMINATION BY MR. YOUNG            23
6     REDIRECT EXAMINATION BY MR. ROTHERT       55

7   GREGORY CAMP:
      DIRECT EXAMINATION BY MR. YOUNG           69
8     CROSS-EXAMINATION BY MR. ROTHERT          95

9   SEAN RONEY:
      DIRECT EXAMINATION BY MR. YOUNG          122
10    CROSS-EXAMINATION BY MR. ROTHERT         129

11  DAVID BRAMMEIER:
      DIRECT EXAMINATION BY MR. YOUNG          132
12    CROSS-EXAMINATION BY MR. ROTHERT         167
      REDIRECT EXAMINATION BY MR. YOUNG        187

13

14  Plaintiff's Argument                       188
    Defendant's Argument                       204

15

16

17

18

19

20

21

22

23

24

25

## <u>EXHIBIT INDEX</u>

Plaintiff's

| <u>Exhibit</u> | <u>Description</u> | <u>Id</u> | <u>Rec'd</u> |
|---|---|---|---|
| A | Complaint | 9 | |
| B | Flyers | 10 | 11 |
| D | Letter | 14 | 15 |
| E | Ordinance | 17 | 17 |
| F | Photo | 19 | 22 |
| G | Photo | 19 | 22 |
| H | Photo | 19 | 22 |
| I | Photo | 19 | 22 |
| J | Photo | 19 | 22 |
| K | Photo | 19 | 22 |
| L | Photo | 19 | 22 |
| M | Photo | 19 | 22 |
| N | Photo | 20 | 22 |
| O | Photo | 20 | 22 |
| P | Photo | 20 | 22 |
| Q | Photo | 20 | 23 |
| R | Photo | 20 | 23 |
| S | Photo | 20 | 23 |
| T | Photo | 20 | 23 |
| U | Photo | 20 | 23 |
| V | Ordinance | 56 | 56 |
| W | Douma Affidavit | 57 | 66 |
| X | Burden Affidavit | 57 | 66 |

Deft's

| <u>Exhibit</u> | <u>Description</u> | <u>Id</u> | <u>Rec'd</u> |
|---|---|---|---|
| 1 | Ordinance | 76 | |
| 2 | Letter | 79 | 80 |
| 3 | Letter | 80 | 81 |
| 4 | Brammeier Report | 140 | 141 |
| 5 | Ordinance | 46 | 86 |
| 6 | Resolution | 92 | 93 |
| 7 | Adopting Ordinance | 93 | 95 |

4

1              (THE PROCEEDINGS BEGAN AT 11:32

2    A.M.)

3              THE COURT:  Well, good morning.

4    Again, I do apologize for the late start.  I did

5    not plan that we were going to have those

6    hearings this morning, but those things happen.

7    So I am sorry about that, but we are now here for

8    the case of Traditionalist American Knights of

9    the Ku Klux Klan versus City of Desologe,

10   Missouri.

11              And I want to let counsel know that

12   we are recording this.  Everything is being

13   recorded through our -- it's called an FTR gold

14   system.  So it's very important to speak into the

15   microphones, otherwise we cannot pick up what is

16   going on here.  The microphone that's here,

17   obviously the witness microphone works, and the

18   microphone that's here at the -- in front of the

19   clerk works, and the one at the podium does.  So

20   when you're questioning witnesses or making

21   argument, please step up to the podium to speak

22   into that microphone.

23              And at this time what I would like

24   is for counsel to announce your presence and who

25   you're representing so that we have that

1    information on the record, and you'll have to

2    step up to the podium to do that.

3              MR. ROTHERT:  Your Honor, I'm

4    Anthony Rothert, and I'm here together with Grant

5    Doty, and we represent the Plaintiff in this case

6    who are the Traditionalist American Knights of

7    the Ku Klux Klan.

8              THE COURT:  All right.  Thank you.

9              MR. YOUNG:  Good morning, Your

10   Honor.  John Young on behalf of the City of

11   Desologe.  Neal Griffin for the City of Desologe.

12   And Joe Goff, Sr. is here for the City of

13   Desologe as council member.

14             THE COURT:  All right.  Thank you.

15   Well, we are here before the Court today because

16   the Plaintiffs are asking for a preliminary

17   injunction in this matter.

18             At this point you may begin

19   presenting your evidence.

20             MR. ROTHERT:  As a preliminary

21   matter, Your Honor --

22             THE COURT:  Yes.

23             MR. ROTHERT:  -- we filed a motion

24   to exclude any witnesses from the courtroom.

25             THE COURT:  You did, and I do recall

```
 1    that, and I will go ahead and grant that motion.

 2    So if there are witnesses that will be

 3    testifying, there's a room out there that you can

 4    use to wait until you're called.

 5               MR. YOUNG:  Your Honor, Mr. Greg

 6    Camp is the city administrator of the City of

 7    Desologe, and he'll be our representative --

 8    party representative for the City of Desologe.

 9               THE COURT:  Okay.  He'll be allowed

10    to remain.  All right.

11               MR. YOUNG:  All of our witnesses are

12    out here.

13               THE COURT:  Okay.

14               MR. ROTHERT:  Our first witness will

15    be Frank Ancona.

16               THE COURT:  All right.  You'll need

17    to step up here and be sworn in.

18                    FRANK ANCONA,

19    being produced and sworn, testified as follows:

20               THE CLERK:  Please state your name

21    and spell it for the record.

22               THE WITNESS:  Frank Ancona.

23    A-n-c-o-n-a.

24               THE COURT:  And you'll be seated

25    right up here.
```

```
 1

 2

 3                    DIRECT EXAMINATION

 4   BY MR. ROTHERT:

 5        Q.   Mr. Ancona, it's going to be important

 6   that you speak directly into the microphone.

 7        A.   Okay.

 8        Q.   Thank you.  Could you state your name

 9   for the record, please.

10        A.   Frank Ancona.

11             MR. ROTHERT:  If I have an exhibit,

12   may I approach the witness with it?

13             THE COURT:  Oh, yes.  Yes.

14   Absolutely.

15             MR. ROTHERT:  And I have a binder of

16   all the exhibits for you to use for the Court.

17             THE COURT:  All right.  Sure.  That

18   would be great.  All right.  Thank you.

19             MR. ROTHERT:  And I have a copy to

20   give to opposing counsel.

21             THE COURT:  I was going to ask to

22   make sure that also they have it.

23             MR. YOUNG:  Your Honor --

24             THE COURT:  Yes.

25             MR. YOUNG:  -- while we're doing
```

```
 1   that I can give you a binder of ours, and he can
 2   do the same.
 3               THE COURT:  Oh, that's okay.  I
 4   mean, he's just letting me know.  You have a
 5   binder of your exhibits as well?
 6               MR. YOUNG:  We have a binder for the
 7   Court, and then we'll do the same thing for
 8   opposing counsel.
 9               THE COURT:  Okay.  Great.
10               MR. ROTHERT:  Okay.  That's great.
11               THE COURT:  Okay.
12   BY MR. ROTHERT:
13       Q.  I've handed you what's been marked as
14   Plaintiff's Exhibit A.  Is that the first amended
15   verified complaint that was filed on August 21st,
16   2013?
17       A.  Yes, sir.
18               (Plaintiff's Exhibit No. A,
19   Complaint, was identified.)
20   BY MR. ROTHERT:
21       Q.  Did you review that complaint before it
22   was filed?
23       A.  Yes, sir, I did.
24       Q.  And when was the last time you reviewed
25   it?
```

1        A.   This morning, sir.

2        Q.   And are the facts alleged in that

3   complaint by you true?

4        A.   Yes, sir, they are.

5        Q.   Now, I've handed you what's been marked

6   and opposing counsel what's been marked as

7   Plaintiff's Exhibit B.  Can you tell me how many

8   pages Exhibit B is?

9        A.   Four pages, sir.

10       Q.   All right.  And what is Exhibit B?

11       A.   These are informational flyers that our

12  organization hands out, distributes.

13            (Plaintiff's Exhibit No. B, Flyers,

14  was identified.)

15  BY MR. ROTHERT:

16       Q.   And are those representative of the

17  handbills that you wanted to distribute in

18  Desologe?

19       A.   Yes, sir, they are.

20            MR. ROTHERT:  I move for admission

21  of Exhibit B.

22            THE COURT:  Exhibit B?

23            MR. ROTHERT:  Yes.

24            THE COURT:  Is there any objection?

25            MR. YOUNG:  No, objection, Your

1    Honor.

2                     THE COURT:  Okay.  The Court will

3    admit Exhibit B.  And I believe on here it's B1

4    through B4.

5                     MR. ROTHERT:  Yeah, I got it.  B1,

6    B2, B3 and B4, yes.

7                     THE COURT:  Okay.  Exhibit B will be

8    admitted into evidence.

9                     (Plaintiff's Exhibit No. B, Flyers,

10   was received.)

11   BY MR. ROTHERT:

12        Q.  Drawing your attention to October 2012,

13   during that month did you have occasion to

14   distribute handbills in the City of Desologe?

15        A.  Yes.  Yes, we did.

16        Q.  Did anyone tell you that you had to

17   stop?

18        A.  I believe so, yes.  That was the day we

19   were told that we were in violation of an

20   ordinance.

21        Q.  Okay.  Who told you that you had to

22   stop?

23        A.  I believe that was I think Cpl. Roney.

24                     MR. YOUNG:  Your Honor, I think this

25   is 2012 we're speaking about.

```
 1                      THE COURT:  Yes.

 2                      MR. YOUNG:  My objection is that the

 3      2012 involves the initial ordinances, which was

 4      the subject of the prior lawsuit.  I don't think

 5      it has any relevancy here in this particular case

 6      since we're only involved in what I term the

 7      initial ordinance and the amended ordinance.

 8                      That's already -- the incident and

 9      that ordinance was already subject to Judge

10      Fleissig's decision, so I don't know why we need

11      to go into that today.

12                      THE COURT:  All right.  What's your

13      response to that?

14                      MR. ROTHERT:  The relevance here is

15      what I would expect the testimony to say is that

16      Mr. Ancona and the other members were told that

17      they were soliciting and that soliciting -- that

18      handing out leaflets is soliciting.

19                      And one of the issues as to -- the

20      Defendant has urged that we don't have standing

21      to challenge the provision of the ordinance as to

22      soliciting.  So the fact that they've previously

23      called distributing leaflets soliciting together

24      with the fact that they haven't defined

25      soliciting it's our evidence to show that we
```

1    had -- that we have standing to challenge the

2    soliciting portion of the ordinance.

3              MR. YOUNG:  Your Honor, that still

4    involves a time period and a different ordinance

5    that's already been determined to have been

6    defective, and it's been repealed.  And the two

7    ordinances that are at issue under the verified

8    complaint that's Exhibit A are really what's at

9    issue here.

10             So I don't understand the point

11   that's been made and why it would be relevant in

12   this case.  I'll renew the objection for

13   relevancy.

14             THE COURT:  All right.  If you're

15   just going to limit the questioning -- this is

16   not about -- about that particular ordinance,

17   although -- and I guess my concern is since the

18   enforcement that was going on was of the

19   ordinance that was in place at 2012, I am not

20   quite sure how that translates to whether their

21   distribution -- if they were to distribute now

22   under the current ordinance, whether -- how that

23   would mean that it would be soliciting -- you

24   know, what your case is -- you're making a case

25   whether it was distribution or soliciting.

1               So, you know what, I'm going to go

2       ahead and sustain the objection with regard to

3       what happened in 2012.

4               MR. ROTHERT:  Okay.  I'd like to as

5       to one exhibit -- Exhibit D -- I'd like to make

6       an offer of proof if I could do that.

7               THE COURT:  Yes.  Okay.

8       BY MR. ROTHERT:

9           Q.  I've handed you what's been marked --

10      what's been marked as Exhibit D, Plaintiff's

11      Exhibit D.  Is that the letter your attorneys

12      gave you that they received from the City of

13      Desologe?

14          A.  Yes, sir, it is.

15              (Plaintiff's Exhibit No. D, Letter,

16      was identified.)

17      BY MR. ROTHERT:

18          Q.  And even though it's dated October 30th,

19      2011, was that, in fact, in 2012 that that was

20      received?

21          A.  Yes, sir, it was.

22          Q.  And could you read that portion of the

23      letter.  Just the sentence that says

24      solicitation.

25          A.  Solicitation by definition applies to

1   activities other than selling and includes the

2   activity which your client described to Mr. Camp.

3           MR. ROTHERT:  So I would ask that

4   Exhibit D just for that limited purpose be

5   admitted.

6           MR. YOUNG:  Your Honor, so that the

7   record is clear, I renew my objection to what was

8   the offer of proof.

9           THE COURT:  Okay.  Overruled.  And I

10  will allow the admission of Exhibit D for that

11  limited purpose.

12          (Plaintiff's Exhibit No. D, Letter,

13  was Received.)

14          MR. ROTHERT:  Okay.

15  BY MR. ROTHERT:

16      Q.  Drawing your attention to April 26th,

17  2013, do you remember that date?

18      A.  Yes, sir.

19      Q.  Did you have occasion to go to Desologe,

20  Missouri on April 26th, 2013?

21      A.  Yes, I did.

22      Q.  What did you do in -- while you were

23  there in Desologe on April 26th?

24      A.  I went with several other members, and

25  we began distributing the handbills, some of

1   which you have here in the exhibits.  And within
2   minutes --
3        Q.  Okay.  Where did you -- where did you do
4   that in Desologe?
5        A.  We did that, I believe, it's the corner
6   of Oak, and I can't remember the exact street
7   intersection, but Oak, and it's right in front of
8   the -- where the library and the post office is
9   in Desologe, Missouri.
10       Q.  Okay.  And can you describe what you
11  were doing.  You said you were distributing
12  literature.  How were you distributing it?
13       A.  Well, we were standing on the sidewalk.
14  And as people would approach the stop sign if
15  they had their windows down, we would hold the
16  flyer up, and if they reached their hand out and
17  wanted a flyer, we would step off the sidewalk,
18  hand them the flyer and walk back to the sidewalk
19  again.
20       Q.  And was that -- do you think that was at
21  the corner of Oak and Desologe Drive?
22       A.  That was at the corner of Oak and
23  Desologe Drive, yes, sir.
24       Q.  So did you stop at some point
25  distributing leaflets on April 26th, 2013?

1           A.   We stopped when I was approached by a

2    police officer that said that we were in

3    violation of an ordinance.  He gave me the

4    ordinance number.  And I followed him into city

5    hall to get a copy of that ordinance.

6           Q.   Do you remember -- do you know who the

7    police officer was?

8           A.   I believe it was Cpl. Roney.

9           Q.   And were you -- did he give you a copy

10   of an ordinance?

11          A.   Yes, sir, he did.

12          Q.   I've handed you what's been marked as

13   Plaintiff's Exhibit E.  Is that the copy of the

14   ordinance that you were handed on April 26th,

15   2013 by Officer Roney?

16          A.   Yes, sir, this is.

17                  (Plaintiff's Exhibit No. E,

18   Ordinance, was identified.)

19                  MR. ROTHERT:  I'd move for admission

20   of Exhibit E.

21                  THE COURT:  Any objection?

22                  MR. YOUNG:  No objection.

23                  THE COURT:  All right.  Exhibit E

24   will be admitted.

25                  (Plaintiff's Exhibit No. E,

1    Ordinance, was received.)

2    BY MR. ROTHERT:

3         Q.   Okay.  Once you were given a copy of the

4    ordinance that's marked as Exhibit E, did it seem

5    to you that what you and the other members had

6    been doing was in violation of that ordinance?

7         A.   Yes.  I kind of scanned through it.  But

8    having experience with this type of ordinance

9    before, I scanned through it, and I felt that,

10   yes, if we continued doing it, we would be in

11   violation of the ordinance, and, you know,

12   subjecting ourselves to arrest or prosecution.

13        Q.   So what effect did this have on you, if

14   any?

15        A.   I told all of our members that we needed

16   to leave immediately and cease handing out

17   flyers.

18        Q.   Do you have any concern or fear that you

19   or other members of your organization will be

20   prosecuted for violating the ordinance for your

21   activities of April 26th, 2013?

22        A.   Yes, I do.  Because I was told that they

23   enforce all the laws and all the ordinances on

24   their books.

25        Q.   And your understanding is that law was

1   on the books on April 26th?

2        A.   Yes, sir.  Once I was provided a copy of

3   this.

4        Q.   I've handed you what's been marked and

5   we're giving a copy to opposing counsel of

6   Plaintiff's Exhibits F through U, a group of

7   photographs.  Have you reviewed those photographs

8   before?

9        A.   Yes, sir.  I've reviewed them this

10  morning.

11              (Plaintiff's Exhibit No. F, Photo,

12  was identified.)

13              (Plaintiff's Exhibit No. G, Photo,

14  was identified.)

15              (Plaintiff's Exhibit No. H, Photo,

16  was identified.)

17              (Plaintiff's Exhibit No. I, Photo,

18  was identified.)

19              (Plaintiff's Exhibit No. J, Photo,

20  was identified.)

21              (Plaintiff's Exhibit No. K, Photo,

22  was identified.)

23              (Plaintiff's Exhibit No. L, Photo,

24  was identified.)

25              (Plaintiff's Exhibit No. M, Photo,

```
 1    was identified.)
 2                (Plaintiff's Exhibit No. N, Photo,
 3    was identified.)
 4                (Plaintiff's Exhibit No. O, Photo,
 5    was identified.)
 6                (Plaintiff's Exhibit No. P, Photo,
 7    was identified.)
 8                (Plaintiff's Exhibit No. Q, Photo,
 9    was identified.)
10                (Plaintiff's Exhibit No. R, Photo,
11    was identified.)
12                (Plaintiff's Exhibit No. S, Photo,
13    was identified.)
14                (Plaintiff's Exhibit No. T, Photo,
15    was identified.)
16                (Plaintiff's Exhibit No. U, Photo,
17    was identified.)
18    BY MR. ROTHERT:
19         Q.   Okay.  And are you familiar with the
20    scenes that are captured in those photographs?
21         A.   Yes.  Very familiar.
22         Q.   How are you familiar with those scenes?
23         A.   Well, I have a P.O. Box in Desologe,
24    Missouri, so I drive through these intersections
25    every day on my way to check the mail at my P.O.
```

1    Box.  I also conduct a lot of business in

2    Desologe.  And actually going back and forth from

3    Park Hills to St. Louis.  So I basically travel

4    through here every day.

5          Q.   So do you recognize the scenes that are

6    captured in those photographs?

7          A.   Yes, sir.

8          Q.   And what are they?

9          A.   Those are -- there's pictures of the

10   city hall, the intersection there.  The

11   intersection by the post office and the library

12   where we distribute flyers, and then there's the

13   VFW hall, which is about a block down the street

14   from city hall.

15         Q.   Let me ask you this:  Do all those

16   photographs show streets and intersections in the

17   City of Desologe, Missouri?

18         A.   Oh, yes, every one.

19         Q.   And based on your experience with the

20   area -- familiarity with the area and your review

21   of the pictures, are they an accurate depiction

22   of streets in Desologe?

23         A.   Yes, they are.

24              MR. ROTHERT:  I would move for

25   admission of Exhibits F through U.

1                    MR. YOUNG:   No objection, Your

2      Honor.

3                    THE COURT:   Exhibits F through U

4      will be admitted.

5                    (Plaintiff's Exhibit No. F, Photo,

6      was received.)

7                    (Plaintiff's Exhibit No. G, Photo,

8      was received.)

9                    (Plaintiff's Exhibit No. H, Photo,

10     was received.)

11                   (Plaintiff's Exhibit No. I, Photo,

12     was received.)

13                   (Plaintiff's Exhibit No. J, Photo,

14     was received.)

15                   (Plaintiff's Exhibit No. K, Photo,

16     was received.)

17                   (Plaintiff's Exhibit No. L, Photo,

18     was received.)

19                   (Plaintiff's Exhibit No. M, Photo,

20     was received.)

21                   (Plaintiff's Exhibit No. N, Photo,

22     was received.)

23                   (Plaintiff's Exhibit No. O, Photo,

24     was received.)

25                   (Plaintiff's Exhibit No. P, Photo,

1    was received.)
2                (Plaintiff's Exhibit No. Q, Photo,
3    was received.)
4                (Plaintiff's Exhibit No. R, Photo,
5    was received.)
6                (Plaintiff's Exhibit No. S, Photo,
7    was received.)
8                (Plaintiff's Exhibit No. T, Photo,
9    was received.)
10               (Plaintiff's Exhibit No. U, Photo,
11   was received.)
12               MR. ROTHERT:  I have no further
13   questions of this witness.
14               THE COURT:  All right.
15                  CROSS-EXAMINATION
16   BY MR. YOUNG:
17        Q.   Good morning, Mr. Ancona.
18        A.   Good morning.
19        Q.   In your first amended verified complaint
20   that's marked Exhibit A it says that the
21   Traditionalist American Knights of the Ku Klux
22   Klan are an unincorporated association; is that
23   correct?
24        A.   That's correct.
25        Q.   So it does not constitute a legal

1    entity; correct?

2         A.   No.

3         Q.   How -- well, first of all, so who are

4    the members of this unincorporated association?

5              MR. ROTHERT:  Your Honor, I have an

6    objection.

7              THE COURT:  Okay.

8              MR. ROTHERT:  I object to any

9    questions about who the members are of the

10   organization.  The U.S. Supreme Court in AACP v.

11   State of Alabama found that there's immunity from

12   state scrutiny of membership lists, which an

13   association claims -- can claim on behalf of its

14   members to protect their private interests and

15   their interests in associating freely without

16   others, and that falls within the protection of

17   the Fourteenth Amendment.  And so on that basis

18   we object.

19             THE COURT:  All right.

20             MR. YOUNG:  Your Honor, it seems to

21   me that I'm entitled to determine that there are

22   members in order to establish that this is a

23   proper party plaintiff.

24             I understand that there are rules

25   that allow an unincorporated association to be a

1  separate party, but I think I'm entitled to

2  understand what -- who and what that party is

3  including, since it's an unincorporated

4  association, an association of what and who.

5              THE COURT:  Are you asking for the

6  names of the members?

7              MR. YOUNG:  Well, I guess --

8  initially, yeah -- well, maybe I ought to ask how

9  many members there are.

10              THE COURT:  That might be a good way

11  to go about it.

12              MR. YOUNG:  Because I'm not looking

13  for hundreds of names, by any means.

14              THE COURT:  Right.  Yes.

15              MR. ROTHERT:  Our objection is only

16  to the names.

17              THE COURT:  That's what I assumed.

18              MR. YOUNG:  Okay.

19              THE COURT:  So I think you can get

20  the information regarding the association without

21  the names.

22              MR. YOUNG:  Okay.  I will do that,

23  Your Honor.

24              THE COURT:  Okay.

25  BY MR. YOUNG:

1      Q.   How many members does the Ku Klux Klan
2   here have that's the Plaintiff?
3      A.   I couldn't give an accurate estimate of
4   the numbers right now at this point.  That
5   changes daily.
6      Q.   Well, what's the last accurate number
7   you could give?
8      A.   I don't really keep a tally of
9   membership.
10      Q.   Do members pay any dues?
11      A.   They do pay donations to help defray
12   costs for printing flyers, mailing information
13   packets to people, things like that.
14      Q.   And is there a certain sum that's
15   required that they donate for those kinds of
16   efforts at some certain point in the year?
17      A.   There is $35 per year.
18      Q.   All right.  And the last time that you
19   collected $35 from members how many members were
20   there?
21      A.   I couldn't tell you that.  I don't know.
22      Q.   Now, you're the Imperial Wizard of the
23   Ku Klux Klan that we're talking about in this
24   case; right?
25      A.   Yes, sir, I am.

1      Q.   And does that mean you're the head --

2   the person who runs the show in this group?

3      A.   Yes, sir.

4      Q.   And you're not able to give me any

5   estimate of the number of members in this group?

6      A.   No, sir, I'm not.  That's not part of my

7   duties as to count the members.

8      Q.   What is involved in determining who is

9   actually a member of this Plaintiff

10   unincorporated association?

11      A.   What is involved?

12      Q.   What do you require of someone before

13   you say they're a member of this Plaintiff

14   association?

15      A.   Well, they're required that they fill

16   out an application.

17      Q.   Okay.  And do you have records of those

18   member applications on file somewhere?

19      A.   I may have some.

20      Q.   Do you have some kind of a contact list

21   to the members that identifies the members for

22   purposes of your communications about your

23   message?

24      A.   I have a list of the people that I need

25   to speak to that are in charge.  I'm the national

1    leader.  So I have state leaders.  They in turn

2    have people under them.  So I don't have a list

3    of every single member in the organization.

4            I don't actively speak with every member

5    of the organizations.  You know, it's a loosely

6    ran organization basically based on ideals.

7        Q.  All right.  Now, you said that you're

8    the head -- you're the head of the national

9    association; is that right?

10       A.  The Imperial Wizard is the term, yes.

11       Q.  And so are the members of your group

12   national in scope?

13       A.  Yes, they are.

14       Q.  And do you have any estimate of the

15   number of members in your organization?  Is it

16   less than 50?

17       A.  No.  It's not less than 50.

18       Q.  Okay.  Is it more than 100?

19       A.  Yes.  It's more than 100.

20       Q.  Is it more than a thousand?

21       A.  I couldn't give you an accurate

22   estimate, so I don't want to give a number out.

23       Q.  Well, tell me the top number you think

24   you could give me an accurate estimate of between

25   100 and 100,000.

1          A.   I really can't recall a number right

2     now.

3          Q.   How does the Traditionalist American

4     Knights of the Ku Klux Klan relate to what is

5     sort of commonly known in the press as the Ku

6     Klux Klan on a national scope?

7          A.   How does it relate to the press -- well,

8     what the press calls the Ku Klux Klan is

9     basically misinformation, propaganda, slander,

10    smears, so we don't relate to that at all.

11         Q.   Okay.  What I'm trying to understand is

12    is there -- are there other Ku Klux Klan national

13    organizations in the country?

14         A.   I couldn't tell you.  I can only speak

15    for Traditionalist American Knights of the Ku

16    Klux Klan.  I believe we are the only Ku Klux

17    Klan in my estimation.

18         Q.   Okay.  Let me direct your attention to

19    Paragraph 12 of Exhibit A before you.  In

20    Paragraph 12 it says that -- it says the Ku Klux

21    Klan for short form -- and that's what I'm going

22    to refer as to your Plaintiff organization

23    here --

24         A.   Okay.

25         Q.   -- describes itself as a white patriotic

1    Christian organization.  What -- can you describe
2    to the Court what that is, what that means.
3         A.   It's pretty self-explanatory.  It's an
4    organization comprised of white Christian
5    patriots, people who care about their nation and
6    their race.
7         Q.   Okay.  So the membership is solely
8    white; is that right?
9         A.   Yes, it is.
10        Q.   And how do you determine race for
11   purposes of your membership?
12        A.   Well, I can -- we don't do DNA testing,
13   so --
14        Q.   That didn't answer my question.  I'm
15   trying to understand how you determine who can be
16   a member.
17        A.   The same way you determine if someone is
18   white.  I look at them, and if they look white, I
19   would -- like you look like you might be a white
20   man.  My attorneys look white.  So that's
21   basically how I do it.
22        Q.   All right.  If someone is Hispanic, can
23   they be part of the organization?
24        A.   Well, there's qualifications on the
25   application, and if you don't meet the

30

1    qualifications, you can't be a member.

2         Q.   What are those qualifications on the

3    application?

4         A.   I don't have an application in front of

5    me right now, so I really can't tell you, but,

6    yeah, you do have to be a white person, and you

7    have to be over 18.  You have to be a Christian.

8    You have to believe that Jesus Christ is the son

9    of God, that he was raised from the dead on the

10   third day.

11        Q.   All right.

12        A.   You have to believe in the basic tenets

13   of Christianity and the teachings of the holy

14   bible.  Those are -- you cannot be a homosexual

15   or have homosexual thoughts.

16        Q.   Do you --

17        A.   So we're an exclusive organization.

18   We're not inclusive.

19        Q.   You're an exclusive organization --

20        A.   Kind of like a lot --

21        Q.   -- not inclusive:  Is that what you

22   said?

23        A.   Yeah, exactly.

24        Q.   Does someone who's Christian have to be

25   an active member of a particular congregation in

1   order to qualify?

2        A.   That's between them and God.  We just

3   ask them if they believe in the basic tenets of

4   the Christian religion.  If they answer yes,

5   they've met our qualification for that.

6        Q.   Okay.  Now, you go on in that same

7   sentence it says that your organization the Ku

8   Klux Klan bases its roots back to the Ku Klux

9   Klan of the early 20th century.

10       A.   It's Ku Klux Klan.

11       Q.   What does that phrase mean?

12       A.   It's Ku Klux Klan, not Ku Klux Klan.

13       Q.   I'm sorry.  I mispronounced it?

14       A.   Yes.

15       Q.   I'm sorry.

16       A.   Well, what that means is that the Ku

17   Klux Klan was revived by Colonel William Joseph

18   Simmons on Thanksgiving Eve in 1915.  And he

19   wrote a constitution and laws based on the

20   original prescripts of the Klan.  He wrote the

21   ceremonies and rituals that the Klan uses, which

22   are the ritual books for the Klan are called

23   Klorans.  So he wrote those ritual books.  So we

24   base our organization on those -- his

25   constitution, laws, and those teachings and

1    ceremonies.  We try to preserve those.

2         Q.   Okay.  So do you have copies of those

3    materials that you follow as your basis for your

4    tenets?

5         A.   Yes.  I have some historical copies of

6    those, yes.

7         Q.   If someone is a Catholic, can they

8    belong to your organization?

9         A.   Yes, they can.  In fact, my Missouri

10   chaplain is a Catholic, as a matter of fact.

11        Q.   When did you form this particular

12   unincorporated association?

13        A.   It was -- I mean, it's been around for a

14   long time under various different names, but, I

15   mean, as far as under the name Traditionalist

16   American Knights I believe it was around May --

17   somewhere around May 22nd, 2008, but don't hold

18   me -- that's my best guess on that date.

19        Q.   And did you form the organization

20   yourself?

21        A.   I and other individuals who were

22   associating with each other.

23        Q.   Are women allowed in the organization?

24        A.   Yes, they are.

25        Q.   Now, going on in that same Paragraph 12,

1    it says that you're -- the Ku Klux Klan is a

2    non-violent organization that believes in the

3    preservation of the white race.  What does that

4    mean?

5         A.   Well, it means we do not commit acts of

6    violence, and we believe in perpetuating our

7    race.  We believe in having children and

8    grandchildren, white ones.

9         Q.   Among white people only?

10        A.   Right.  We don't believe in -- we

11   believe, you know, that God created all the

12   races, and they all have their -- God created all

13   the races for a purpose.

14             And that if you read the creation story

15   of Genesis, after each thing he created, each

16   species, after its kind he saw that it was good.

17   So if God saw that it was good, we see no reason

18   to interfere with what God says is good.

19        Q.   Okay.  It goes on to state also that the

20   organization believes in the preservation of the

21   United States Constitution as it was originally

22   written.  What does that mean?

23        A.   Well, it means we believe in the

24   Constitution as it was originally written by our

25   forefathers that founded this nation.

1          Q.   I'm just curious, does that mean you
2     don't agree with the amendments to the
3     Constitution as it's been amended?
4          A.   No.   No.   The Constitution as it was
5     originally written provided for the Constitution
6     to be amended, so if they were lawfully enacted
7     amendments, we believe in them.
8          Q.   The leaflets that have been marked as
9     exhibits here, is that the only leaflets that you
10    distribute as flyers, or are there other ones
11    with different contacts?
12         A.   That's -- at that particular flyer drive
13    I really don't know, but, yeah, we do have other
14    flyers.
15         Q.   Generally, can you describe for me what
16    the content of the other flyers is.
17         A.   Well, we have -- in one of the flyers we
18    distributed in Desologe had to do with the Second
19    Amendment.   That was -- in fact, that was one of
20    the biggest ones we did at the last flyer drive
21    we were pushing because of all the proposed gun
22    law legislation.
23              So we had a Second Amendment flyer that
24    we put together, and we were -- I believe that
25    was probably the main flyer that we passed out.

1      Q.   Any other topics that --

2      A.   We've got flyers that have to do with

3  drug dealing and pedophiles, you know, that

4  letting people know that we're keeping an eye out

5  for those type of people in our neighborhoods and

6  that we will alert law enforcement basically if

7  we see those type of activities.

8      Q.   Have any of these activities of the

9  members of the Plaintiff organization led to any

10  violent confrontations?

11      A.   No.

12      Q.   Are you a resident of Desologe?

13      A.   No.

14      Q.   You only have a post office box in

15  Desologe; is that right?

16      A.   Yes.  Actually, it's -- the P.O. Box

17  says Park Hills, Missouri.  I guess that's the

18  actual address, but it's at the Desologe Post

19  Office.

20      Q.   Okay.  Are there other members of the

21  Plaintiff Ku Klux Klan that are residents of

22  Desologe?

23      A.   Yes, I'm sure there are.

24      Q.   Now, as Imperial Wizard of the Ku Klux

25  Klan here that's the Plaintiff what is your role?

1          A.    Here?

2          Q.    Let me rephrase the question.

3     Apparently, you didn't understand it.

4               What's your role as the Imperial Wizard

5     of the particular Plaintiff association here?

6          A.    Well, I basically make all the decisions

7     for the organization as a whole on a national

8     level, so I run the national organization.

9               The state leaders have fairly free reign

10    to run the states, which we call realms.   The

11    Grand Dragons run the realms as they see fit as

12    long as it's in keeping with our constitution and

13    laws, which we have a constitution and laws,

14    again, that was written by Colonel Joseph Simmons

15    in 1924 that we adhere to with the exception of a

16    few amendments, which we've amended, you know, to

17    reflect the times like as far as voting it

18    doesn't have to be done by mail anymore, and it

19    can be done by e-mail and just to update to the

20    times.

21               THE COURT:   Did you say the states

22    are called rooms?

23               THE WITNESS:   Realms.

24               THE COURT:   Realms.   R-e-a-l-m-s.

25               THE WITNESS:   Realms, yes.

1            THE COURT:  Okay.  Thank you.

2   BY MR. YOUNG:

3       Q.   And what are your duties then as the

4   national Imperial Wizard?

5       A.   Well, I just set the direction that I

6   believe the organization needs to go.  You know,

7   I try to write content as far as flyers that I

8   feel need to be distributed based on the calls

9   that we're getting from the public to our

10  hotline.

11           You know, I make sure that the members

12  are performing the ceremonies and rituals that

13  are prescribed by the Klan in accordance with the

14  Kloran.  It's K-l-o-r-a-n.  Kloran.  We make sure

15  that they are performing the rituals properly.

16           We have signs, ceremonies.  You know,

17  and we make sure that they're doing those

18  properly -- that's my duty to make sure those are

19  done properly so that we preserve those

20  ceremonies throughout history.

21      Q.   So what relationship does the Plaintiff

22  association have with any other groups that say

23  that they are associated with the Ku Klux Klan?

24      A.   We really have no -- if you're talking

25  about like an alliance with another organization,

1    we have none.

2        Q.   Okay.

3        A.   You can see that by looking on the

4    internet there.  They kind of bash us.

5        Q.   Why do they bash you?

6        A.   Well, I guess because we're not hateful

7    enough.  We're not a hate group.  You know,

8    there's pictures of me on the internet with a man

9    named Daryl Davis, a black man, who came to one

10   of our rallies.  I went and had lunch with him at

11   Blake's Barbecue there in Desologe and then

12   invited him to one of our rallies where he

13   mingled with several members and attended a cross

14   lighting ceremony with us.  So based on those

15   pictures and that special that was on National

16   Geographic I'm a traitor.

17       Q.   So have the members of your group and

18   yourself distributed leaflets in any other towns,

19   cities or municipalities other than Desologe?

20       A.   Many.  Yes.  Not just in Missouri but in

21   several other different states as well.

22       Q.   Has that occurred this year?

23       A.   Yes.

24       Q.   Do you remember if you were distributing

25   leaflets within the roadways of Park Hills this

1   year?

2         A.   Yes, we did.

3         Q.   Was one of your members struck by a

4   motor vehicle while being out in the roadway

5   distributing leaflets this year?

6         A.   I don't know of any member being struck

7   by a motor vehicle.

8         Q.   You don't know of an instance where one

9   of your members was hit by a door of a car --

10        A.   No, I don't.

11        Q.   -- while the car traveled through the

12   roadway by that man?

13        A.   I don't know if the member was hit by a

14   door, but I think the member tripped and fell is

15   what I understand, but I don't know.  I don't

16   know.  You're asking me about something I really

17   don't have full knowledge of it.

18        Q.   Did the member trip and fall within the

19   roadway?

20        A.   Again, I don't know.  I wasn't there.  I

21   wasn't standing where he was at.  I was talking

22   with other people, and so --  I just basically

23   seen the guy getting up off the ground, but that

24   was in Park Hills, Missouri, yes.

25        Q.   Have there ever been any other instances

1    where members who were distributing within

2    roadways in other cities were struck by motor

3    vehicles?

4         A.   No.

5         Q.   Okay.

6         A.   And this guy -- no one was struck by a

7    motor vehicle, I don't believe.  I don't -- that

8    sounds like a false --

9         Q.   Do your members wear Klan robes and

10   hoods in the normal course of delivering your

11   message?

12        A.   We have some members that will wear

13   regalia of the organization.  Most of the time

14   that's reserved for rituals and ceremonies, but

15   we do from time to time wear the regalia.

16        Q.   Have you had members of your

17   organization wear their Klan robes and hoods

18   while soliciting within the roadway in Desologe?

19        A.   Well, you're calling it soliciting.  I

20   call it handing out literature, but --

21        Q.   I'm sorry.  Let me rephrase the question

22   so the record is clear.

23             Have you had members wear their Klan

24   robes and hoods while distributing leaflets

25   within the roadway in Desologe?

1        A.   Yes, we have.

2        Q.   No official or policeman from Desologe

3   ever threatened to put you in jail because of the

4   pundit that you were involved in on that

5   particular day that you had that communication

6   with that person, did they?

7        A.   No one threatened to put me in jail.

8   They just read the ordinance to me and what the

9   punishments were -- the prescribed punishments

10  were on the ordinance.

11       Q.   And did anyone from Desologe ever

12  threaten to fine you as a result of your conduct

13  on a particular day?

14       A.   Well, I was told that they would enforce

15  all the ordinances.  When I asked if this -- I

16  stated the ordinance, which I -- the first

17  ordinance I felt was unconstitutional I was told

18  that regardless they would be enforced.

19            So now, if you look at the punishments

20  for violating those ordinances, they include

21  fines and jail, so no one specifically told me

22  that, but I read it in the ordinance.

23       Q.   With regard to the ordinance that's at

24  issue today, which is the amended ordinance --

25  well, are you familiar with the ordinance that's

1   No. 2013.09, the most recent ordinance that

2   Desologe passed that's the subject of this

3   lawsuit?

4          A.   I'm seeing on my copy 2013.04.

5          Q.   Okay.  I'm asking you about the

6   subsequent ordinance.  Are you familiar with that

7   ordinance?

8          A.   Not really.  I'm not a law scholar.  I

9   didn't go to school for that.

10         Q.   Okay.  So you've not had a chance to

11  read the Ordinance Number 2013.09?

12         A.   All I know is I read the ordinance.

13              THE COURT:  Yes.  Yes.  Hold on.

14  I'm sorry.  Your lawyer is making an objection or

15  a statement.

16              MR. ROTHERT:  I object to the

17  characterization he hasn't had a chance to read

18  it.  We have had it marked as an exhibit, but we

19  haven't introduced it yet.  You can give it to

20  him to read now if you would like now.

21              THE COURT:  Your question was is he

22  aware or had he read this ordinance; correct?

23              MR. YOUNG:  The Ordinance 2013.09.

24              THE COURT:  The newest -- the

25  amended ordinance.

1               MR. YOUNG:  That's right.  That's

2    really all my question is.

3               THE COURT:  That's the question.

4    Okay.  You can answer that question.

5               THE WITNESS:  So that's no, because

6    I don't have a copy of that.

7    BY MR. YOUNG:

8         Q.  Okay.  Let me make sure you understand

9    my question.

10              THE COURT:  Right.

11   BY MR. YOUNG:

12        Q.  Prior to you getting on the stand and

13   testifying today, have you read the ordinance

14   2013.09 that I'll refer to as the amended

15   ordinance?

16        A.  Is that the ordinance that Officer Roney

17   gave me the day that we were at the flyer drive?

18        Q.  I don't believe so.  It's the ordinance

19   that I gave to your counsel after it was passed

20   in August of 2013.

21        A.  Then I'm sure I read it, yes.

22        Q.  Okay.

23        A.  But, you know, I do not have a

24   photographic memory, so --

25        Q.  After you read that and after that

44

1    ordinance was passed in August of 2013, has

2    anyone from Desologe -- whether an official or

3    policeman -- threatened to jail or fine you as a

4    result of any activity of the -- of you or the

5    organization?

6         A.   As of what date was that now?

7         Q.   In August of 2013 when that was passed.

8         A.   We haven't been back out to distribute

9    flyers since then, so, no, we haven't.

10        Q.   Okay.

11        A.   But the ordinance states that -- if it's

12   the same one I'm thinking of, it states that

13   there's penalties, fines, including jail time and

14   fines for violating, so I'm assuming if I stepped

15   off the sidewalk on to the street and handed

16   someone a flyer, I would be in violation of that

17   ordinance.

18              MR. YOUNG:  May I approach the

19   witness?

20              THE COURT:  Yes, you may.

21   BY MR. YOUNG:

22        Q.   So the record is clear, let me direct

23   your attention to what's been marked as

24   Defendant's Exhibit 5.  And take a look at that,

25   and I want to ask and make sure that you've had a

45

1  chance to read this ordinance before you've taken

2  the stand today.

3       A.   I believe I have, yes.

4            (Defendant's Exhibit No. 5,

5  Ordinance, was identified.)

6  BY MR. YOUNG:

7       Q.   Pardon?

8       A.   I believe I've read this one, yes.

9       Q.   And there's nothing in that ordinance

10 that says anything about jail or fine; is that

11 correct?

12      A.   I don't see anything in here, no.

13      Q.   Okay.  So this ordinance shows that it

14 was passed on August 12th of 2013; is that

15 correct?

16      A.   Yes.

17      Q.   Since that time have you or the

18 organization we've talked about as the Ku Klux

19 Klan here today taken any actions that were

20 stopped or you were warned about by anybody in

21 Desologe?

22      A.   No.  We haven't had a chance to go back

23 out yet.

24      Q.   Now, you have no professional background

25 as a traffic safety engineer, do you?

1          A.   No, I don't.

2          Q.   And you have no qualifications to

3    determine if you or your members are safe while

4    you're present within roadways of Desologe --

5          A.   Oh, yeah, I think I do have

6    qualifications.

7          Q.   Excuse me.  Let me finish my question,

8    please.

9               THE COURT:   And I will just mention

10   this.  Please try not to talk at the same time,

11   because everything is being recorded, and we

12   can't get it.  So allow him to finish his

13   question before you start answering:  Okay?

14              THE DEFENDANT:   Yes, Your Honor.

15              MR. YOUNG:   Thank you, Your Honor.

16   BY MR. YOUNG:

17         Q.   Let me start that question over again.

18   You have no qualifications to determine if you or

19   your members are safe while you're present within

20   the roadways of Desologe, do you?

21         A.   Yes, I believe I do have qualifications.

22   I'm 48 years old.  I've been crossing streets for

23   probably, what, 47 years.  I can't remember the

24   exact date I started walking, but at least since

25   I was in kindergarten, you know, five years old I

1   was crossing roadways, and I've never been struck

2   by a vehicle.

3           I've been doing these types of

4   literature distributions for several years, never

5   been struck by a vehicle.  So I think I'm

6   qualified to determine whether I'm safe when I

7   cross a street or not.

8           And in this case we don't even cross a

9   street.  A car comes to a stop sign, they hold

10  their hand out for a flyer.  We step up to the

11  vehicle.  And so the vehicle is stopped at a stop

12  sign, and we hand them the flyer, and we walk

13  back.  So I think we're all intelligent enough to

14  determine that.

15      Q.   Let me ask this question:  I'll come

16  back to your qualifications in a minute.

17      A.   Are you saying I'm not qualified?

18      Q.   Are you telling me that under no

19  circumstances has a member of the organization

20  that's the Plaintiff here, the association, had a

21  member stand and continually stand in the street

22  while there's a stream of cars coming up to a

23  stop sign or to a stop traffic signal where they

24  stay out in the street as additional cars go by?

25      A.   Not that I know of, no.

1          Q.   You're saying that's not happened?

2          A.   Not that I've seen.

3          Q.   That stands out there?

4          A.   Not that I've seen.

5          Q.   Really?

6          A.   Not that I've seen.  Exactly.

7               I mean, I pay -- you know, everybody

8     that's out there passing out flyers is

9     responsible for making sure they're safe and that

10    they do it in a safe manner.  So when I'm handing

11    out flyers, I'm watching out for my own safety,

12    so I'm not necessarily seeing everything every

13    person is out there doing.

14         Q.   Does the Ku Klux Klan that's the

15    Plaintiff association here have any written

16    policies regarding how the members are to conduct

17    themselves in roadways while distributing

18    leaflets?

19         A.   No.

20         Q.   Let's go back to your qualifications a

21    minute.  You have no specialized training

22    regarding the safety of pedestrians or people in

23    roadways; is that correct?

24         A.   Again, I've got 47 years of experience.

25    It's personal.

1        Q.   I asked if you have specialized

2    training.

3        A.   That's your opinion.  My opinion is I

4    have 47 years of training, life experience

5    crossing streets and standing on sidewalks.

6        Q.   I'm sorry.  I'll try not to talk over

7    you.  Do you have an engineering degree?

8        A.   No, I don't.

9        Q.   What do you do for a living?

10        A.   I'm an independent contractor.

11        Q.   In what area?

12        A.   In transportation.

13        Q.   You run a truck for people?

14        A.   Delivery service.

15        Q.   Delivery service?

16        A.   Uh-huh.

17        Q.   Okay.  So have you ever had any kind of

18    specialized training regarding the safety of

19    pedestrians, and I'm talking about classes or

20    courses or degrees in that type of area?

21        A.   I've had training as a driver, yes, on

22    safety of pedestrians.  Also, I'm DOT -- or not

23    the -- what do you call it -- TSA certified,

24    so --

25        Q.   But you've really not had any training

1     that where you've had educational training about

2     safety within roadways for pedestrians; right?

3          A.   Not in a school, no.  On the street of

4     hard knocks, yes.

5          Q.   It is true, isn't it, that under the

6     ordinance that's marked Defendant's Exhibit 5

7     that you and your members can distribute

8     literature from the tops of curbs; is that

9     correct?

10               MR. ROTHERT:  Your Honor, I object

11    on the basis it's calling for a legal conclusion

12    for him to interpret the ordinance --

13               THE COURT:  All right.

14               MR. ROTHERT:  -- to interpret what

15    it means when it defines roadway.

16               THE COURT:  All right.  I will

17    overrule the objection based on the question that

18    he asked.

19    BY MR. YOUNG:

20          Q.   Can you answer?

21          A.   Well, if you look at the picture on

22    Plaintiff's Exhibit F, and you look at the

23    sidewalk here, and you look at the street, the

24    person that comes up to the stop sign, there's no

25    way unless I had arms that were maybe 12 feet

1   long that I could reach to a person's car without

2   stepping off the sidewalk.  So, no, there's no

3   way that could be done.

4        Q.   If the car came over close enough to the

5   top of the curb or the sidewalk, you could hand

6   that into the car that was parked there; is that

7   correct?

8        A.   If they did that.  I don't know.  You

9   know, you're speculating on how people are

10  driving out there.  I don't know.  In my

11  experience they stay on the street.  They don't

12  drive over on to the curb.  They stay on the

13  street at the stop sign.

14       Q.   Is it possible for you to distribute

15  literature from the city parking lot or within

16  the city parking lot?

17       A.   I don't know who I would distribute the

18  literature to since nobody comes to the parking

19  lot to get literature, but they do come through

20  the intersection, and it's visible there and

21  people can see us.

22       Q.   But it's possible for you to distribute

23  to people in the city parking lot; correct?

24       A.   I don't know.  I don't write the laws

25  for Desologe.  You tell me.

1      Q.   Is it possible for you to distribute

2   literature while standing on any sidewalk in

3   Desologe?

4      A.   Again, I don't know the laws that well

5   in Desologe.  If the police would allow me to do

6   it, I'm sure I could do it.

7      Q.   Okay.  And, finally, it's possible

8   there's -- a large city park in Desologe, isn't

9   there?

10      A.   Yes.

11      Q.   It's possible for you to circulate and

12   distribute anywhere in that park the leaflets; is

13   that right?

14      A.   It's possible, but the place where we

15   reach most people is that intersection, which is

16   basically the post office, the library and, I

17   believe the two businesses that don't even

18   operate there anymore.  The 7-11 is closed down.

19      Q.   And you described that the --

20      A.   But it's still got enough -- there's

21   more visibility there than there is in the park.

22      Q.   And in that instance you have to go out

23   into the roadway where the motor vehicles are

24   being operated in order to distribute your

25   leaflets; is that correct?

1          A.   We may, and we may not.   It depends on

2     where the person stops at.   If they pull up right

3     up to the curb, we may not have to.   If they're

4     stopped on the roadway, like, again, if you see

5     the distance from the sidewalk to the street, no,

6     then we would have to step out onto -- I wouldn't

7     consider it the street.   I would consider it the

8     curb, the shoulder.

9          I mean, I don't know what your legal

10    term for that is, but, so -- I mean, we're not --

11    if I park my car there, I would have to step on

12    to that same space of the street.   Am I violating

13    the law when I do that?   Because I do that every

14    day when I go to Desologe Post Office to pick my

15    mail up.   I park on the street, and I open my car

16    door up, and I step out from my car, and I'm

17    right up on the street.   And I have to walk

18    around my car to the sidewalk.

19         Q.   All I'm trying to get through and make

20    it clear is there are alternative means for you

21    to distribute the leaflets and get your message

22    out other than when you have to be within the

23    roadway; is that correct?

24         A.   Well, there are alternatives, but

25    they're not as good -- they're not as good of

1    visibility as we have there.

2            We have -- that's the most cost

3    effective way for us to distribute the leaflets

4    is at that intersection in the town of Desologe

5    from my studies.  And I do believe I'm qualified

6    to --

7            MR. YOUNG:  All right.  Your Honor,

8    I'm going to ask -- I think he's answered my

9    question.  His run-on answers are more his

10   speech, I guess.

11           THE COURT:  I think that the

12   question has been asked and answered, and, yeah,

13   you can --

14           MR. YOUNG:  I have no further

15   questions at this time, Your Honor.

16           THE COURT:  Okay.  All right.

17               REDIRECT EXAMINATION

18   BY MR. ROTHERT:

19       Q.   Mr. Ancona, you mentioned that there's a

20   favorite intersection in Desologe to distribute.

21   Is that intersection in any of the pictures

22   Exhibits F through U?

23       A.   Let me see it.  There is a picture.  It

24   looks like P is probably the best picture of the

25   intersection that we use.

1            Q.   Okay.

2            A.   And you can see like on the left there's

3       a vacant business here.  And you can see like

4       this big curb.  The sidewalk is -- the sidewalk

5       on the left is -- I don't know -- judging I'll

6       guess, what, 5, 6 feet from the actual street.

7            Q.   All right.

8                 MR. ROTHERT:  I have no further

9       questions.

10                THE COURT:  Okay.

11                MR. YOUNG:  I have nothing further.

12                THE COURT:  All right.  You may step

13      down.

14                MR. ROTHERT:  Your Honor, we would

15      like to move for admission of Plaintiff's Exhibit

16      V, which is a certified copy of Ordinance Number

17      2013.09.  It's the same as Exhibit 5.

18                (Plaintiff's Exhibit No. V,

19      Ordinance, was identified.)

20                THE COURT:  Oh, that's 5.  Okay.

21                MR. YOUNG:  I have no objection,

22      Your Honor.

23                THE COURT:  Exhibit V will be

24      admitted into evidence.

25                (Plaintiff's Exhibit No. V,

1   Ordinance, was received.)

2                   MR. ROTHERT:  The rest of our

3   testimony will be by -- our further testimony or

4   our other witnesses will be by affidavit.

5                   THE COURT:  Okay.

6                   MR. ROTHERT:  We have two additional

7   witnesses.  Exhibit W is the affidavit of Frank

8   Douma from the University of Minnesota.

9                   (Plaintiff's Exhibit No. W, Douma

10  Affidavit, was identified.)

11                  MR. ROTHERT:  And Exhibit X is the

12  affidavit of Daniel E. Burden, a walkability and

13  active transportation technical assistance

14  provider.

15                  (Plaintiff's Exhibit No. X, Burden

16  Affidavit, was identified.)

17                  MR. ROTHERT:  And their

18  qualifications and their testimony is set

19  forth in Exhibits -- sorry -- W and X.  So I

20  would move for admission of Exhibits W and X.

21                  THE COURT:  All right.  Mr. Young.

22                  MR. YOUNG:  Your Honor, it's a

23  motion for preliminary injunction.  This is not a

24  temporary restraining order.  I don't think an

25  affidavit is appropriate.  I think live testimony

1    is the only thing that is permitted.  And I think

2    that this denies us any opportunity to confront

3    these witnesses or to cross-examine any

4    witnesses.

5              So I'd ask the Court to deny the

6    admission of these.  We have no opportunity to

7    cross these, and there's no reason the Court

8    should have to accept these as if they are

9    properly admitted.

10             THE COURT:  All right.

11             MR. ROTHERT:  I have three

12   responses.  First, as a matter of law that is --

13   it's just incorrect.  Hearsay affidavits are

14   allowed in preliminary injunction hearings.

15   Recently, in ACORN v. Scott the western

16   district -- or the United States District Court

17   for the Western District of Missouri noted that

18   at a preliminary injunction hearing procedures

19   are less formal.  And they cite a -- and that

20   court cited a decision from this court at

21   230 F.Supp.2d. 980 footnote 4 that hearsay

22   affidavits are admissible in a preliminary

23   injunction hearing.

24             Second --

25             THE COURT:  What was that site

1   again?

2               MR. ROTHERT:   The western

3   district court --

4               THE COURT:   What was the Supp -- the

5   cite for this?

6               MR. ROTHERT:   Okay.   It was BeBe

7   Department Stores v. May Department Stores, 230

8   F.Supp.2d. 980.   It's at footnote 4.   That was

9   cited by ACORN v. Scott, which is recorded at

10  2008 WL 278 7931 at footnote 5.

11              The second point is that the Eighth

12  Circuit ruled back in 1974 that by its nature an

13  application for preliminary injunction requires

14  an expeditious hearing and decision.   And in

15  order to overcome the problems that would be

16  created in attempting to gather the necessary

17  witnesses it has often been held that affidavits

18  may be received on a motion for preliminary

19  injunction.

20              That's a direct quote from Wounded

21  Knee Legal Defense/Offense Commission v. Federal

22  Bureau of Investigation, 507 F.2d 1281.   And the

23  pin cite is 1287 through 1280 -- I'm sorry, 1286

24  to 1287.

25              I think that's especially pertinent

1    here where the new ordinance and the consultant

2    report we received about a couple weeks ago and

3    the expedited nature of this hearing is caused by

4    Defendant's decision to have its ordinance go

5    into effect on a quick basis, so we only have a

6    short, short time.

7              And our witnesses -- you know, one

8    is in Minnesota and one is in Hawaii, so

9    they're -- and we got their affidavits last night

10   and this morning, so there would be no way to

11   actually have them here.

12             Third, the 7th Circuit has held

13   directly -- and I'll quote, Affidavits are

14   ordinarily inadmissible at trials, but they are

15   fully admissible in summary proceedings,

16   including preliminary injunction proceedings.

17   That's in Ty v. GMA Accessories, which is

18   recorded at 132 F.3d 1167 at page 1171.  And it's

19   quoting the 11th circuit or citing the 11th

20   Circuit for the same proposition.

21             THE COURT:  All right.  Mr. Young.

22             MR. YOUNG:  Your Honor, first of

23   all, I think this is within the discretion of the

24   Court.

25             These -- I've never seen these until

1    literally just now.  They apparently purport to

2    be expert opinions.  I disagree.  I gave them a

3    copy of Mr. Brammeier's report right at the same

4    time as the ordinance was passed back in August.

5    They've had that time to work with his report.

6    He's going to be here live and testify.  They'll

7    have a chance to cross-examine him.

8                I have no chance to cross-examine

9    these people.  I don't even know who they are.  I

10   don't even know what the topic is.  But it seems

11   to me, Your Honor, this is a little bit of trial

12   by ambush.

13               And while it's a preliminary

14   injunction hearing, that's not necessarily the

15   same thing as a temporary restraining order.  And

16   I think that these kind of affidavits are

17   inappropriate and should not be admitted for the

18   purposes of their being -- I mean, the little bit

19   I looked at it looks like they're taking complete

20   shots at Mr. Brammeier's report with me having no

21   opportunity then -- and so I think we're being

22   denied due process.

23               And this is a significant hearing in

24   that as a result of this the Court makes a

25   determination about the constitutionality of this

                              61

1    particular ordinance.  I just don't -- I think
2    it's inappropriate to try to admit these kinds of
3    affidavits.  I'm not familiar with the cases
4    they're talking about to know whether they're
5    perfunctory affidavits identifying an ordinance
6    or whether they're substantive expert opinions
7    that I have had no chance to test, no chance to
8    look up qualifications.
9              I'd ask the Court to deny admission
10   of these.
11             THE COURT:  And I will say that I'm
12   not familiar with the cases either.  And I am
13   concerned, because they do appear to be expert --
14   affidavits from experts.
15             Do you have cases on point involving
16   affidavits from experts or which purport to give
17   expert testimony?
18             MR. ROTHERT:  Yes.
19             THE COURT:  Because I will tell you
20   I do have a concern about the fact that there is
21   no ability to cross-examine, you know, from their
22   standpoint.
23             MR. ROTHERT:  Well, there is -- I
24   mean, any party can ask for discovery before a
25   preliminary injunction hearing, and we didn't

1    conduct discovery and neither did they or ask for

2    it.

3                    THE COURT:  But the --

4                    MR. ROTHERT:  And also, you know, I

5    just want to correct a fact.  We were not given

6    this report until it was filed with the Court on

7    a Monday before a Thursday hearing.  So we also

8    had no opportunity to cross-examine before the

9    initial hearing.

10                    THE COURT:  I thought that report --

11    that -- wasn't that report available -- I thought

12    we had it.

13                    MR. ROTHERT:  It was attached --

14                    THE COURT:  Yeah.  It was attached

15    to their -- am I correct -- it seems to me that

16    we've had that -- the expert report, and I don't

17    remember how we got it, if it was attached to

18    their response, or something like that.  I'm not

19    quite sure.

20                    MR. ROTHERT:  Yes.  It was filed on

21    Monday -- our original hearing was scheduled for

22    a Thursday.  It was filed that Monday with the

23    Court.

24                    THE COURT:  Right.

25                    MR. ROTHERT:  And we got it when the

1    Court got it.

2              Several of the cases cited in the

3    Wounded Knee case I believe but I can't say for

4    sure have to do with expert testimony.  I just

5    know we've done it several times in several

6    courts without there being objection.  So I don't

7    know the specific case.

8              Also, I believe the cases -- if

9    anything, they -- you know, the affidavits have

10   to be admitted, but you could consider the lack

11   of opportunity to cross-examine and the weight

12   given -- the weight to give to the testimony by

13   affidavit.

14             And, you know, if the preliminary --

15   if the ordinance wasn't going into effect, we

16   would have no objection to continuing the hearing

17   to give an opportunity for discovery.

18             THE COURT:  I understand.

19             MR. ROTHERT:  But it's the

20   Defendant's choice to make that ordinance go into

21   effect.

22             THE COURT:  Okay.  Mr. Young.

23             MR. YOUNG:  The only other thing

24   I'll add is that I think because these are expert

25   witness opinions, and they're particularly

1    attacking a report that they've had, I think we

2    end up without the ability to cross-examine, and

3    it denies due process in the context of this

4    particular decision about the validity of this

5    ordinance.

6              THE COURT:  Okay.  I will -- I will

7    overrule your objection.  And basically I do

8    believe that it will go to the weight of the

9    evidence, not the admissibility of the evidence.

10             In addition, you will -- you do plan

11   to have an expert testifying, or is it just your

12   report, just out of curiosity?  I don't --

13             MR. YOUNG:  Your Honor,

14   Mr. Brammeier is out in the hallway.  He's here

15   ready to testify.  And we'll offer the report as

16   well.

17             THE COURT:  All right.  And you'll

18   offer his report.  And he will have an

19   opportunity, I guess, to see these affidavits.

20   And if there's something you would like to -- you

21   can also use it, you know, with regard to his

22   testimony as well.

23             MR. YOUNG:  I understand.  There's

24   not a lot of time to do that.

25             THE COURT:  So it will go to the

1    weight of the evidence, and so it is overruled.
2    And so the Court will admit the Exhibits W and --
3    it was W and X; correct?
4                   MR. ROTHERT:  W and X, Your Honor.
5                   THE COURT:  Okay.  Those will be
6    admitted into evidence.
7                   (Plaintiff's Exhibit No. W, Bouma
8    Affidavit, was received.)
9                   (Plaintiff's Exhibit No. X, Burden
10   Affidavit, was received.)
11                  MR. ROTHERT:  Can I have just one
12   moment?
13                  THE COURT:  Yes.
14                  MR. ROTHERT:  Plaintiff has no
15   further evidence.
16                  THE COURT:  Okay.  What we're going
17   to do now is we've been going for about an hour
18   now.  We'll take about a ten-minute break.  And
19   then the defense can present their evidence.  All
20   right.
21                  (Proceedings stood in temporary
22   recess.)
23                  THE COURT:  All right.  We're back
24   in session, and you may present your evidence.
25                  MR. YOUNG:  Thank you, Your Honor.

1                    THE COURT:  Mr. Young.

2                    MR. YOUNG:  The first thing I'd like

3     to do is make a motion to dismiss the Plaintiff's

4     unincorporated association.  I don't think it

5     meets the definition based on the testimony that

6     we've heard today, and I think they should be

7     dismissed out of the case.  Obviously, Mr. Frank

8     Ancona would still be a plaintiff, but I'd make

9     that motion at this time.

10                   THE COURT:  All right.  Your

11    response to that?

12                   MR. ROTHERT:  If the Court is

13    inclined to grant that motion, I'd ask for a

14    chance to file a brief in opposition.

15                   The -- I'm trying to remember the

16    name of the case from Washington about that apple

17    industry consumer group.  I think an organization

18    that has -- well, even 20 or 30 members is

19    sufficient for association initial standing if

20    the members of the organization are affected by

21    the ordinance.  And the testimony I think was

22    that there are at least 100 members of the

23    organization here.

24                   Also, as far as a motion to dismiss,

25    you would construe the allegations in the light

                            67

1     most favorable to the Plaintiff.  So I'd ask you

2     to deny the motion to dismiss.

3                   THE COURT:  Okay.  All right.  I

4     don't have -- with regard to the testimony he did

5     give some testimony regarding generally speaking

6     the number of members somewhat of the

7     organization and the purposes of the

8     organization.

9                   And what is it that -- and it is --

10    basically this is a dismissal on the pleadings;

11    correct?

12                  MR. YOUNG:  Yes.

13                  THE COURT:  I'm going to deny the

14    motion to dismiss, but I understand that you have

15    to preserve that issue.

16                  MR. YOUNG:  I understand.  At this

17    time I'd like to call Mr. Greg Camp to the stand.

18                  THE COURT:  Okay.

19                  MR. YOUNG:  Would you step over and

20    be sworn, please.

21                       GREGORY CAMP,

22    being produced and sworn, testified as follows:

23                  THE CLERK:  Would you state your

24    name and spell your name for the record.

25                  THE WITNESS:  Gregory Camp.

1    C-a-m-p.

2                    DIRECT EXAMINATION

3    BY MR. YOUNG:

4         Q.   Would you state your name, please.

5         A.   Gregory Camp.

6         Q.   What is your address?

7         A.   205 South Trailwood, Desologe, Missouri.

8         Q.   And who are you employed by?

9         A.   The City of Desologe.

10        Q.   What's your position with the City?

11        A.   I'm the city administrator for the City

12   of Desologe.

13        Q.   And in that position describe your

14   duties.

15        A.   I'm responsible for the day-to-day

16   operations of the City.  Department heads report

17   to me.  And I serve at the pleasure of the mayor

18   and the board of aldermen.

19        Q.   And in conjunction with the business of

20   the board of aldermen and the ordinances they

21   pass what's your relationship with the board of

22   aldermen on that topic?

23        A.   Specific to ordinances obviously we take

24   direction from the mayor and the board.  If

25   there's a particular area that they feel needs to

1   be addressed, whether it's updated, whether it's

2   something new, obviously we do that in

3   conjunction with legal counsel or help from the

4   municipal league.

5          Q.   And how long have you held that position

6   with Desologe?

7          A.   I've been with the City of Desologe

8   since June of 2007.

9          Q.   Okay.  And so can you describe

10  specifically for the Court your involvement in

11  that capacity in conjunction specifically with

12  ordinances that are presented or that come up for

13  consideration before the board.

14         A.   Depending on the type of ordinance it's

15  typically crafted by myself with the assistance

16  of the city clerk, reviewed by legal counsel at

17  which time if there needs to be any changes made.

18  But then that ordinance is presented to the mayor

19  and board of aldermen at a regular monthly

20  meeting with notice given prior, and then, of

21  course, would be approved or denied by a motion

22  and a roll call vote by the board.

23         Q.   Prior to becoming the city administrator

24  did you have a role or some relationship with the

25  City of Desologe for some time?

1          A.   I was an aldermen for the City of

2     Desologe in 1997 until 2000.  I was the mayor of

3     the City of Desologe from 2000 until 2005.

4          Q.   And in any gap times were you always

5     more or less involved in the business of the City

6     of Desologe?

7          A.   I'm a resident of Desologe, so, yes,

8     I've always been interested, yes.

9          Q.   All right.  So you've had knowledge and

10    involvement with the City of Desologe for over

11    16 years; is that correct?

12         A.   Correct.

13         Q.   In that period are you aware that

14    Desologe had concerns regarding public safety of

15    pedestrians or people within the streets of

16    Desologe?

17         A.   I am.

18         Q.   How did you first become aware of that

19    concern?

20         A.   Back in 1999 specifically there was

21    concern by the mayor and board at the time

22    concerning specifically groups that would be

23    soliciting donations:  Ball clubs, usually

24    baseball teams, 12, 13 year olds that were

25    raising funds to go to a little league World

1    Series.  That was where it all really began.

2         Q.   And what was the conduct that the mayor

3    and the board was concerned about initially at

4    that time?

5         A.   They were deeply concerned -- of course,

6    as a member of the board at the time, deeply

7    concerned about obviously having a pedestrian --

8    and in this very specific case a child struck by

9    a moving vehicle.

10        Q.   Did -- how did the -- and in those

11   particular instances what was the solicitation or

12   distribution?  What was the activity?  How was it

13   being performed in the roadway?

14             MR. ROTHERT:  Your Honor, I object

15   to lack of foundation for how he would know or

16   whether this is based on personal information or

17   hearsay as to what activity.

18             MR. YOUNG:  Your Honor, it's being

19   offered -- he's on the board of aldermen during

20   this time period.

21             THE COURT:  Right.

22             MR. YOUNG:  It's being offered for

23   what caused Desologe to take actions in response

24   to particular activities that were reported to

25   them.  I don't think personal knowledge is

1    necessary in that instance.

2                    THE COURT:  Overruled.

3    BY MR. YOUNG:

4         Q.   Do you remember the question?

5         A.   No.

6         Q.   Okay.  What I was asking was what -- can

7    you describe for me the kinds of activity that

8    was going on within the roadways that caused you

9    to have concern about safety.

10        A.   Well, you can imagine a baseball team of

11   12, 13-year old boys, say 15 of them, and

12   hopefully some adult supervision, but typically

13   maybe not being as attentive as they needed to be

14   drivers would slow, come to a stop with the offer

15   of some money that they could drop in a baseball

16   helmet for the fundraiser.

17        Q.   All right.  And were there other

18   instances of that same type of solicitation or

19   distribution out in the roadways that were a

20   concern?

21        A.   Sure.  And that's one particular

22   instance that I recall specifically.  There were

23   other instances in general involving other groups

24   or organizations, whether it would be for the

25   solicitation of funds, or if they were just

1      handing out informational flyers about a bake

2      sale or a car wash or something along that line.

3           Q.   Okay.  Now, in that time period where

4      you're familiar with the business of the City of

5      Desologe was there an instance where a person who

6      was on foot within a roadway was injured by a

7      motor vehicle within the City of Desologe?

8           A.   In 2001 a crossing guard, who you would

9      presume had the right to be in the roadway, they

10     were holding a stop sign at a cross intersection,

11     and they were struck by a vehicle.

12          Q.   Okay.  As a result of these concerns

13     about public safety in the streets what steps did

14     you witness Desologe to take in an effort to

15     address these safety issues?

16          A.   The original ordinance, of course, which

17     was drafted and approved by the board back in

18     1999.

19          Q.   Okay.  And then subsequent to that -- we

20     know what happened with regard to Judge

21     Fleissig's decision on that ordinance.

22     Subsequent to that -- so I'm talking about

23     roughly in the April 2013 time period so the

24     record is clear -- was Desologe still concerned

25     about an issue with respect to the conduct of

1    people in the roadway?

2         A.   Yes.  Absolutely.  And --

3         Q.   I'm sorry.

4         A.   I'm sorry.

5         Q.   Go ahead.

6         A.   An ordinance was passed at that time.

7         Q.   I was going to ask you what did Desologe

8    do in response to that.  So you said an ordinance

9    was passed at that time; is that right?

10        A.   Correct.

11             MR. YOUNG:  Your Honor, we may have

12   double markings, but rather than me hunt through

13   there I have mine in order.  I'll just -- unless

14   you don't want me to mark them again.  It's the

15   same stuff that's already been admitted.  Would

16   you rather me use their version?

17             THE COURT:  It doesn't matter.

18             MR. YOUNG:  Okay.

19             THE COURT:  You can use your

20   version.  That's fine.

21   BY MR. YOUNG:

22        Q.   I've handed you what's been marked as

23   Defendant's Exhibit 1 and ask you if you can

24   identify that.

25        A.   This is ordinance 2013.04 which repealed

1    the old ordinance from 1999, 615.070, and then

2    established a new section 220.205, which dealt

3    with pedestrians being prohibited from soliciting

4    in the roadways.

5                    (Defendant's Exhibit No. 1,

6    Ordinance, was identified.)

7    BY MR. YOUNG:

8        Q.   All right.  And what was the purpose of

9    that particular ordinance being passed?

10       A.   We were trying to -- obviously, the

11   concern over having an ordinance of the City of

12   Desologe that was, perhaps, deemed

13   unconstitutional, we wanted to try to craft an

14   ordinance that would allow us to address the

15   governmental interest that we had at hand, which

16   was the concern over pedestrian safety, but at

17   the same time do something that would pass

18   constitutional muster.

19       Q.   Okay.  After that -- and I'm going to

20   refer to that Exhibit 1 as the initial ordinance.

21       A.   Uh-huh.

22       Q.   And then the ordinance that came along

23   later I'll refer to that as the amended

24   ordinance, but I'll have you identify it later.

25                    But after that initial ordinance was

1    passed what happened relative to the Plaintiffs

2    or any of them and the City of Desologe in terms

3    of any contact?

4         A.   They staged a demonstration or a -- had

5    a -- scheduled a place -- a time to distribute

6    flyers at that time later in April after the

7    passage of the ordinance.

8         Q.   All right.  Was that April 26th?

9         A.   Yes.

10        Q.   Okay.  And were you involved at all that

11   day?

12        A.   I was not.

13        Q.   Okay.  So ultimately after this

14   ordinance marked Exhibit No. 1 -- the initial

15   ordinance -- was passed, what steps were taken,

16   if any, regarding enforcement of that ordinance

17   against any of the Plaintiffs?

18        A.   As far as enforcement an ordinance

19   was -- at the time of that April 26th instance

20   they were provided with a copy of the ordinance,

21   and they were asked to comply with the ordinance.

22   There was no other contact with them following

23   that.

24             It was brought to our attention that

25   there may be a lack of clarity in the ordinance

1    specific to the definition of a sidewalk and

2    roadway, and we felt we needed to suspend

3    enforcement of the ordinance at that time.

4         Q.   And was that brought to your attention

5    by reason of the filing of this lawsuit by the

6    Plaintiffs as to the initial ordinance?

7         A.   Yes.

8         Q.   And so in response to that filing of

9    that ordinance what did the City do in terms of

10   trying to reconsider the ordinance based on what

11   the lawsuit said?

12        A.   Well, obviously we talked with legal

13   counsel.  We also felt that we needed to take a

14   step back from the process of the ordinance and

15   take a look at the problem itself, which is the

16   pedestrians in the roadway.

17        Q.   All right.  Before you get to that let

18   me just ask you then, as a result of that initial

19   lawsuit did the City agree with the Plaintiffs

20   through their counsel in order to take -- that

21   they would hold in abeyance any enforcement of

22   that initial ordinance --

23        A.   Yes.  Yes, we did.

24        Q.   -- for some period of time?

25        A.   Yes, we did.

1          MR. ROTHERT:  Your Honor, I object.

2    That calls for hearsay.

3          THE WITNESS:  I provided a letter --

4          THE COURT:  I'm sorry.

5          MR. YOUNG:  Wait, wait, wait.  The

6    Court has to rule.

7          THE COURT:  I'll overrule it.

8    BY MR. YOUNG:

9       Q.  Let me hand you -- I've handed you

10   what's been marked as Defendant's Exhibit 2, and

11   I'd ask you if you can identify that document?

12      A.  Yes, I can.  It's a letter from me to

13   Grant Doty of the ACLU.

14          (Defendant's Exhibit No. 2, Letter,

15   was identified.)

16   BY MR. YOUNG:

17      Q.  And what's the stated purpose of the

18   letter in short form?

19      A.  That the City will hold in abeyance the

20   enforcement of the initial ordinance, 220.205,

21   and that the City would provide notice if there

22   was any amendment to that ordinance.

23      Q.  And did the City also agree to cover

24   some attorney's fees?

25      A.  Yes, we did.

1              MR. YOUNG:  Your Honor, I'm going to

2    offer into evidence Defendant's Exhibit 2.

3              THE COURT:  Any objection?

4              MR. ROTHERT:  No objection.

5              THE COURT:  Exhibit 2 will be

6    admitted into evidence.

7              (Defendant's Exhibit No. 2, Letter,

8    was received.)

9    BY MR. YOUNG:

10        Q.  I've handed you what's marked as

11   Defendant's Exhibit 3 and ask you, first, are you

12   copied on that particular letter?

13        A.  Yes.  Yes, I am.

14             (Defendant's Exhibit No. 3, Letter,

15   was identified.)

16   BY MR. YOUNG:

17        Q.  And is that letter dated the same day

18   that your letter was that's marked Exhibit 3?

19        A.  May 7th, yes.

20        Q.  Exhibit 2, excuse me.

21        A.  Yes.

22        Q.  And this is a letter from the chief of

23   police also indicating that any enforcement will

24   be held in abeyance until any amendment of the

25   ordinance?

1          A.   Correct.   Correct.

2          Q.   And you directed the chief to take this

3     action; is that right?

4          A.   Yes.

5                MR. YOUNG:   I'll offer into evidence

6     Exhibit 3.

7                THE COURT:   Any objection?

8                MR. ROTHERT:   No objection.

9                THE COURT:   Exhibit 3 will be

10     admitted.

11                (Defendant's Exhibit No. 3, Letter,

12     was received.)

13     BY MR. YOUNG:

14          Q.   All right.   So after May 7th, when these

15     letters were written, you mentioned earlier the

16     City decided to take a step back.   Describe what

17     the City did next with respect to its concern

18     about this public safety in the roadway issue.

19          A.   Well, the City had history with a

20     traffic engineering firm by the name of Crawford,

21     Bunte & Brammeier, David Brammeier being one of

22     the principals.   He had assisted us in trying to

23     acquire some federal and state funding on some

24     road and highway projects within Desologe.   And

25     we asked Mr. Brammeier if he could come to take a

1    look at the pedestrian in the roadway issue for
2    us.
3         Q.   All right.  Specifically do you remember
4    what you asked him to do?
5         A.   Basically provide us with a
6    comprehensive, objective look at all of the areas
7    within Desologe where potentially pedestrians and
8    automobiles are going to come in contact with
9    each other, specifically the roadways, and
10   determine for us whether or not it was safe or
11   not for the pedestrians to be there.
12        Q.   And for to be there for a particular
13   purpose?
14        A.   Correct.  Distribution or solicitation.
15        Q.   Okay.  So was Mr. Brammeier engaged then
16   by the City of Desologe?
17        A.   Yes, he was.
18        Q.   Does Desologe have its own highway and
19   traffic engineer or planner?
20        A.   No, we do not.
21        Q.   So if Desologe has issues regarding its
22   streets, the design of streets, safety issues,
23   you have to go to outside parties to get that --
24        A.   Correct.
25        Q.   -- advice?  I didn't finish my sentence.

1      A.   Sorry.

2      Q.   And the City you mentioned had had some

3   previous familiarity with Mr. Brammeier and his

4   employer; is that right?

5      A.   Correct.

6      Q.   What was the nature of that familiarity?

7   Can you talk about what projects, say the last

8   project he did for the City.

9      A.   I touched on it briefly.  There's a

10  process that communities go through when working

11  with the Missouri Department of Transportation

12  that requires you to essentially have a hierarchy

13  of projects that are submitted to the county

14  authority which goes to the regional planning

15  authority which goes to MoDOT.  And in order for

16  us to make a case with MoDOT in reference to

17  reconstruction of Missouri Highway 8, which is

18  known as Desologe Drive also in town and State

19  Street, we used Mr. Brammeier's firm to help us

20  with that.

21     Q.   Okay.  And how long ago was that

22  roughly?

23     A.   About 12 years ago.

24     Q.   Okay.  What did Mr. Brammeier do then in

25  response to the particular engagement related to

1    the issue concerning pedestrians in the roadway

2    for solicitation or distribution purposes?

3         A.   He came to Desologe, spent a

4    considerable amount of time in Desologe analyzing

5    intersections, roadways and the structures that

6    are in and around the roadways, obviously storm

7    drainage structures, curbs, sidewalks, so he

8    provided us with a fairly comprehensive analysis

9    of all the roadways within Desologe.

10        Q.   All right.  And did he deliver a written

11   report to the City of Desologe?

12        A.   Yes, he did.

13        Q.   I've handed you what's been marked as

14   Exhibit 4.  Can you describe what that is?

15        A.   This is the report we received from

16   David Brammeier, Final Analysis of Safety Risks

17   Associated with Solicitation and/or Distribution

18   By Pedestrians in the Roadways.

19        Q.   What's the date of that report?

20        A.   July 17th, 2013.

21        Q.   Did you receive that report shortly

22   after that particular date?

23        A.   Yes, I did.

24        Q.   Is this -- Plaintiff's Exhibit 4 a true

25   and accurate copy of the report from

84

1   Mr. Brammeier that you -- that the board of

2   aldermen considered in response to that

3   engagement?

4        A.   Yes, it is.

5        Q.   Once you received this report, what did

6   you do with it relative to the board?

7        A.   It was distributed to the board of

8   aldermen for their review -- the mayor and the

9   board for their review at that time.

10       Q.   All right.

11            MR. YOUNG:  Your Honor, I'd offer --

12  well, I can wait.  I'll offer it into evidence

13  when Mr. Brammeier is here.

14            THE COURT:  All right.

15  BY MR. YOUNG:

16       Q.   What steps did the City of Desologe then

17  take upon receiving this report and the board

18  having been obtained copies of it?

19       A.   After consideration the board directed

20  me to direct legal counsel to work on an

21  amendment to the initial ordinance.

22       Q.   All right.  And then -- so prior to

23  passing any additional ordinance on the subject

24  of pedestrian safety in the roadways did the

25  board of aldermen rely on Mr. Brammeier's report?

85

1        A.   Yes, sir.

2        Q.   Was an amendment ordinance passed?

3        A.   Yes, it was.

4        Q.   All right.  I've handed you what's been

5    marked as Exhibit 5.  Can you identify that for

6    the Court?

7        A.   This is the amended ordinance 2013.09.

8        Q.   And when the board passed it, what

9    effect did it have on the initial ordinance

10   that's marked as Exhibit 1?

11       A.   It replaced it.

12       Q.   And did it repeal it?

13       A.   Correct.

14       Q.   Okay.

15            MR. YOUNG:  Your Honor, I offer into

16   evidence -- well, I guess Exhibit 5 is already in

17   evidence with you in a different form.

18            MR. ROTHERT:  It's already in as

19   Exhibit E.

20            MR. YOUNG:  Okay.  Thank you.

21            THE COURT:  Okay.

22            (Defendant's Exhibit No. 5,

23   Ordinance, was received.)

24            MR. YOUNG:  It's already in

25   evidence.

1    BY MR. YOUNG:

2        Q.   So then when was this ordinance passed?

3        A.   Oh, August 12th of this year.

4        Q.   All right.  So let me direct your

5    attention specifically to the language of the

6    amended ordinance.  Does the amended ordinance

7    include language about why the board passed it?

8        A.   Yes, it does.

9        Q.   Why was that language included?

10       A.   We wanted to make sure that we were very

11   deliberate in letting everyone know the specific

12   reasons as to why the ordinance was being

13   enacted.

14       Q.   All right.  Why does the amended

15   ordinance contain the language that it does in

16   the sections on prohibition and solicitation --

17   I'm sorry, the prohibition of solicitation and

18   distribution?  Did you understand that?  I

19   butchered that question.

20       A.   No.  Could you rephrase.

21       Q.   Yeah.  So why does the amended ordinance

22   contain language it does, say, in Section 1 on

23   the prohibition of solicitation?  Next I'll ask

24   you about the language in the distribution

25   section.

1           A.   The -- specific to solicitation these
2      were the types of solicitation that we were
3      familiar with.  These were the types that we had
4      seen demonstrated most often in the City of
5      Desologe.  They were also the types that with the
6      advice of legal counsel had been, I guess,
7      reviewed by the Court and had been upheld at that
8      time, so those were the types that we felt were
9      uncomfortable with because those were the types
10     we were trying to address and, two, the types
11     that we felt that there was a legal precedent
12     that allowed us to put that in there.
13          Q.   Okay.  And then with regard to the
14     provision on distribution why was the language
15     there chosen with regard to distribution?
16          A.   For the same reasons.  For the same
17     reasons.
18          Q.   Okay.  So does the amended ordinance
19     make a distinction between roadways and
20     sidewalks?
21          A.   Yes, it does.
22          Q.   In fact, it defines them separately;
23     correct?
24          A.   Correct.
25          Q.   And does the amended ordinance make a

1    distinction between solicitation and

2    distribution?

3         A.   Yes, it does.

4         Q.   And does it spell out what those are?

5         A.   Yes, it does.

6         Q.   Where does that appear?

7         A.   It's in the second paragraph

8    specifically defining solicitation of rides,

9    employment, business, or sales and charitable

10   contributions by a person within the roadway.

11   And then also farther down distribution of

12   anything by a person within the roadway to an

13   occupant of a vehicle involving the exchange

14   between the person in the roadway and the

15   occupant of the vehicle on the roadway.

16        Q.   All right.  So why did the City prohibit

17   both solicitation and distribution by a

18   pedestrian within the roadway?

19        A.   Obviously, the recommendation from

20   Mr. Brammeier stating that pedestrians in the

21   roadway is just a dangerous -- a dangerous

22   combination, that we wanted to try to prevent

23   them from getting hurt.

24        Q.   Okay.  Where in the City of Desologe

25   other than in the roadways can the Plaintiffs

1    solicit or distribute without fear of being

2    stopped or confronted about distributing any

3    leaflets or handbills?

4         A.   Any sidewalk.  In fact, the ordinance

5    here specifically says that nothing contained

6    herein is intended to prohibit solicitation or

7    distribution by any person on a sidewalk, also

8    among persons in a city parking lot or city park.

9         Q.   And so the Court is familiar, she's seen

10   some photographs, but are there sidewalks

11   throughout Desologe?

12        A.   Yes, there are.

13        Q.   Are there other areas where the

14   distribution of leaflets can be taken other than

15   the roadway?

16        A.   Any public property.  The library.  In

17   front of city hall on the city hall property in

18   its parking lot.  Within inside the city park at

19   Brightwood Park, our baseball complex, they would

20   be more than welcome to do that, yes.

21        Q.   In fact, is the City in the process of

22   actually setting up some trails that would be

23   public, and so additional availability would

24   be --

25        A.   We have two trails that we've been able

1    to fund with federal highway money, and we're in

2    the process of building a third, yes.

3         Q.   Okay.  Is there any ordinance or any

4    reason why the Plaintiffs the Ku Klux Klan here

5    would be inhibited from distributing anything

6    they wanted in any of those other alternative

7    areas?

8         A.   No.

9         Q.   Can they carry signs in those areas?

10        A.   Yes.

11        Q.   So where are the only areas within

12   Desologe where the KKK would be restricted from

13   distributing leaflets?

14        A.   By the ordinance it wouldn't just be the

15   KKK, but basically as defined the roadway by the

16   ordinance.

17        Q.   And that's the point I wanted to make.

18   The ordinance doesn't specify the KKK.  The

19   ordinance applies equally to everyone; is that

20   correct?

21        A.   Correct.

22        Q.   All right.  A question arose regarding

23   what impact or effect the passage of the amended

24   ordinance Exhibit 5 had on the initial ordinance

25   Exhibit 1; is that correct?

1          A.   Correct.

2          Q.   Did the City decide to take some action

3    with regard to making clear on the record what

4    the status of the initial ordinance was?

5          A.   Later in the month of August we passed a

6    resolution making that clear that the initial

7    ordinance had been repealed and replaced by the

8    amended ordinance earlier that month.

9          Q.   I've handed you what's been marked as

10   Defendant's Exhibit 6:  Is that a copy of that

11   resolution?

12         A.   Yes, it is.

13              (Defendant's Exhibit No. 6,

14   Resolution, was identified.)

15   BY MR. YOUNG:

16         Q.   And it makes it very clear that the

17   initial ordinance marked Exhibit 1 here is in

18   repeal; correct?

19         A.   Replaced and repealed, correct.

20              MR. YOUNG:  I'd offer into evidence

21   Exhibit 6, Your Honor.

22              THE COURT:  Any objection?

23              MR. ROTHERT:  Which one was Exhibit

24   6?

25              THE COURT:  The resolution.

1                    MR. YOUNG:  The resolution.

2                    MR. ROTHERT:  No objection.

3                    THE COURT:  Exhibit 6 will be

4      admitted into evidence.

5                    (Defendant's Exhibit No. 6,

6      Resolution, was received.)

7      BY MR. YOUNG:

8           Q.  Finally, does Desologe have an ordinance

9      that speaks to the board of aldermen's intent on

10     severability of paragraphs and sections within an

11     ordinance if there is a declaration of its

12     invalidity?

13          A.  It's in our general governmental code,

14     correct, and it's included in the heading of all

15     of our ordinances when they're read, the

16     severability, and, of course, the severability

17     clause.

18          Q.  Let me hand you what's been marked as

19     Exhibit 7.  Is that a copy of the adopting

20     ordinance that you just made reference to?

21          A.  Correct.

22                   (Defendant's Exhibit No. 7, Adopting

23     Ordinance, was identified.)

24     BY MR. YOUNG:

25          Q.  And is there in Section 9 on the last

1    page of that ordinance a paragraph regarding the

2    severability and the City's intention with regard

3    to that?

4          A.   Correct.

5               MR. YOUNG:   I offer into evidence

6    Exhibit 7.

7               THE COURT:   Any objection?

8               MR. ROTHERT:   I guess my objection

9    is to -- on page 9 I don't know if this is

10   currently part of the code or if it's currently

11   in effect.

12              MR. YOUNG:   I can ask those

13   questions.

14              MR. ROTHERT:   Can you lay a little

15   more foundation?

16              MR. YOUNG:   I can ask those

17   questions.

18              THE COURT:   Go ahead and lay your

19   foundation for it.

20   BY MR. YOUNG:

21        Q.   I'll hand you Exhibit 7, Mr. Camp.   Is

22   this particular adopting ordinance the operative

23   and current adopting ordinance that is in the

24   code for the City of Desologe?

25        A.   Yes, it is.   Yes, it is.

```
 1                    MR. YOUNG:  I'll offer Exhibit 7.
 2                    MR. ROTHERT:  Then I have no
 3      objection.
 4                    THE COURT:  All right.  Exhibit 7
 5      will be admitted.
 6                    (Defendant's Exhibit No. 7, Adopting
 7      Ordinance, was received.)
 8                    MR. YOUNG:  I have no further
 9      questions of this witness at this time.
10                    THE COURT:  All right.  You may
11      cross-examine, Mr. Rothert.
12                         CROSS-EXAMINATION
13      BY MR. ROTHERT:
14           Q.   Good afternoon, Mr. Camp.
15           A.   Good afternoon.
16           Q.   I'm going to start by talking a little
17      bit about Ordinance 23.04.  That's the one that
18      was passed in April of 2013; correct?
19           A.   Correct.
20           Q.   And did that ordinance go through the
21      regular process you described of being authored,
22      reviewed by counsel and then passed?
23           A.   Yes, sir.
24           Q.   Now, you said you felt that you needed
25      to suspend operation of ordinance 2013.04.  Why
```

1    did you -- why did you feel that you needed to

2    suspend operation of it?

3         A.   It was brought to our attention that

4    there was some concern or question about the

5    definitions that are contained within it.

6         Q.   Okay.  Was there anything else that made

7    you think that you should suspend it?

8         A.   We were contacted by -- our counsel was

9    contacted by your office, so that was part of

10   that attention process.

11        Q.   Anything else?

12        A.   No.

13        Q.   Okay.  Did you -- did the Plaintiffs in

14   this case give you anything in exchange for

15   suspending the enforcement of Ordinance 2013.04?

16        A.   We -- if I remember correctly, there was

17   an agreement that we would withhold enforcement

18   of the ordinance -- we would hold it in

19   abeyance -- while the parties were allowed to

20   have time to take a closer look at the process.

21        Q.   Okay.  Well, is it your understanding

22   that the Plaintiffs also withdrew their motion

23   for contempt against the City?

24        A.   Correct.  Correct.

25        Q.   And that was part of the reason why you

1    suspended it?

2         A.   That was part of -- I wouldn't say it

3    was part of the reason, but it was certainly part

4    of the process.

5         Q.   Turning to Ordinance 2013.09, which is

6    Plaintiff's Exhibit V, but I think you have it

7    there --

8         A.   It's 5.

9         Q.   -- as Defendant's Exhibit 5.  We'll just

10   use the Defendant's Exhibit.  Could you read for

11   me how roadway is defined.

12        A.   A portion of a public street, road or

13   highway improved, designed or ordinarily used for

14   vehicular traffic and extending from one curb or

15   edge of payment to the opposite curb or edge of

16   pavement, including lanes commonly used for

17   parking and including center medians and lane

18   dividers.

19        Q.   All right.  And in this version could --

20   I guess Plaintiff's B3 -- could you read that for

21   me.

22        A.   The solicitation described in

23   subparagraph 1 and the distribution described in

24   subparagraph 2 are each permissible to an

25   occupant of a non moving vehicle on the roadway

1    adjacent to the sidewalk and if the person doing

2    so is on the adjacent sidewalk.

3         Q.   Now, that was not the original version

4    of this -- there was an earlier draft of this

5    ordinance, was there not?

6         A.   Not that I recall.

7         Q.   Okay.  And in particular there's an

8    earlier draft of that Section 3 that you

9    described?

10        A.   Not that I recall.

11        Q.   Isn't it true that it used to end at the

12   word sidewalk?

13        A.   Maybe in the --

14        Q.   And if the person doing it is on the

15   adjacent sidewalk was added?

16        A.   I don't recall.  It may have been in the

17   04 -- the 2013.04 ordinance.  I'd have to look.

18   But it's certainly not in this one.

19        Q.   No.  I mean, in an earlier draft of this

20   ordinance.

21        A.   Oh, in a draft of this ordinance?

22        Q.   In a draft one before it was enacted.

23        A.   No.

24        Q.   Okay.  Have you ever heard of a

25   publication called The Daily Journal?

1          A.   Yes.

2          Q.   And what is that?

3          A.   It's the newspaper for St. Francois and

4     surrounding counties.

5          Q.   Okay.  I'm going to hand you Plaintiff's

6     Exhibit W.  On Plaintiff's Exhibit W can you turn

7     to W\D, Exhibit D to Exhibit W, a news article.

8     Do you see that?

9          A.   What section now?

10          Q.   It's labeled -- I think it's labeled

11     Exhibit W\D.

12          A.   D.  Sure.

13          Q.   And can you tell what that is, if you

14     know?

15          A.   It appears to be a copy off the online

16     addition of The Daily Journal of an article done

17     on an ordinance or I assume the August ordinance

18     in Desologe.

19          Q.   And what's that article -- what's the

20     date on that?

21          A.   It looks to be August 14th.

22          Q.   All right.  Have you read that article

23     before or seen it?

24          A.   I have seen it, yes.

25          Q.   And, if you would, turn to the second

1   page -- I think it's the second page -- where it

2   lists the ordinance, where it sets forth the

3   ordinance:  Do you see that?

4        A.   Uh-huh.

5        Q.   Okay.  And is that the ordinance that

6   was passed that appears in the newspaper?

7        A.   No, it's not.

8        Q.   Okay.  Can you tell me how it's

9   different?

10       A.   Section -- it looks like Section 3 --

11   it's hard to tell here.  It appears that Section

12   3 is different.

13       Q.   And how is it different?

14       A.   It doesn't read the same as the

15   ordinance.

16       Q.   Okay.  In what way does it not read the

17   same?

18       A.   Well, solicitation described -- the

19   first two lines appear to be correct.  On the

20   roadway adjacent to the sidewalk or by and among

21   persons in a city parking lot or city park is

22   different.

23       Q.   Okay.  All right.  So in that version --

24       A.   This isn't a version of the ordinance.

25       Q.   Okay.  Is that a copy of a previous

1    draft?

2          A.   No.

3          Q.   Do you have any idea where the newspaper

4    would have come up with close but not the same?

5                MR. YOUNG:   Objection, Your Honor.

6    This is hearsay.

7                THE COURT:   Sustained.

8                MR. YOUNG:   You would have to ask --

9                THE COURT:   He just stated that it's

10   not a draft of the ordinance.  I don't know.

11               MR. ROTHERT:   Okay.

12   BY MR. ROTHERT:

13         Q.   Did you -- did the City ever consider as

14   part of passing this ordinance allowing people to

15   enter the roadway to hand something to a non

16   moving vehicle?

17         A.   I think we tried to address that as best

18   we could.  Obviously, the paragraph that

19   addresses the occupant of a non moving vehicle on

20   the roadway adjacent to the sidewalk and also to

21   provide or make a provision for that any person

22   on a sidewalk or among persons in the city

23   parking lot or city park.

24         Q.   As part of your duties you're familiar

25   with the code of ordinances in Desologe; correct?

1      A.   I'm sorry, Say that again.

2      Q.   You're familiar with the code of

3    ordinances in Desologe, the ordinances that are

4    in effect?

5      A.   Yes.

6      Q.   Is there a penalty for violating an

7    ordinance of the City of Desologe if there's a

8    default if there's not a penalty set forth in a

9    particular ordinance?

10      A.   There's a standard misdemeanor clause,

11    yes.

12      Q.   And what would be the penalty for a

13    violation of an ordinance where there's not one

14    specified in the particular ordinance?

15      A.   Each singular violation is punishable by

16    90 days and/or -- 90 days in jail and/or a $500

17    fine.

18      Q.   When you hired a consultant, what did

19    you ask him to do?

20      A.   I asked him to take a look at all the

21    roadways in Desologe and consider whether or not

22    it is or is not safe for pedestrians to be within

23    the roadway.

24      Q.   And did you limit pedestrians from being

25    in the roadway in any other way other than by

1    solicitation or distributing?

2         A.   Specific to this ordinance just for

3    solicitation or distribution.

4         Q.   Oh, so you only asked him about

5    distribution and solicitation?

6         A.   Correct.

7         Q.   You still -- do you still allow crossing

8    guards to enter the roadway?

9         A.   Yes.

10        Q.   Why if one has been hit?

11        A.   For the benefit of allowing the children

12   to cross carefully and safely get across the

13   roadway.

14        Q.   Okay.  So you had to balance the risk

15   that someone might be hit and someone actually

16   has been with the benefit that comes from having

17   a crossing guard; correct?

18        A.   We certainly want to do everything

19   possible to make sure that the children are safe

20   crossing the street.

21        Q.   Are you familiar with -- with Section

22   355.090 of the code of ordinances?

23        A.   Not off the top of my head, no.

24        Q.   Are you aware of a provision of the code

25   of ordinances that allows the City traffic

1    engineer to determine and designate places where

2    vehicles cannot stand, stop or park, because they

3    would cause a hazardous situation or a delay to

4    traffic?

5         A.   There is a provision in the code for

6    that, yes.

7         Q.   So that would require the City to look

8    at specific intersections and make a

9    determination if there needed to be a prohibition

10   on standing, stopping and parking; correct?

11        A.   Since the City does not have a specific

12   inhouse traffic engineer, it would require us to

13   contract with someone as we did with

14   Mr. Brammeier to look at that particular

15   situation, yes.

16        Q.   Okay.  So the City has given itself

17   authority to make a decision on an intersection

18   by intersection basis where parking and standing

19   are prohibited; correct?

20        A.   Correct.

21        Q.   And you've exercised that power;

22   correct?

23        A.   Correct.

24        Q.   Are you familiar with the provision of

25   the code Section 315.140 that allows the City to

1    designate crosswalks and safety zones for
2    pedestrians?
3         A.   That is in there, yes.
4         Q.   And that requires the City to look at
5    particular intersections and decide whether or
6    not to put a crosswalk or a safety zone there;
7    correct?
8         A.   A crossing -- yes, correct.
9         Q.   And the City has exercised that
10   authority and has put in crosswalks?
11        A.   There are crosswalks in Desologe, yes.
12        Q.   Is there ever a time in according to the
13   ordinances when a street is actually a sidewalk
14   in Desologe?
15        A.   A street would be a sidewalk?
16        Q.   Where a street would fit the definition
17   of a sidewalk.
18        A.   Not that I'm aware of, no.
19        Q.   There are areas in Desologe that don't
20   have sidewalks; correct?
21        A.   There are.
22        Q.   And isn't it true that there's a
23   provision in your code that -- that defines --
24   creates a right of pedestrians to use walking
25   along the roadway in lieu of a sidewalk when

1    there is no sidewalk?

2         A.   There is a portion of the code, but I

3    would refer, again, to the ordinance that we

4    passed in August, which for the purpose of that

5    ordinance defines those areas very specifically.

6         Q.   Okay.  So I'm going to hand you

7    Plaintiff's Exhibits K and J in the interest of

8    time.  Plaintiff's Exhibits J and K, that's 399

9    West Oak; right?

10        A.   This is the -- both are pictures of the

11   area of P Highway or West Oak in front of the VFW

12   hall, yes.

13        Q.   Okay.  And can you tell me for purposes

14   of the -- of the ordinance that we're talking

15   about here today where would someone be able to

16   stand to hand out a leaflet to a non moving car?

17        A.   There's a sidewalk across the street.

18        Q.   So they would not be allowed anywhere on

19   that side of the street or on the right looking

20   at the picture to the right side of the street?

21        A.   That's a private parking lot owned by

22   the VFW.  They could get permission from the VFW

23   to do that.

24        Q.   What about from the section of the --

25   where the travel portion ends to the grass on

1    both those pictures, what is that?

2         A.   That is the shoulder of the road.

3         Q.   Okay.  And that belongs to the City?

4         A.   That is all State right of way.  It

5    doesn't belong to the City.

6         Q.   Okay.  So is someone allowed to stand

7    there and distribute literature on the shoulder?

8         A.   On the shoulder?

9         Q.   Yes.

10        A.   No.  They would be able to stand on the

11   corner here of Chadrick and Oak Street or on the

12   sidewalk across the street.

13        Q.   Now, in an area on the right side of

14   that road -- that same side that the VFW is on --

15   isn't it true that your ordinances allow

16   pedestrians to walk on the edge of the roadway?

17        A.   Again, without seeing the specific

18   ordinance, but there are -- there's accommodation

19   for that.  There's also accommodation across the

20   street for them to be able to walk safely with

21   the sidewalk.

22        Q.   Okay.  But you do have an ordinance

23   Section 345.080 that does allow an accommodation

24   where there's no sidewalk?

25        A.   Correct.

1          Q.   And you'd agree on J and K on the VFW
2     side of the street there's no sidewalk; correct?
3          A.   Correct.
4          Q.   In Desologe it is lawful for an
5     individual to hand a leaflet to a second person
6     on a sidewalk; correct?
7          A.   Correct.
8          Q.   If that second person receives the
9     leaflet and throws it on the ground, are they
10    breaking the law?
11         A.   There is a littering ordinance in the
12    City of Desologe.
13         Q.   And who would be breaking the law --
14         A.   The person --
15         Q.   -- the first person or the second
16    person?
17         A.   The person that would discard the paper.
18         Q.   Desologe also has an ordinance that
19    requires drivers to exercise care and to take the
20    responsibility for avoiding any collision with
21    any pedestrian on any roadway; isn't that true?
22         A.   That's just standard traffic law,
23    correct.
24         Q.   And you've enacted that in the code of
25    ordinances for Desologe?

1          A.   Correct.

2          Q.   Under your ordinances, as you understand

3     it, is someone allowed to enter the roadway to

4     place a leaflet on a parked car?

5          A.   Are they parked on private property or

6     public property?

7          Q.   Well, let's say public.

8          A.   Public property?

9          Q.   Yes.

10         A.   The car is parked?

11         Q.   Yes, parked.

12         A.   Then there's nothing that would prohibit

13    them from doing that.

14         Q.   So an individual could enter the roadway

15    and place the -- enter and place a leaflet on a

16    car parked on the shoulder?

17         A.   As the ordinance states, a parked car

18    adjacent to the sidewalk in a parking area, say

19    in front of the library where there are parking

20    areas directly adjacent to the curb, they would

21    be able to place something directly on their

22    windshield, correct.

23         Q.   What about on the shoulder in front of

24    the VFW?

25         A.   A parked car on the shoulder?

1      Q.   Yes.

2      A.   Are they approaching it from the corner

3  of Chadrick and Oak Street there?

4      Q.   I'm asking if they can enter onto the

5  shoulder to place it on a parked car parked on

6  the shoulder?

7      A.   The ordinance provides that they can do

8  so from the edge of the -- the edge of the

9  roadway, basically the curb or the sidewalk, on

10  the parked car, yes.  So if we're going to define

11  the edge of the roadway there as the shoulder --

12      Q.   Uh-huh.

13      A.   -- the grassy area adjacent to it, they

14  would be able to stand there and place something

15  on a parked car.

16      Q.   Now, turning back to Exhibit 5, I

17  believe, the ordinance 2013.09.

18      A.   Yes, sir.

19      Q.   What's -- could you read Section 2

20  there that says -- well, let me read it to you.

21  It says, No person shall stand in or enter upon a

22  roadway for the purpose of distributing anything

23  to the occupant of a vehicle; correct?

24      A.   Correct.

25      Q.   So your understanding of that is that

1    even just putting something on an unoccupied
2    vehicle violates this provision?
3           A.   It doesn't say anything about to the
4    vehicle.  It says to the occupant --
5           Q.   Okay.
6           A.   -- of any vehicle.
7           Q.   So what I was asking earlier is if
8    there's a parked car there, there's no one in it,
9    it's on the shoulder of the road, can an
10   individual enter onto the shoulder of the road to
11   put a leaflet like under the windshield wiper of
12   a parked vehicle?
13          A.   This ordinance doesn't appear to address
14   that.
15          Q.   Okay.  Now, if the same car was parked
16   there but there was someone sitting in the
17   passenger seat, would it be lawful for an
18   individual to enter the roadway and hand the
19   leaflet to the occupant?
20          A.   Section 3 does address that.
21          Q.   Entering the road --
22          A.   A non moving vehicle on the roadway
23   adjacent to the sidewalk if the person is doing
24   so on the adjacent sidewalk.
25          Q.   Okay.  But my question was if someone

1   enters the roadway -- enters the shoulder to hand

2   the leaflet to the occupant of a parked vehicle,

3   is that permitted or not?

4        A.   They are able to hand something to

5   someone adjacent to the sidewalk if the person

6   doing so is on the adjacent sidewalk.

7        Q.   And my question is if they're not on the

8   adjacent sidewalk, they're entering the roadway,

9   is that allowed?

10       A.   This ordinance doesn't address that.

11       Q.   You don't think they'd be distributing

12   something to the occupant of a vehicle?

13       A.   They would.

14       Q.   Okay.  So the ordinance really does

15   address it, doesn't it.

16       A.   It does.  In Paragraph 2 it does, yes.

17       Q.   I'm going to ask you a question about

18   the solicitation.  There were several types of

19   solicitation specified in the ordinance.  Is it

20   the City's intention to prohibit all solicitation

21   or just the types that are listed?

22       A.   The types that are listed.

23       Q.   So is the solicitation of political

24   donations still allowed, you can enter into the

25   roadway for that?

1         A.   Yes.

2         Q.   What about signatures on a petition?

3         A.   It's not addressed in the ordinance.  It

4    depends I suppose what the petition would be for.

5         Q.   Would it depend?  Okay.  What petitions

6    would be prohibited?

7         A.   Anything that is in here.

8         Q.   Okay.  I've handed you what's been

9    marked F through U -- Exhibits F through U.  And

10   I won't go into too great of detail here to move

11   things along, but I'm just quickly going to ask

12   you where you think someone is allowed to be in

13   these pictures.

14             Exhibit F, isn't that a picture of the

15   corner of North Lincoln and Locust near city

16   hall?

17        A.   It is.  That is at city hall, correct.

18        Q.   Okay.  And on the right side of the

19   street looking at the picture on the right can

20   you tell me where someone would be able to -- is

21   there any portion of the roadway someone would be

22   able to enter in there if they wanted to hand

23   something to someone at the stop sign?

24        A.   From the sidewalk they would be able to

25   do so.  There are also parking areas directly in

1    front of city hall where they would be able to do

2    so.

3          Q.   Well, I'm concerned about people at the

4    stop sign for now.

5          A.   Oh, at the stop sign?

6          Q.   At the stop sign.  So they would have to

7    stand on the sidewalk and reach over?

8          A.   They would.

9          Q.   Okay.  Exhibit G, that's the corner of

10   Lincoln --

11         A.   Lincoln and Chestnut.

12         Q.   -- and Chestnut?

13         So do you see there's a gap between the

14   sidewalk and the stop sign.  If I wanted to hand

15   something to someone or distribute something to

16   someone at the stop sign, could I enter into that

17   gap in between or --

18         A.   It's a parking area.

19         Q.   It's a parking area?

20         A.   That sign that you can't see because you

21   have your back to it, it has a back to you it

22   there is a parking area.

23         Q.   So you're not allowed to enter that

24   because that's part of the roadway?

25         A.   Correct.

1        Q.   And, by the way, I noticed a sign on the

2   stop sign:  what does it say?

3        A.   No skateboards or roller blades allowed

4   on the sidewalk.

5        Q.   Okay.  So where do skateboarders and

6   roller bladers go if they're not allowed on the

7   sidewalk?

8        A.   They can go to one of the several trails

9   we've constructed in the City --

10       Q.   Uh-huh.

11       A.   -- which is designed specifically for

12  non motorized traffic.

13       Q.   Are they allowed on the roadway there?

14       A.   They would be putting themselves at

15  risk.

16       Q.   I understand that, but as far as the

17  laws -- the ordinances are concerned they're

18  allowed on the roadway?

19       A.   Not that I'm aware of, no.

20       Q.   Is there anything in the ordinance that

21  prohibits them from being on the roadway?

22       A.   This ordinance?

23       Q.   Any ordinance.

24       A.   I don't know of one off the top of my

25  head, no.

1        Q.   Okay.  Exhibit H, that's the front of

2    city hall?

3        A.   Correct.

4        Q.   300 North Lincoln; right?

5        A.   Correct.

6        Q.   What is that box?

7        A.   It's a bill payment depository.

8        Q.   And who owns that?

9        A.   The City does.

10       Q.   All right.  And how does that work?

11       A.   Cars are able to pull up into the

12   parking area that's shown in front of the city --

13   in front of city hall and able to make their

14   utility bill payments.

15       Q.   Okay.  So if I were going to -- you park

16   across the street, and you walk over and pay your

17   bill?

18       A.   You can drive right up to it.

19       Q.   Well, okay.

20       A.   That was the intent, which is why it has

21   the elongated shoot on the one side of it.

22       Q.   Well, isn't it on the wrong side of the

23   street for that?

24       A.   It can be, yes.

25       Q.   Okay.  So in practice how do people --

1    do the people drive on the wrong side of the

2    street or what?

3         A.   They will move into the parking area and

4    pass it either through their window or through a

5    passenger window.

6         Q.   Okay.  And do people also park across

7    the street and walk over and put it in?

8         A.   They do.

9         Q.   Is that legal?

10        A.   To walk across the street and pay their

11   utility bill?

12        Q.   Yes.

13        A.   Yes.

14        Q.   But they're standing in the roadway to

15   do that, aren't they?

16        A.   Or they step up on the sidewalk and use

17   the other side.

18        Q.   Do people stand in the roadway and stick

19   their bills in that slot?

20        A.   I don't know if I've seen someone do it

21   or not to be honest.

22        Q.   We've already talked about J and K.  So

23   if you could skip ahead to exhibit -- Plaintiff's

24   Exhibit L.

25        A.   Okay.

1          Q.   That's the corner of North Carter and

2     Hawthorne Street; correct?

3          A.   Correct.

4          Q.   The Baptist church is up there.  Is that

5     what's on the left?

6          A.   It's the First Baptist Church, correct.

7          Q.   All right.  So can you tell me if I

8     wanted to hand a leaflet to someone parked there

9     at the stop sign at the corner of North Carter

10    and Hawthorne Street at that stop sign that you

11    see there, where could I stand and do that?

12         A.   The area off the roadway.

13         Q.   Okay.  So where does the road -- I mean,

14    what's your -- where does the roadway begin in

15    your understanding?  There's no curb, so --

16         A.   Extending from one curb or edge of

17    pavement to the opposite curb or edge of

18    pavement, including lanes commonly used for

19    parking, including center medians and lane

20    dividers.  So the edge of pavement.  So they

21    could stand if they wanted to between the stop

22    sign and the road, because they're at the edge of

23    the pavement on the grassy area there.

24         Q.   Now, that is a parking lane there;

25    correct?

1          A.   No.   That's a two-lane street.   There's
2     not a lot of room to park.
3          Q.   But there is a car parked there.
4          A.   You car is parked there, as a matter of
5     fact, yes.
6          Q.   Oh, were you spying?
7          A.   I saw you going through.
8          Q.   Plaintiff's Exhibit M, that is Lincoln
9     and Chestnut?
10         A.   Correct.
11         Q.   And can you tell me where that stop
12    sign -- if I wanted to hand something to someone
13    at that stop sign where I could stand?
14         A.   Well, there's a grassy area in between
15    the trail which goes to a crossing over the
16    railroad and to a bridge over the PA ditch which
17    would be directly adjacent to that stop sign.  At
18    the opposite corner you'd be able to stand on the
19    sidewalk as well.
20         Q.   Now, on the opposite corner that you
21    brought up there's a part that's kind of yellowed
22    off -- this yellow line -- is that -- is that a
23    median, or do you consider that -- what do you
24    consider that?
25         A.   It's a non parking area --

1          Q.   Okay.

2          A.   -- because of the corner.

3          Q.   So since it's a non parking area -- I

4    know you're not allowed in a parking area, but

5    are you allowed in non parking areas, or is

6    that --

7          A.   You're not allowed to park in non

8    parking areas.

9          Q.   Are you allowed to stand and distribute

10   leaflets?

11         A.   It's not defined in the ordinance.

12         Q.   Next is Plaintiff's Exhibit N, if you

13   could look at that.  Again, my question is the

14   first car that's at the stop sign if I wanted to

15   hand them a leaflet, would I be able to do that?

16         A.   No.

17         Q.   There's --

18         A.   There's a right turn lane there --

19         Q.   All right.

20         A.   -- that goes down to Chestnut Street.

21         Q.   Okay.  So that section in between that's

22   lined off, is that -- what do you consider that?

23         A.   Well, it's not an area for vehicular

24   travel.  We're trying to define the area between

25   the north/south lane and the lane that turns

120

1   right to go east on Chestnut.

2       Q.   If I could ask you to skip ahead to

3   Plaintiff's Exhibit T.

4       A.   T?

5       Q.   T.   T as in Tony.   Okay.   Looking across

6   the street, is the area where cars are parked, is

7   that considered a parking lane?

8       A.   It's a parking area, yes.

9       Q.   So you wouldn't be allowed to --

10      A.   It's not the edge of the pavement.   The

11  edge of the pavement is to the left of that.   The

12  edge of the pavement.

13      Q.   Okay.   So even though it's a parking

14  lane it's not part of the roadway?

15      A.   Correct.

16      Q.   I'm just curious, are you allowed to

17  play basketball in the roadway in the City of

18  Desologe?

19      A.   No, you're not.

20          MR. ROTHERT:   If I can have just one

21  moment.

22          THE COURT:   Sure.

23  BY MR. ROTHERT:

24      Q.   It would be the intention of the City of

25  Desologe to enforce Ordinance 2013.09 starting

1    tomorrow?

2         A.  Yes.

3              MR. ROTHERT:  I have no further

4    questions.

5              THE COURT:  All right.  Mr. Young.

6              MR. YOUNG:  I have no further

7    questions.

8              THE COURT:  All right.  You may step

9    down.

10             MR. YOUNG:  The Defendant calls Sean

11   Roney.

12             THE COURT:  Okay.

13                  SEAN RONEY,

14   being produced and sworn, testified as follows:

15             THE CLERK:  Please state your name

16   and spell it for the record.

17             THE WITNESS:  Sean Roney.  S-e-a-n

18   R-o-n-e-y.

19                 DIRECT EXAMINATION

20   BY MR. YOUNG:

21        Q.  Would you state your name, please.

22        A.  My name is Sean Roney.

23        Q.  What is your address?

24        A.  My home address?

25        Q.  Yes.

1          A.   610 South Vandervoort, Desologe,

2    Missouri.

3          Q.   Where are you employed?  I'm sorry.

4          A.   Do you want my employment address?

5          Q.   Yes.

6          A.   It's 1000 North Desologe Drive,

7    Desologe, Missouri.

8          Q.   And who are you employed by?

9          A.   Desologe Police Department.

10         Q.   What's your position with the Desologe

11   Police Department?

12         A.   Corporal.

13         Q.   Describe your duties in that position.

14         A.   The normal duties as a patrolman would

15   have.  I also have supervisory duties within the

16   department.

17         Q.   Okay.  How long have you had that

18   position?

19         A.   Since approximately 2007.

20         Q.   Let me direct your attention to

21   April 26th of 2013.  Were you on duty that day?

22         A.   Yes.

23         Q.   Can you describe to the Court what

24   involvement, if any, you had in connection with

25   Mr. Frank Ancona and other members of the Ku Klux

1    Klan in the City of Desologe.

2         A.   What involvement on that day?

3         Q.   Yes.

4         A.   I was notified that there had been

5    members of the KKK at city hall, and I was

6    responding to that area.  And while I was

7    responding to that area, I got called away to a

8    possible fight in progress of 20 people.  I went

9    to that call first.

10             And then after I left from that call, I

11   responded to the area of city hall.

12        Q.   All right.  And what, if anything,

13   happened next with regard to any involvement with

14   the KKK?

15        A.   As I was at the four-way intersection I

16   watched the group of members from the KKK come up

17   towards my location -- towards the intersection

18   from city hall.

19        Q.   What intersection was that?

20        A.   It would be Oak Street and Desologe

21   Drive.

22        Q.   Okay.  And what did you observe?

23        A.   They walked up.  And as they walked up

24   to that intersection, I seen them separate into

25   groups, and they went on every street corner in

1    that intersection.

2         Q.   Okay.  All right.  And what did you

3    observe next?

4         A.   As I yielded to make a left turn to go

5    into Oak Street from Desologe, I watched one

6    member approach a truck parked or yielding in the

7    four-way intersection, go to the window, and I

8    seen an exchange of a piece of paper.

9         Q.   And did that person go out into the

10   roadway in order to do that?

11        A.   Yes.

12        Q.   And was that truck a truck that had been

13   moving down the road, stopped at the stop sign

14   and then moved on?

15        A.   That's correct.

16        Q.   All right.  What else did you observe

17   that day?

18        A.   I -- at that point that's when I knew

19   that we had this new ordinance in place, so I

20   seen the violation of the ordinance.  And so I

21   parked my vehicle at the post office.  And then I

22   approached the group, which I knew Frank Ancona

23   was the leader of that, so I approached him, and

24   I initiated contact.

25        Q.   All right.  And just so the record is

1    clear, let me direct your attention to Exhibit 1.

2    That should be right -- is it right there on the

3    top of there?

4         A.   Yes.

5         Q.   And is that which is Ordinance Number

6    2103.04 -- is that the ordinance that was in

7    effect that day?

8         A.   It appears so, yes.

9         Q.   Okay.  And that ordinance has since been

10   repealed and an amended ordinance has been put in

11   its place; correct?

12        A.   I believe so.

13        Q.   I just want it to be clear on the

14   record.  So then you saw Frank Ancona.  What

15   happened next?

16        A.   I told him that we have a new ordinance

17   in place, and what I just observed was a

18   violation of that new ordinance.

19        Q.   Okay.  And what did he say in response?

20        A.   I believe his immediate response was,

21   well, that new ordinance is not constitutional.

22   And then I responded to him saying that's not my

23   place to say one way or the other.

24        Q.   What happened next?

25        A.   And then at some point we had basically

1    walked down to city hall.  I had a mutual

2    agreement to go down there to obtain a copy of

3    this new ordinance.  And we went into the city

4    hall building.  I asked for the copy, received

5    the copy, gave it to him, and he reviewed it in

6    front of me.

7         Q.  And prior to the time before you went

8    down to city hall with Mr. Ancona did you observe

9    other -- the conduct of other members of the KKK,

10   particularly within the roadway?

11        A.  Not at that point.  After we -- once we

12   left, I didn't observe anything.  My back was

13   turned to that group.

14        Q.  What I'm really asking is let's say

15   prior to your conversation with Mr. Ancona

16   besides the one person you saw approach a truck

17   did you see anyone else in the roadway?

18        A.  I wasn't looking at that point.  I was

19   talking to Frank and talking to that specific

20   group.

21        Q.  Okay.  So did you give him a copy of

22   that Exhibit 1 that was in effect that day at

23   that meeting at the city hall?

24        A.  Yes.

25        Q.  What happened next then as he left city

1    hall?

2          A.   We -- I went over the ordinance with

3    him.  I read it, and I focused his attention to

4    the prohibited content, section B of the

5    ordinance.  And that's the section where I

6    observed the violation.  And he said, Well, this

7    is not -- this is not constitutional.  Again, I

8    said it's not my place to say that.

9          He said, Are you asking me to leave?

10   And I said, No, I'm not.  And then at some point

11   during this conversation I stepped away from him

12   and made a phone call to our chief of police, and

13   I advised him what was going on, what was the

14   content.  And he just said basically relay the

15   message we're just asking him to abide by the new

16   ordinance.  And once I disconnected from the

17   phone, I said that exact same thing to Frank.

18         Q.   Okay.  And at any time did you ever make

19   statements to Mr. Ancona or any other members of

20   the Ku Klux Klan that was present that Desologe

21   was going to enforce the ordinance by arresting

22   him?

23         A.   There was no statement made about

24   enforcement.

25         Q.   How about any mention that they -- a

128

```
 1    consequence of a violation of the ordinance was
 2    led -- could lead to jail or fine?
 3           A.   There was no discussion of that.
 4           Q.   After they left you at city hall, did
 5    you observe them at all any more that day?
 6           A.   No, I did not.
 7           Q.   And since that time have you ever had
 8    any occasion to observe any member of the --
 9    identified member of the Ku Klux Klan within the
10    City of Desologe?
11           A.   There's been no contact since that day
12    from me at all.
13                MR. YOUNG:  I have nothing further,
14    Your Honor.
15                THE COURT:  All right.  Mr. Rothert.
16                   CROSS-EXAMINATION
17    BY MR. ROTHERT:
18           Q.   Hi.  I'm Tony Rothert.  I'm one of the
19    attorneys for the Plaintiffs.
20           A.   Hello.
21           Q.   You had mentioned in your -- at the
22    beginning of your testimony that one of the
23    members handed a leaflet to a truck that was
24    yielding at the intersection.  When you say
25    "yielding," do you mean stopped?
```

129

1          A.   Yes.   He was at the stop sign.   It was

2     his turn to stop and then progress right, left or

3     straight.

4          Q.   Okay.   And what are cars -- that's a

5     four-way stop intersection?

6          A.   Yes, it is.

7          Q.   And what are cars required to do when

8     they approach a stop sign?

9          A.   They need to make a complete stop.

10          Q.   You had contact with Mr. Ancona back in

11    October of 2012 as well, did you not?

12          A.   There was a previous contact.   The

13    date -- I don't recall the date, but there was

14    contact.

15          Q.   Do you remember telling him that his

16    handing out leaflets to vehicles was soliciting?

17               MR. YOUNG:   Objection, Your Honor.

18    That's in relation to the former ordinance that

19    Judge Fleissig has already ruled on.

20               THE COURT:   Does -- where are you

21    going with that?   Just --

22               MR. ROTHERT:   There's no followup

23    question.

24               THE COURT:   Okay.

25               MR. ROTHERT:   I'm just asking him if

1    he was the one -- he testified he was told that.

2    I'm asking if he's the one that told him that.

3                    THE COURT:   Okay.   I will sustain

4    the objection.

5    BY MR. ROTHERT:

6         Q.   In April of 2013 -- April 26th -- you

7    had authority to arrest the members of the Ku

8    Klux Klan and Frank Ancona who you observed

9    violating an ordinance?

10        A.   I have arrest authority, yes.

11        Q.   Yes.   As a police officer?

12        A.   Yes.

13                    MR. ROTHERT:   No further questions.

14                    MR. YOUNG:   Nothing further, Your

15   Honor.

16                    THE COURT:   You may step down.

17                    MR. YOUNG:   I'm getting my next

18   witness from out in the hallway.

19                    Thank you.

20                    Just so I'm clear, I'm assuming

21   there's no problem with allowing Cpl. Roney to be

22   released to go.

23                    THE COURT:   Oh, no, everyone can be

24   released or --

25                    MR. YOUNG:   He needs to get back to

1    town.
2                   Come forward and be sworn, please.
3                       DAVID BRAMMEIER,
4    being produced and sworn, testified as follows:
5                   THE CLERK:  Please state your name
6    and spell it for the record.
7                   THE WITNESS:  David Brammeier.
8    B-r-a-m-m-e-i-e-r.
9                   DIRECT EXAMINATION
10   BY MR. YOUNG:
11        Q.   Would you state your full name, please.
12        A.   David Brammeier.
13        Q.   And what's your address?
14        A.   1830 Craig Park Court, St. Louis,
15   Missouri.
16        Q.   Who are you employed by?
17        A.   I'm sorry?
18        Q.   Who are you employed by?
19        A.   The traffic and transportation
20   engineering firm of Crawford, Bunte, Brammeier,
21   St. Louis, Missouri.
22        Q.   And you may have just touched on it, but
23   elaborate on it please.  What's the business of
24   Crawford, Bunte?
25        A.   Traffic and transportation engineering.

1          Q.   Okay.  What's your job with Crawford,

2     Bunte?

3          A.   Currently I'm one of the principals.

4     I've been the CEO and president for the last

5     30 years, and I'm transferring down to a little

6     less role.

7          Q.   Is that for slowing down for retirement

8     purposes ultimately?

9          A.   Yeah, it's looking that way.

10         Q.   Describe your specific duties with

11    Crawford, Bunte currently.  I'm sure they've

12    changed over the years.

13         A.   Well, probably for the last 20 years and

14    I still continue to do marketing.  I do traffic

15    studies.  I do accident reconstruction for

16    lawyers.  And I do a lot of development work for

17    major developers here in the St. Louis area.

18         Q.   And how long have you been with

19    Crawford, Bunte, Brammeier?

20         A.   I've been with the Crawford firm for

21    42 years.  It's been Crawford, Bunte, Brammeier

22    since about 1978.

23         Q.   Okay.  Would you tell the Court what

24    your educational background is briefly.

25         A.   I'm sorry?

133

1          Q.   Can you tell the Court what your

2     educational background is briefly.

3          A.   Yes.   I have a bachelor of science

4     degree in civil engineering from Southern

5     Illinois University in Edwardsville.

6          Q.   All right.  And do you have any specific

7     certifications or registrations to professional

8     organizations?

9          A.   Yes.  I'm a Registered Professional

10    Engineer in the State of Missouri and Illinois.

11    And I'm also licensed as a Professional Traffic

12    Operation Engineer through a program with the

13    Institute of Transportation Engineers.  It's an

14    examination certification.

15         Q.   Do you have any other specialized

16    training?

17         A.   I have work zone safety as part of the

18    International Municipal Signal Association and

19    various other courses in traffic signing, traffic

20    signals and then work zones, work zone safety.

21         Q.   And can you describe for the Court what

22    exactly you went through in terms of work zone

23    safety and safety within a roadway type training.

24         A.   Yes.  The various agencies are always

25    trying to improve on the standards that we apply

1    when we have work in the public highway for the
2    proper and uniform design of signing, striping,
3    flashing lights, whether it's a short term
4    operation, long term operation for the safety of
5    workers.
6        Q.   And you mentioned you had some
7    specialized training.  What exactly was the
8    training in that particular area for work zone
9    safety?
10       A.   In that particular case it was a two- or
11   three-day training course, eight-hour day to be
12   certified in that particular area.
13       Q.   And do you hold a certificate in that
14   area?
15       A.   Yes.
16       Q.   Among others?
17       A.   Yes.
18       Q.   And who issued that certificate?
19       A.   I'm sorry?
20       Q.   Who issued that certificate?
21       A.   That's issued by what we call IMSA,
22   which is recognized in our business as kind of a
23   standard for the application of traffic control
24   and safety for workers, pedestrians, utility
25   workers.

1          Q.   What does IMSA stand for?

2          A.   It's the standards for the International

3    Municipal Signal Association.

4          Q.   And do you have any other memberships or

5    affiliations in professional organizations?

6          A.   Yes.  I belong to ITE, which is the

7    Institute of Transportation Engineers.  I belong

8    to the local organization here in St. Louis, the

9    TEAM, which is the Traffic Or Transportation

10   Engineering Association of Metropolitan St. Louis

11   and then the IMSA, which I had already

12   referenced.

13         Q.   Okay.  Describe for me your professional

14   experience over your career.

15         A.   For the past 42 years I've provided

16   consulting services to municipalities generally

17   in the Midwest.  In this case it would be the

18   State of Illinois, the State of Missouri, City of

19   St. Louis, St. Louis County and most every public

20   agency I'd say east of Jeff City, south of

21   Peoria, west of the Indiana state line in the

22   area.

23         Q.   In the normal course of that work do you

24   have to study and analyze and consider highway

25   and traffic safety considerations?

1          A.    The bulk of our work has been traffic

2     safety, and most of the improvements that we're

3     asked to identify and recommend is based on

4     accidents and improving traffic flow for drivers

5     and pedestrians.

6          Q.    Okay.  So describe for the Court how

7     those highway and traffic safety considerations

8     become important in the scope of those regular

9     duties on an ongoing basis.

10          A.    Well, often whether it's the State or

11     the County will ask us to look at, say, their top

12     20 intersections where incidents occurred and to

13     make recommendations on how to reduce those

14     incidents, whether it's vehicular accidents

15     whether it's pedestrian.  It's just whatever it

16     is.

17               And we've spent 42 years of our life

18     working with various agencies.  We've worked with

19     the Missouri Highway Department for probably

20     38 years on what they call a TEAP program, which

21     is the Traffic Engineering Assistance Program,

22     which has virtually taken us into every city in

23     the State of Missouri for the purpose of

24     identifying high accident locations and how to

25     improve them.

1      Q.   Have you worked with the City of

2   Desologe previous to your engagement in this

3   instance?

4      A.   Yes.

5      Q.   In what context have you worked with the

6   City of Desologe?

7      A.   A number of years ago -- I made a

8   reference to what I call the TEAP program, the

9   Traffic Engineering Assistance Program, and it's

10  a program provided by the Missouri Highway

11  Department to assist small cities that don't

12  generally have a traffic engineer -- a

13  professional traffic engineer.  So any city that

14  requests those services -- and we've worked in

15  the City of Desologe several times over the --

16  since 1973 when the program started.  There are

17  various intersections -- a few times we worked

18  with private developers.  I believe the Wal-Mart

19  along Desologe Road.  There's probably been half

20  a dozen projects since '73.

21     Q.   Prior to your most recent engagement by

22  Desologe, when was the last time you worked with

23  the City of Desologe?

24     A.   I believe it was about six years ago --

25  five or six years ago at the intersection of

1    Desologe and State Highway 8 to make safety

2    improvements.

3        Q.   In 2013 were you engaged by the City of

4    Desologe to make a study regarding the roadways?

5        A.   Yes.

6        Q.   What were you asked to do?

7        A.   I was asked to make an analysis of

8    safety risks that were associated with

9    pedestrians that are soliciting or distributing

10   information along the roadways.

11       Q.   All right.  When were you asked to

12   perform the analysis in general terms?

13       A.   I believe it was sometime in May of this

14   year.

15       Q.   Okay.  Describe specifically what aspect

16   of traffic and safety you were asked to consider

17   and on which you were asked to provide a opinion

18   and recommendation to the City.

19       A.   We were asked to look at and identify

20   issues as they involve the -- and, I'm sorry, we

21   were asked to identify issues and evaluate risk

22   affecting safety of both vehicles and pedestrians

23   in roadways as it relates to distributing or

24   soliciting information.

25       Q.   All right.  From an overview standpoint

1   just generally can you describe for me what steps

2   you took to further the engagement and end up

3   with an opinion and recommendation on that

4   subject.

5        A.   Well, first of all, I thought I had a

6   pretty good understanding of the information that

7   was available on the subject --

8             MR. ROTHERT:  Your Honor, I object.

9   The witness appears to be reading from something,

10  and I was wondering if that could be marked as an

11  exhibit or --

12            THE COURT:  Yes.  Yes.

13  BY MR. YOUNG:

14       Q.   So the record is clear, Mr. Brammeier,

15  you've got in front of you what's been marked as

16  Defendant's Exhibit 4; is that right?

17       A.   Yes.

18       Q.   I'll jump ahead here.  From the

19  standpoint of that is that a copy of the report

20  you produced?

21       A.   Yes.

22            (Defendant's Exhibit No. 4,

23  Brammeier Report, was identified.)

24  BY MR. YOUNG:

25       Q.   And that was produced and delivered by

1  you to the City of Desologe; is that correct?

2       A.   Yes.

3       Q.   All right.

4            MR. YOUNG:  At this time so the

5  record is clean I'll offer into evidence

6  Exhibit 4.

7            THE COURT:  Any objection?

8            MR. ROTHERT:  My objection is that

9  it's hearsay, but I think hearsay should be

10 allowed in preliminary injunctions, so you should

11 decide what weight to give it.

12           THE COURT:  All right.  Exhibit 4

13 will be admitted into evidence.

14           (Defendant's Exhibit No. 4,

15 Brammeier Report, was received.)

16           MR. YOUNG:  Thank you.

17 BY MR. YOUNG:

18      Q.   Mr. Brammeier, so we're clear, I'm

19 asking you questions.  Obviously, I don't want

20 you to read from the report.

21      A.   Sure.

22      Q.   To the extent that you need to refer to

23 something briefly to make an answer to my

24 question do that, but I'm not looking for you and

25 certainly the Court doesn't want to hear you read

1   your report.

2           But I want the Court to understand the

3   process that you went through and ultimately the

4   different stages you took in rendering an opinion

5   and a recommendation to Desologe.

6       A.  Yes, sir.

7       Q.  I think I asked you from an overview

8   standpoint what did you do in order to ultimately

9   render an opinion and recommendation to Desologe?

10      A.  The first thing I did is I consulted all

11  the industry sources that we use in our business,

12  information that would be provided by the

13  Institute of Transportation Engineers,

14  information by the Federal Highway

15  Administration, the Manual on Uniform Traffic --

16      Q.  Just so we're clear I don't want you to

17  go into that much.  I'm just looking for an

18  overview right now.  So you referenced materials.

19  What did you do next?  We'll come back to the

20  details of some of those.

21      A.  Oh, okay.  Excuse me.  I researched

22  every reference material I could find relating to

23  the subject.

24      Q.  What did you do with respect to the

25  actual roadways in Desologe?

142

1          A.   Eventually I -- I had been to Desologe
2    before, but I wanted to go down and drive the
3    primary highways, the secondary highways, the
4    local roads just to have a feel for the community
5    as it related to what I was looking at.
6          Q.   All right.  Did you take some
7    photographs while you were there?
8          A.   Yes.
9          Q.   And do those appear in your report?
10         A.   Yes.
11         Q.   So we're clear, I think you said you
12   looked at materials first as part of your
13   engagement.  And in the engagement you were asked
14   about pedestrians in the roadway, and I wanted to
15   make sure what did you mean by a pedestrian when
16   you used that word in your testimony today and in
17   your report?
18         A.   Generally I would define a pedestrian as
19   anybody in the roadway, whether they're crossing
20   the roadway, whether they're a utility worker, a
21   construction worker, a maintenance worker.  It's
22   a human being that's in the roadway.
23         Q.   Okay.  Let me make clear something.  At
24   the time that you were asked to get involved in
25   this engagement and at any time before you

1    rendered your opinion and recommendation in

2    what's been marked as Exhibit 4 had you seen a

3    copy of the amended ordinance as it's been come

4    to be known in Desologe or a draft of that

5    ordinance?

6          A.   The amended I believe I have.

7          Q.   You're talking about before the report?

8    Let me make sure you understand.

9          A.   Well, I'm not sure before the report.

10   Okay.  The one August 12th, no, I had not seen

11   that.

12         Q.   So the record is clear, at any time

13   prior to the making of that report by you and

14   delivering it to Desologe, did you see that

15   version of that ordinance or any draft of that

16   version?

17         A.   No.

18         Q.   Okay.  So in the context of your

19   testimony today and the report what do you mean

20   using the term solicitation in the context of a

21   pedestrian within the roadway?

22         A.   Solicitation is simply -- is the handing

23   out information or requesting information and a

24   return of it.  It's a two-way -- you hand

25   something out, you get something back.  It

144

1    doesn't always have to be money.  It could be

2    information, but both the driver and that person

3    has a function.

4         Q.   Okay.  And in the context of your

5    testimony today and in the context of the report

6    what did the -- or does the term distribution

7    mean in the context of a pedestrian within the

8    roadway?

9         A.   Simply handing information or even

10   discussing verbally with a driver, more of a

11   one-way action.

12        Q.   Okay.  So talking about your actual

13   engagement process and what you did, what

14   information did you look at first regarding

15   safety of pedestrians on U.S. roadways as part of

16   the engagement?

17        A.   One of the things in my research I found

18   was a number of statistics regarding pedestrian

19   deaths and pedestrian accidents, and that was all

20   referenced in my report.  I put that in there

21   because quite honestly after 42 years I'm not

22   sure I realized how many pedestrians were being

23   killed at intersections and just how important it

24   was and what an issue it was.

25        Q.   And was the source of that the National

1    Highway Transportation Safety Administration?

2         A.   Yes.

3         Q.   Okay.  So after you took a look at the

4    death and injuries that were caused to

5    pedestrians by motor vehicles in the roadway,

6    what information then did you then look at with

7    respect to next in that engagement?

8         A.   With respect to what?  I'm sorry.

9         Q.   What did you do next is what I'm trying

10   to get to.

11        A.   After that then I started to assemble

12   all the known information I could find regarding

13   what I call pedestrians in the roadway from every

14   source that I could find that had been noted in

15   that report, which was Federal Highway, ITE, the

16   National Transportation Safety, et cetera.

17        Q.   And you also had mentioned -- and we'll

18   come back to some of the details.  You also had

19   mentioned that you went and examined the roadways

20   of Desologe even though you were familiar with

21   them; correct?

22        A.   Yes.

23        Q.   And you put some photos in the report.

24   What types of roads are located in Desologe in

25   the context of your professional categorization?

1          A.   Well, first, we would describe U.S. 67

2     as a primary road or an arterial road, which has

3     grade separations, not at grade intersections --

4     interchanges.  Second we would describe arterial

5     roads which would be like Desologe Road itself.

6     Second would be major highways, which could be

7     Oak and others.  And then, of course, the

8     remaining would be just local roads.

9          Q.   All right.  Let me go back to --

10    Highway 67 is actually a divided four-lane

11    highway; is that right?

12         A.   Yes.

13         Q.   And what's the speed limit there?

14         A.   I -- it's at least 55 miles an hour.

15         Q.   Okay.  And then you talked about the

16    next level of roadways.  What are those roads?

17         A.   That would be the primary or secondary

18    roads, which are not grade separated, local

19    roads, major local roads like Desologe.

20         Q.   And what's the -- generally what is the

21    speed limit on those type of roadways within

22    Desologe?

23         A.   I believe that road varies from 25 to

24    35.  In the CBD it's 25, and outside it's the

25    35-mile an hour.

1      Q.   And CBD is the central business

2   district?

3      A.   Oh, I'm sorry.  Yes.  Central business

4   district.

5      Q.   Just so we're up with your lingo.  So

6   did you also look at intersections within the

7   City?

8      A.   I did.

9      Q.   And so the Court has something to look

10  to, did you produce a map that appears in your

11  report that's been marked Exhibit 4?

12     A.   Yes.  It's in Exhibit 4, but it's -- I

13  believe it's Exhibit 1 in the report, yes, sir.

14     Q.   Yeah.  It's comes right after page 21 of

15  the report; is that right?

16     A.   Oh, yes, it does.

17     Q.   Okay.  All right.  And so on that with

18  following the legends you show where signals are,

19  where stop signs are, what's an arterial and

20  what's a primary highway; is that right?

21     A.   Yes.

22     Q.   All right.  And so we talked about what

23  the speed limits are with respect to those.

24  There are other roadways -- so we're clear there

25  are other roadways within Desologe, but they do

148

1    not -- they do not constitute an arterial or

2    primary roadway, so you didn't include them on

3    the map; correct?

4         A.   Yes.

5         Q.   All right.  In reviewing the roadways in

6    Desologe did you consider safety details relevant

7    to pedestrians who may be within the roadways of

8    Desologe?

9         A.   Yes.

10        Q.   And specifically did -- what did you

11   consider about specific features of the roadways

12   within Desologe that were relevant on that

13   subject?

14        A.   Well, first, you know, I noted that the

15   roadways in Desologe were similar to most

16   communities.  I looked for side obstructions.  I

17   looked for restrictions in vertical and

18   horizontal curves.  I looked for sidewalks,

19   shoulders, the foliage that blocks the view of

20   signage.  I looked for sidewalks, graded inlets.

21   Just everything that I have had the experience in

22   40 years of knowing that creates an urban

23   highway.

24        Q.   And did you cover those specifics in the

25   portion of the report that's called safety

1    details and Desologe specific factors?

2         A.   Yes.

3         Q.   And you have reference to exhibits

4    there.  Are those -- do those exhibits tie to

5    photos that illustrate the particular factor that

6    you've identified in the paragraph?

7         A.   Yes.

8         Q.   All right.  Rather than go through all

9    the details of those, we'll have the Court -- ask

10   the court to look at that so the Court

11   understands.

12        So then next you talked earlier about

13   the industry material.  Explain why the industry

14   materials that you referred to became important

15   in your engagement.

16        A.   The industry materials are important,

17   because throughout this country every state is

18   required to adopt a manual.  We refer to that as

19   the manual on uniform control traffic devices for

20   streets and highways.  Every agency is required

21   to adopt one.  The Missouri highway certainly has

22   adopted one.

23        That manual provides in addition to

24   other manuals, but that manual provides the

25   necessary guidelines for engeners or anybody

1    that's preparing a set of plans or construction

2    plans, utility maps, to prepare temporary traffic

3    control plans that are uniform from state to

4    state, so drivers will recognize what they're up

5    against, you know, what they're coming into.  Is

6    it a work zone?  Is it a utility repair?  What is

7    it?  But the intent of the uniform manual is all

8    signs and all markings would be uniform.

9         Q.   Okay.  And so in the context of your

10   review of these materials what steps did you take

11   in order to identify industry materials on

12   professionally approved or recommended conditions

13   or standards that were directed at a location of

14   a pedestrian within a roadway for purposes of

15   solicitation or distribution?

16        A.   I researched probably 100 or more

17   various sources, and I was not able to find any

18   information that even used the words solicitor or

19   distributor in a roadway, period.

20        Q.   Did you find any materials that

21   identified, recommended or professionally

22   approved standards or conditions that you would

23   employ to allow pedestrians within the roadway to

24   do anything other than cross the street?

25        A.   The only thing we identified was the

1    manual on uniform control traffic devices

2    provides for traffic control plans to allow for

3    maintenance and construction workers and workers

4    that are doing incident management in the

5    roadway, and that's it.

6        Q.   All right.  And so when you say that's

7    what that allows, explain to the Court what

8    exactly do you mean by that.  What do those

9    standards basically say about who should be in

10   the roadway from a safety standpoint?

11       A.   Well, I think the industry standard

12   recognizes that occasionally you're going to have

13   an incident -- for example, an accident.  You

14   could have -- an incident could be anything.  It

15   could be an emergency vehicle, EMTs, police, fire

16   that are in the road, and they have to be there.

17   You know, they have to take care of that.

18            So part of the section on the manual

19   describes incident management.  The second part

20   describes utility operations.  We have a lot of

21   utilities in our roadways in this country.  So

22   whether it's renewal, replacement, repair.

23            And the third item is construction and

24   maintenance to repair our roads, to add to them,

25   to widen to them.  It's just part of life.  And

1    they identify those three different scenarios and

2    only those three.

3              I think what they're saying is if you

4    have to be out on the road, these are the only

5    three people that should be out in the road.  And

6    we need to protect them.

7         Q.   Okay.  And what are the -- can you just

8    describe generally for the Court what the types

9    of professionally approved or recommended

10   conditions or standards that those manuals say

11   apply to those three particular set of facts.

12        A.   Well, the standards provide signing and

13   markings for those three type of groups, and

14   that's it.  Nothing more than that.

15        Q.   Okay.  And those groups all are equipped

16   and have that kind of signing and material that's

17   necessary for their jobs that they have to do

18   within the roadway; is that right?

19        A.   These groups of people are constantly

20   trained as we are as professional engineers to

21   provide uniform signing for the incident that

22   they're taking care of.

23        Q.   And then those -- that signing and those

24   conditions that are approved in these manuals end

25   up being part of the law of the particular area

1    so everyone knows what the -- what conditions and

2    standards should apply to particular instances be

3    it highway workers, be it incident emergency type

4    of responders or utility workers in the roadway;

5    is that right?

6         A.   That's correct.

7         Q.   Did you find any materials at all in all

8    these materials of your search that allowed for a

9    set of conditions that could be used by a

10   pedestrian to protect a pedestrian in the roadway

11   for any solicitation or distribution conduct?

12        A.   I found none.

13        Q.   So having found none on that particular

14   point, what consideration, if any, did you give

15   to the industry materials that covered

16   professionally approved or recommended conditions

17   of standards that related to workers maintaining

18   or constructing a roadway or for incident

19   responders or utility workers in the roadway as

20   that might give you some guidance with respect to

21   a pedestrian soliciting or distributing in the

22   roadway?

23        A.   I wasn't able to find any reference to

24   any kind of protection that would provide for a

25   pedestrian soliciting or distributing in the

1  roadway.

2      Q.  Okay.  Describe for the Court just

3  generally some of the specific materials you

4  looked at as part of this process that you just

5  described.

6      A.  In my industry and there's books and

7  publications that are used by the Missouri

8  Highway Department that we're required to use in

9  the preparation of plans or development plans for

10  any public project.  ITE, which is the Institute

11  of Transportation Engineers, provides a great

12  deal of information on plans.

13          Federal Highway has gone to an extensive

14  trouble of putting together a manual on uniform

15  traffic control devices for streets and highways.

16  In Section 4 of their book they have 44 scenarios

17  for incident management, construction,

18  maintaining, utility work, and that's it.

19          IMSA, which is the institute -- or

20  International Municipal supply -- Signal

21  Association has standards, courses,

22  certifications for engineers and people in this

23  business, and they basically follow the MUTCD in

24  every case.  The State of Missouri has adopted

25  the manual.  And if you're doing any sort of

1    plans, whether they're roadway widening, utility

2    plan, you're required to follow the MUTCD as the

3    guideline.

4         Q.   Now, let me -- so we're clear, describe

5    what the MUTCD is.

6         A.   The MUTCD is the Manual on Uniform

7    Traffic Control Devices for Streets and Highways.

8    It is published by the Federal Highway

9    Administration, and every state is required to

10   adopt that manual or a version of it to adapt to

11   their local conditions.

12        Q.   All right.  So --

13             THE COURT:  Mr. Young.

14             MR. YOUNG:  Yes, Your Honor.

15             THE COURT:  I am sorry to stop you

16   at this point, but I need to take a break.

17             MR. YOUNG:  Okay.

18             THE COURT:  So we're going to take a

19   ten-minute recess here.  I apologize for that,

20   but I realize there's something I have to get on

21   my docket for tomorrow.  So I will just be back.

22   It says -- up here it says 2:33, so we'll just

23   start back -- let's start back at 2:50.

24             MR. YOUNG:  Okay.  Thank you, Your

25   Honor.

1                    (Proceedings stood in temporary

2        recess.)

3                    THE COURT:  Please be seated except

4        for you, Mr. Young.

5                    MR. YOUNG:  Thank you.

6        BY MR. YOUNG:

7             Q.   Mr. Brammeier, are you ready?

8             A.   Okay.

9             Q.   I think right before our break you were

10       talking about the MUTCD standards.  Is there one

11       set of standards that you relied on more than

12       others as part of this engagement?

13            A.   The first several in the series of 44 I

14       relied on more.  They describe actually work --

15       construction work, utility work, incident

16       management within the shoulder and then outside

17       of the area of the shoulder.

18            Q.   Okay.  What other factors did you

19       consider as relevant to your analysis of the

20       safety risk associated with a pedestrian involved

21       in solicitation or distribution in the roadway?

22            A.   The other part of the information that

23       we discovered or found was the articles dealing

24       with driver behavior and the distracted driver.

25       And I guess I didn't realize myself how

1    distracted drivers are.  It's in the world of

2    texting and GPS's and all the kind of other

3    information, but the distracted driver probably

4    is the reason for most of the accidents in this

5    country, and they're all identified in my report

6    on various pages.

7            Q.   And is one of the distractions to a

8    driver the unexpected placement of a pedestrian

9    in the roadway as they're driving along roads?

10           A.   Yes.

11           Q.   So what did you consider was relevant

12   about these identified distractions for purposes

13   of your specific engagement here?

14           A.   Well, what was relevant is the driver

15   being distracted is in a 4,000-pound vehicle.

16   The pedestrian is a 200 pound or less generally

17   person.  The number of distractions identified by

18   the various industry sources that I utilized is

19   pretty alarming.  And the number of fatalities

20   and deaths at intersections associated with

21   distracted driving and all the other things that

22   are happening with distracted driving and texting

23   it's pretty alarming.  And so there in and itself

24   is the bulk of the problem is the driver.

25           Q.   Okay.  So is there anything else we

1    haven't talked about that you utilized in forming

2    your opinion and recommendation to Desologe?

3         A.   I can't think of anything else.

4         Q.   Okay.  In reaching your opinion and

5    recommendation what did you consider the most

6    important factors that led you to come to a

7    conclusion and opinion regarding the safety of a

8    pedestrian involved in solicitation or

9    distribution in the roadway?

10        A.   Probably in the information that we

11   found on the number of pedestrians that are

12   killed and injured every year at intersections

13   would be the most important factor.

14        Q.   All right.  Did you consider what was

15   involved in actually the act of solicitation by a

16   pedestrian within the roadway?

17        A.   Well, the mere fact that you're handing

18   out and receiving something or just handing

19   something out, whether you're soliciting or

20   distributing, it's a tremendous distraction to

21   the driver, and it's identified in numerous

22   articles that I found, and two of them are

23   attached to my report, they talk about the

24   distractions to the drivers, and it's just awful

25   serious.  It's a serious matter.

1      Q.   Did you consider what was involved by a

2 pedestrian involved in the distribution of

3 materials while entering the roadway?

4      A.   I believe it to be about the same amount

5 of distraction.

6      Q.   Okay.  So I think you may have answered

7 this question, but let me ask it this way:  How

8 does the time involved in each of the respective

9 activities by a pedestrian within the roadway

10 compare, meaning is the time that it takes to be

11 involved in a solicitation within the roadway

12 versus the time involved in distribution in the

13 roadway impact your decision in any way?

14      A.   No.

15      Q.   And why was that?

16      A.   Because I believe they are both

17 distractions, and neither one of them should be

18 allowed.

19      Q.   Okay.  And so what -- in summary what

20 did you consider the most important steps you

21 took that allowed you to render an opinion and

22 recommendation?

23      A.   When I completed my analysis and I found

24 no information anywhere -- I don't care what

25 source it was -- regarding protection of a

1    pedestrian in the roadway for doing soliciting or

2    distributing, the only information I could find

3    was traffic control plans were temporary for

4    construction workers, utility workers and

5    incident management, I came to the conclusion

6    that there should be no pedestrian in the roadway

7    unless they're in one of those three categories

8    or a pedestrian crossing the road, because that's

9    just part of our environment.

10          Q.   So basically what you just described is

11   your opinion that you rendered to Desologe with

12   respect to the safety of pedestrians located

13   within a roadway to distribute or solicit?

14          A.   Yes.

15          Q.   So what was your recommendation to the

16   City of Desologe?

17          A.   My recommendation was not to allow any

18   city official to have to determine a traffic

19   control plan.  They're complex enough for

20   professional engineers that have training --

21   continued training on this.  So my recommendation

22   was not to allow it in the first place, because

23   they're not a necessary part of the traffic

24   control plan identified by the manual.

25          Q.   Well -- and isn't it true that there --

161

1    as you said, there was no particular standards or

2    conditions that would cover a pedestrian

3    soliciting or distributing in the roadway?

4         A.   I could find no information, a standard

5    or not.

6         Q.   Okay.  So after you completed your

7    report, it was delivered to the City of Desologe;

8    is that right?

9         A.   Yes.

10        Q.   So after Desologe received the report,

11   what, if anything, did you learn that the City

12   did with respect to its concerns over the safety

13   of pedestrians who would solicit or distribute

14   within its roadways?

15        A.   It was shortly after that I was told

16   that they passed the ordinance.  I believe it was

17   dated sometime in August.

18        Q.   Is that Exhibit 5 before you?

19             MR. ROTHERT:  We'll stipulate that

20   it is.

21             MR. YOUNG:  Okay.

22   BY MR. YOUNG:

23        A.   I don't seem to have it here.

24        Q.   All right.  So in your opinion from a

25   safety standpoint is there any rational basis

1    supporting a limitation or any kind of a limit on

2    prohibition to specific areas or locations or

3    streets within the City of Desologe for the

4    prohibition on solicitation or distribution in

5    the roadway?

6         A.   My recommendation is it should not be

7    allowed at all.

8         Q.   Explain your answer why you say that.

9         A.   Based on the research information I

10   found regarding the fatalities, the injuries of

11   pedestrians at roadways and based on the

12   standards that apply to my industry, the ones

13   that we are required to follow when we prepare

14   traffic plans for any kind of project, it's

15   clearly stated in Section 4 of the manual of

16   uniform traffic control devices that traffic

17   control plans are identified for three specific

18   areas, and I don't believe a pedestrian in the

19   roadway soliciting or distributing falls into

20   those three categories.

21        Q.   Okay.  So have you had a chance to

22   review the amended ordinance that was passed by

23   the board of Desologe to address the safety

24   concerns after your report was rendered?

25        A.   Yes.

1          Q.   I direct your attention to Exhibit 5.
2          A.   For some reason I don't see it.  Excuse
3     me.  I'm sorry.
4          Q.   Based on your knowledge of the Desologe
5     roadways and this amended ordinance as you read
6     it, are there any areas that have a non-traveled
7     portion of a roadway as the term roadway is
8     defined in the ordinance?
9          A.   No.
10         Q.   Explain why you say that.
11         A.   Because the travel ways -- in what I
12     found in Desologe either the travel ways or the
13     parking areas are what was pretty much in
14     Desologe, and I think they've covered that for
15     the purpose of this ordinance.
16         Q.   All right.  In Desologe is the top of
17     the road at the end of the pavement, is that part
18     of the roadway under the definition in the
19     ordinance, or is it outside of the roadway?
20         A.   I would actually call it the face of the
21     curb instead of the top of the curb.  Actually,
22     the face of the curb would be the edge of the
23     roadway.
24         Q.   So the top of the curb would not be part
25     of the roadway; is that right?

1        A.    That's correct.

2        Q.    Are there any center or

3    middle-of-the-road medians within Desologe based

4    on your review and knowledge of the city streets

5    and roads?

6        A.    There's no center-of-the-road medians at

7    all.

8        Q.    Are there any parking lanes where motor

9    vehicles do not travel or operate within the City

10   of Desologe?

11       A.    No.

12       Q.    And so cars are always parking,

13   operating, coming in and out of any of those

14   parking lanes; is that right?

15       A.    They can, yes.

16       Q.    If there are cars parked within parking

17   spaces, what would be your opinion of the safety

18   risks associated with pedestrians who made

19   efforts to solicit or distribute from parking

20   lanes in between parked cars to motor vehicles on

21   the balance of the roadway?

22       A.    Outside intersections -- most accidents

23   involving pedestrians involved backing vehicles.

24   And having pedestrians interfacing with parking

25   areas is extremely dangerous.

1          Q.   In your report on page 19 you use the
2     phrase travel way of a public roadway:  Do you
3     see that?  Page 19.
4          A.   Oh, yes.
5          Q.   And what did you mean by that?
6          A.   What do I mean by that is the area in
7     which the car travels, the area which a car can
8     leave a travel lane and use a parking lane is
9     part of the travel way.
10         Q.   Okay.  And so at the time you used the
11    term -- this phrase travel way of a public
12    roadway you had not seen any definition of
13    roadway in the new amended ordinance that's
14    marked Exhibit 5; is that correct?
15         A.   Yeah.  I had never seen the ordinance
16    until it was passed.
17         Q.   So as you now look at that definition of
18    roadways in the amended ordinance marked Exhibit
19    5, how would you compare that definition of a
20    public roadway to what you intend to mean when
21    you used the phrase travel way of a public
22    roadway?
23         A.   I believe their definition is consistent
24    with mine.
25         Q.   So it's one in the same?

1          A.   Yes.

2          Q.   Based on your knowledge of the roadways

3     within Desologe, is it possible for a pedestrian

4     to distribute leaflets or materials to occupants

5     of stopped vehicles without going out into the

6     roadway where the motor vehicles are being

7     operated?

8          A.   No.

9          Q.   What could happen if in your opinion --

10    I'm sorry, what could happen in your opinion if

11    Desologe allowed pedestrians to enter into the

12    roadway to solicit or distribute as prohibited in

13    the amended ordinance?

14         A.   It's my belief that potentially they

15    could add to the statistics of pedestrian

16    accidents at intersections or fatalities.

17              MR. YOUNG:  I have no further

18    questions of the witness.

19              THE COURT:  All right.  Mr. Rothert.

20                 CROSS-EXAMINATION

21    BY MR. ROTHERT:

22         Q.   Good afternoon.

23         A.   Good afternoon.

24         Q.   So it's your testimony that no one other

25    than in three categories should be allowed to be

1    in a roadway that's not in a car?

2          A.   That's correct.

3          Q.   And what are those three categories?

4          A.   Utility workers, construction workers

5    and incident management personnel.

6          Q.   Okay.  And then you mentioned one

7    exception.  What was that?

8          A.   Well, a pedestrian is part of our

9    environment.  That's a given necessity to cross

10   the street.

11         Q.   Why should we make exceptions for

12   pedestrians?

13         A.   I don't believe I'm making an exception.

14   A pedestrian is part of our environment.  With

15   the other three the guidelines have proven they

16   need to be protected against the distracted

17   drivers, et cetera.

18         Q.   Isn't it true that people communicating

19   ideas by handbills and literature in streets is

20   part of our environment as well?

21         A.   I don't believe it should be part of it.

22   I think it's a distraction.  It's identified in

23   both of the amendments that I have added to my

24   report.

25         Q.   But it is part of our -- our environment

1    in the United States.  That's a tradition;

2    correct?

3         A.  I don't know if it is or not.  I'm

4    saying it's a distraction to a driver, and it's

5    identified in both of the add-ons that I have to

6    the report.

7         Q.  Should crossing guards be allowed in

8    roadways?

9         A.  Should what?

10        Q.  Should crossing guards be allowed in

11   roadways?

12        A.  Crossing guards certainly have another

13   respect in our society for crossing children, and

14   I think they have come to be respected.  They

15   don't generally stand in the middle of the

16   roadway except at times when they are allowing

17   children to cross.

18        Q.  So they should be allowed?

19        A.  Each community handles it differently,

20   and I do believe they are a safety part of

21   children crossing highways.  That's correct.

22        Q.  Should pedestrians be allowed to walk

23   along a road where there's no sidewalk, for

24   instance?

25        A.  Often there's not a choice.

1          Q.   Okay.  So should that be allowed?

2          A.   I just said there's not a choice to

3     walk.

4          Q.   Or is that a distraction?

5          A.   A lot of pedestrians are killed along

6     the roadways, and sometimes there's not a choice,

7     because the roadways have been built without

8     accommodations for pedestrians.

9          Q.   Should people be allowed to walk on the

10    roadway to get to their cars if the car is parked

11    in a parkway along a road?

12         A.   To get to their car:  Is that what

13    you're saying?

14         Q.   Yes.  Yes.

15         A.   Well, that's pretty obvious, I think.

16    Yeah, of course.

17         Q.   Okay.  What about crossing the street --

18    well, let me ask you, if you could look in front

19    of you at exhibit -- Exhibit H.  There's a stack

20    of photographs.

21         A.   If I have it, I don't see it.  Okay.

22         Q.   Could you look -- they may not be in

23    order.  If you could find H.

24         A.   Okay.

25         Q.   Do you see that box there?

1        A.   I do.

2        Q.   Are you familiar with that from your

3   travels to Desologe?

4        A.   I did not see that.  Or if I did, I was

5   not looking for it.

6        Q.   Okay.  Can you tell what that is?

7        A.   It looks like it's a box to make a bill

8   payment.

9        Q.   Okay.  Is that safe to have -- to have

10  people walk up and pay their bills?

11       A.   I think it's more of a drive-up, isn't

12  it?

13       Q.   I don't know.  Is it on the right side

14  of the street to be a drive-up?

15       A.   It looks to be a drive-up.  Again, I

16  think we're confusing a box for a purpose of

17  payment and somebody standing out in the middle

18  of the roadway as a safety issue.  Somebody

19  standing in the road in my professional opinion

20  is a safety issue.

21       Q.   What about skateboarding in roads,

22  should that be allowed?

23       A.   In my opinion probably not.

24       Q.   What about riding a bicycle?

25       A.   That's part of our -- in general if it's

1  done, you know, for a reason of transportation

2  and not kids zigzagging.  I mean, people ride

3  their bicycles in our roadways.  And if they

4  follow the same rules and regulations that a

5  motor vehicle does, then it would be certainly

6  expected.

7      Q.  What about soliciting petition

8  signatures in the roadway, should that be

9  allowed, go up to a car to ask them to sign my

10 petition?

11     A.  My report would not allow that.

12     Q.  Now, you were not able to identify any

13 articles that talked about the distribution of

14 literature as a distraction in roadways, were

15 you?

16     A.  I could find no article that even talked

17 about anything with distribution or soliciting.

18     Q.  Have you heard of complete streets?

19     A.  Of who?

20     Q.  Complete streets?

21     A.  Oh, yes.

22     Q.  Can you tell me what that is?

23     A.  Well, it's a -- it's a new concept.

24 It's coming across the nation.  And its purpose

25 is to make friendly, walkable, rideable streets,

1    but the intent isn't to distribute information in

2    intersections and distract drivers.  It's really

3    the intent is just the opposite.

4        Q.  Well, isn't the intent of the complete

5    streets movement to make streets that are

6    available for multi-mobile use?

7        A.  The intent of complete streets is to

8    make them safe and usable for all modes of

9    transportation, and the purpose is really to get

10   the distractions out of the intersections.  So

11   it's really just the opposite of what you might

12   think they're for.

13       Q.  Well, I'm not saying what I think.  The

14   idea of complete streets is that streets should

15   be safe and accessible to pedestrians and motor

16   vehicle users and bicyclists; correct?

17       A.  The purpose of complete streets is to

18   get the public that we realize today out walking

19   and riding bicycles and provide them safe access

20   across the highway and not to distribute or

21   distract drivers that are in the public roadway.

22       Q.  Now, based on your experience, you're

23   able to tell from visiting intersections which

24   ones are more dangerous or less dangerous;

25   correct?

173

```
1        A.   I probably can't stand there and look at

2   them.  No.  Statistics would show -- you have to

3   have statistics.  You have to have accident

4   reports.

5        Q.   Okay.  And so did you look at any action

6   reports for any of the intersections in the City

7   of Desologe to determine which ones were more

8   dangerous or less dangerous?

9        A.   No.

10       Q.   But someone could do that; correct?

11       A.   Correct.

12       Q.   And did you try to identify -- looking

13  at incident reports couldn't you identify maybe

14  times when intersections were dangerous or not,

15  or are they equally dangerous all the time?

16       A.   No.  Well, no, they're certainly not

17  equally dangerous all the time.  Statistics would

18  indicate that certain times of the night they're

19  more dangerous.  During peak hours they can be

20  more dangerous.

21       Q.   Are you aware of any -- in your trip to

22  Desologe were you able to identify any traffic

23  congestion problems?

24       A.   Congestion is kind of in the eyes of the

25  beholder.  What we think in St. Louis is
```

1    congestion -- smaller communities have a

2    different tolerance for congestion.  I was there

3    during peak times, and the traffic backed up six,

4    eight cars.  In fact, there's a picture in the

5    report -- one of the exhibits -- that shows

6    accumulating of vehicles at one of the

7    intersections.  I probably would not really call

8    it congestion, but it certainly -- smaller

9    communities have a different point of view

10   sometimes.

11        Q.   How long did it take you to prepare --

12   to do your work and prepare your report?  After

13   you were hired to go into Desologe and visiting

14   and doing the research and drafting your report

15   how long did that take?

16        A.   Well, your question is how long did it

17   take to do the report?

18        Q.   No.  All of it.  From the time you were

19   hired, to going down seeing Desologe, taking the

20   pictures, doing the research, writing the report

21   and I'm asking you to state days, weeks, months.

22        A.   Oh, it didn't take months.  I had a

23   meeting or two with the attorney.  I spent a day

24   going to Desologe and driving as many of the

25   streets -- all the primary streets, all the

175

1    secondary and sampling some of the local roads.

2    And I probably spent a day in doing research

3    certainly looking for information that I never

4    found, as I've already testified to.  And then I

5    spent probably another two days putting the

6    reports together with the documentation and the

7    pictures and the two supporting articles on

8    distracted drivers and also researching the

9    manual to make sure that it applied in this case

10   as thoroughly as I expected it to.

11        Q.  What attorney did you meet with?

12        A.  Mr. Young.

13        Q.  Okay.  And what was -- what did you

14   discuss at those meetings?

15        A.  I'm sorry?

16        Q.  That was before you did your report?

17        A.  Well, of course, I met with him before I

18   did the report.

19        Q.  Okay.  What did you discuss?

20             THE COURT:  I was expecting

21   something here.  I'm sorry.  I was anticipating

22   I'll just put it that way.  Yes, Mr. Young.

23             MR. YOUNG:  Objection, Your Honor.

24   I think this gets into a privileged area of trial

25   preparation.  He's clearly an expert witness for

1  Desologe, and I think that what we talked about

2  in terms of engagement and what happened after

3  that is a privileged area.

4           THE COURT:  Do you have a response

5  to that?

6           MR. ROTHERT:  Well, my response

7  would be that he's a third party, not the client

8  and that meetings before his study go to the --

9  go to the reliability of the study.

10          THE COURT:  I'm going to sustain the

11  objection.

12  BY MR. ROTHERT:

13      Q.   In your review of the literature did you

14  review any literature from the American

15  Association of State Highway and Traffic

16  Officials?

17      A.   That's one of the main sources that we

18  use in our business.

19      Q.   Okay.  And did you find any guidance

20  from the American Association of State Highway

21  and Traffic Officials regarding protecting

22  pedestrian access to roads?

23      A.   The book has a lot of guidelines and

24  standards as it relates to vehicles and

25  pedestrians, but there's nothing in that book

1    that addresses solicitors or distributors.

2        Q.   And you're talking about a book, is

3    there just one book?

4        A.   It's one huge book.

5        Q.   Okay.  And do you know when that book

6    was published?

7        A.   It's published -- it's updated every

8    several years.  It's the American Association of

9    State Highway Officials, and the latest one, I

10   believe, is 2012 maybe.  It's updated constantly.

11       Q.   Okay.  And they give other guidance,

12   though, beyond the book; correct?

13       A.   They have books and supplements and

14   guidelines, yes, sir, they do.

15       Q.   What about the Transportation and

16   Research Board of the National Academies -- of

17   the National Academies?

18       A.   They put out so many different

19   publications on this subject that I would need a

20   box to bring them into this courtroom.

21       Q.   Well, did you review them?

22       A.   I reviewed as many of them as I could,

23   yes.

24       Q.   Okay.  How many?

25       A.   Probably 30.

1          Q.   Okay.  And out of how many?

2          A.   There's hundreds of them.

3          Q.   What about the Federal Highway

4     Administration?

5          A.   The Federal Highway also publishes

6     numerous books.  The main one is the Manual on

7     Uniform Traffic Control Devices For Streets and

8     Highways, particularly Section 4 for

9     construction, utility and incident management.

10         Q.   Okay.  Did you read the section about

11    pedestrian access to roads?

12         A.   I've read most of the book at various

13    times over the 42 years, yes.

14         Q.   Okay.  But in preparation for your

15    opinion here did you read the section on

16    pedestrian access to roads?

17         A.   No.

18         Q.   Okay.  Did you look at all the streets

19    and intersections in Desologe, or did you limit

20    your --

21         A.   I drove all the major highways.  I drove

22    all the secondary highways and many of the local

23    roads.  I probably could have driven them all in

24    a couple more hours, but there's not that many,

25    but, no, did I drive them all?  No.

1          Q.   Do you think it would be -- if Desologe

2     limited distributing literature to non moving

3     vehicles, that would be safer than having no

4     regulation; correct?

5          A.   I'm sorry, I didn't --

6          Q.   If the -- if the exception was for -- or

7     if the rule was that you can't distribute

8     literature except for when the vehicle is not

9     moving, that would be -- would that help with the

10    distraction safety issue?

11         A.   How does a vehicle not move unless it's

12    parked?

13         Q.   Well, are you familiar with any

14    intersections in Desologe?  But let me ask you,

15    can you look at Exhibit G?

16         A.   What?

17         Q.   Exhibit G that's in front you.  It's one

18    of the photos.

19         A.   Okay.  Which one am I looking at?

20         Q.   G.

21         A.   G?

22         Q.   G.

23         A.   Okay.

24         Q.   It's the back of a sign, but do you see

25    a sign there that has six sides -- or eight

1    sides?

2         A.   It says, No skateboards.

3         Q.   Right.  Above that.

4         A.   Well, it's a stop sign.  I assume it is.

5         Q.   Yes.  And vehicles stop at stop signs;

6    correct?  Vehicles stop at stop signs?

7         A.   I assume it's a stop sign.  I can't see

8    it.

9         Q.   Okay.  Well are there stop signs in

10   Desologe?

11        A.   Most of the stop signs look like that on

12   the back side.

13        Q.   But are there stop signs in Desologe is

14   what I'm asking?

15        A.   Yes.

16        Q.   And do vehicles stop at stop signs?

17        A.   Yes.

18        Q.   It's safer to distribute literature in a

19   roadway during the daylight than it would be at

20   night; correct?

21        A.   I've testified it's unsafe to distribute

22   or to solicit in a roadway where there's

23   pedestrians and vehicles under any circumstances,

24   period.

25        Q.   And I heard your testimony.  I'm asking

1  if in your opinion it would be safer --

2  relative -- during the day than at night?

3       A.   I have not reviewed whether it has been

4  or not.

5       Q.   Okay.

6       A.   I don't think it's safe to distribute at

7  all at the daylight --

8       Q.   I understand.

9       A.   Okay.

10       Q.   Okay.  You don't know if there's any

11  relative difference?

12       A.   I haven't researched that, but I'm sure

13  there is.

14       Q.   Okay.  Do you know is it safe or

15  relatively more safe to distribute literature to

16  motorists who are coming to a stop like at a

17  traffic signal or a stop sign than, you know,

18  somewhere else on the roadway?

19       A.   I believe it's not safe to distribute or

20  solicit a pedestrian with a vehicle in a stop or

21  unstopped traffic signal or any portion of the

22  roadway, period.

23       Q.   Would it be safer if you're trying to

24  prevent -- the purpose here of this ordinance in

25  your opinion would be to prevent distraction for

1    drivers; is that correct?

2         A.   Distraction and injuries.

3         Q.   Would it be -- would it prevent

4    distraction and injuries if Desologe banned

5    texting while driving?

6         A.   I believe most communities have done

7    that, so --

8         Q.   Okay.  I wasn't asking if most

9    communities have.  I was asking if that would --

10   would that lower distractions?

11        A.   Texting has been identified as a

12   distraction to drivers, yes.

13        Q.   And there's lots of research on that;

14   correct?

15        A.   There's a lot of research on that.

16        Q.   But what about using cell phones while

17   driving, there's a lot of research on that, isn't

18   there?

19        A.   That's identified in the second addendum

20   to my report also.

21        Q.   And there's also quite a bit of research

22   about eating while driving; correct, isn't there,

23   that that's distracting?

24        A.   In the second addendum of my report that

25   is also identified among other -- other subjects.

1     Q.   And do you have any knowledge of whether
2  Desologe has banned any of those things, texting
3  while driving or using a cell phone while driving
4  or eating while driving?
5     A.   I'm not aware of those.
6     Q.   Okay.  If you could look at Exhibit L,
7  it's another one of those photos.
8     A.   L, did you say?
9     Q.   L.  Yes.
10    A.   Okay.
11    Q.   Where do you think it would be safe near
12 that stop sign for someone to distribute
13 literature to a car that's stopped at the stop
14 sign?
15    A.   There's nowhere on that roadway or on
16 that sign that there would be a place that's safe
17 for anyone to distribute or solicit information
18 at that intersection.
19    Q.   Let me ask you to look at Exhibit S.
20    A.   I'm sorry?
21    Q.   S.  Exhibit S.
22    A.   S.  Okay.
23    Q.   Is there anywhere in that picture that
24 would be safe to distribute literature?
25    A.   There's nowhere in that intersection as

1  defined by the roadway in my report that would be

2  safe for a pedestrian to solicit or distribute

3  information.

4       Q.   And where would you consider the roadway

5  starting?

6       A.   The face of the curb to the face of the

7  opposite curb.

8       Q.   Okay.  And if there's no curb -- do you

9  see a curb in Plaintiff's Exhibit S?

10      A.   There is a curb there.

11      Q.   Oh, there is?

12      A.   And you're looking at Exhibit S?

13      Q.   I'm looking at a smaller version.  Maybe

14  I'm talking about the wrong one.  What about U,

15  Plaintiff's Exhibit U?

16      A.   Which one?

17      Q.   This is U.

18      A.   Yes.  Let me -- can I -- is this U?  It

19  looks like V to me, but U?

20      Q.   Yes.

21      A.   Okay.

22      Q.   Where would it be safe to stand in that

23  -- U -- and distribute literature in that picture

24  U?

25      A.   There would be no place within the

1   roadway to distribute at that location.

2        Q.   And where does the roadway begin?

3        A.   The roadway in this case would be

4   everything that's paved from one side of the road

5   to the other, and clearly it is the travel way

6   for the vehicles.

7        Q.   And you think it's dangerous to

8   distribute literature to vehicles in parking

9   areas park -- where they park along the street

10  too?

11       A.   If they're parked on a public street

12  where vehicles have backing maneuvers, it is

13  extremely dangerous.

14       Q.   Okay.  So do you think it's equally

15  dangerous in parking lots?

16       A.   I believe it also occurs in parking

17  lots, but that's a private manner, a Wal-Mart

18  lot, but, yes, it's still --

19       Q.   What about a public parking lot like the

20  one in Desologe?

21       A.   Backing maneuvers on vehicles make it

22  very dangerous for people to be meandering around

23  a parking lot.

24            MR. ROTHERT:  Okay.  I have no

25  further questions.

1           MR. YOUNG:  I have just a couple

2     more.

3                THE COURT:  Okay.  Mr. Young.

4                  REDIRECT EXAMINATION

5     BY MR. YOUNG:

6          Q.   Let me direct your attention,

7     Mr. Brammeier, to Exhibits L and S and U.  Now, I

8     want to make sure I understood your testimony.

9     What you were saying is there's no safe place to

10    distribute or solicit from within the roadway in

11    any of those three photographs; is that correct?

12         A.   That's correct.

13         Q.   It's possible to distribute safely in L

14    from the grass at the edge of the pavement; is

15    that right?

16         A.   I believe that would be, yes.

17         Q.   And that would be to a car parked on the

18    side of the road; correct?

19         A.   Yes.

20         Q.   And is that also true in each of S and U

21    that distribution could occur from the grass that

22    shows in the photographs to a parked car on the

23    side of the road?

24         A.   A parked car, yes, that would be --

25                MR. YOUNG:  Okay.  I have no further

1    questions, Your Honor.

2                THE COURT:  Okay.  You may step

3    down.

4                THE WITNESS:  Thank you.

5                MR. YOUNG:  I have no further

6    witnesses.

7                THE COURT:  All right.  Well, do you

8    wish to proceed with argument at this time?

9                MR. ROTHERT:  Yes, please.

10               THE COURT:  Okay.  Your Honor, we

11   can excuse Mr. Brammeier; correct?

12               MR. ROTHERT:  Yes.

13               THE COURT:  Yes.

14               MR. YOUNG:  Thank you.

15               (Plaintiff's Argument.)

16               MR. ROTHERT:  May it please the

17   Court.  The parties have done quite a bit of

18   briefing on this, so I'm not going to regurgitate

19   everything here.  But I'm not intending to

20   abandon any arguments.  And any questions you

21   have are fine.

22               I also want to bring to the Court's

23   attention there's a new Eighth circuit case about

24   reversing the denial of a preliminary injunction

25   where someone is prohibited from distributing

1    leaflets at a fair.  And that case is Johnson v.

2    Minneapolis Park and Recreation Board.  The

3    Eighth Circuit Number is 12-2419.  And it was

4    decided on September 11th, 2013.  So I read it on

5    my phone at the break, but it seems very close to

6    on point.

7                    THE COURT:  So there's an Eighth

8    Circuit case that came out today?

9                    MR. ROTHERT:  Today.

10                   THE COURT:  Shall we just all take a

11   break and read it right now and -- No.  I'm

12   just --

13                   MR. ROTHERT:  I read it just -- I'm

14   happy --

15                   THE COURT:  Okay.  What was the -- I

16   mean -- okay.

17                   MR. ROTHERT:  I mean, I think it has

18   some relevance, and I can discuss it.  It

19   discusses the Heffron case, and it discusses many

20   of the other cases that we rely on.

21                   THE COURT:  Okay.  All right.

22                   MR. ROTHERT:  I just got it at the

23   last break and put it on my little phone, you

24   know, and it addresses -- well, it reverses the

25   denial of preliminary injunction to distribute --

189

1    there it was bibles at a fair.  It was the LGBT

2    Pride Fair in Minneapolis.

3              It was found the ordinance was not

4    likely to be found -- or not likely to be

5    narrowly tailored in part because it was under

6    inclusive.  It allowed a lot of other

7    distribution activity that would have the same

8    harms that had been identified by the City.

9              And, oh, and the Court also made the

10   distinction between distribution and solicitation

11   and how they're different.  So that's the

12   relevance I think of the case obviously.

13              THE COURT:  Okay.

14              MR. ROTHERT:  It came after we were

15   here.  It came out after we were here.

16              THE COURT:  All right.  Well,

17   obviously, we will all be taking a look at it

18   for --

19              MR. ROTHERT:  And I only had a quick

20   look at it.

21              So just very briefly on the former

22   ordinance --

23              THE COURT:  Yes, let's talk about

24   standing.

25              MR. ROTHERT:  -- the April 1st --

190

1    for preliminary injunction purposes --

2                    THE COURT:  Uh-huh.

3                    MR. ROTHERT:  -- you know, there is

4    a nominal damages claim, and I think that gives

5    standing in the case, because they left -- they

6    left.  They stopped their First Amendment

7    activities.

8                    But for preliminary injunction

9    purposes, you know, Frank Ancona, who admitted

10   under oath that he violated that ordinance, and

11   the police officer who says he saw him do it, he

12   can still be charged under the ordinance, because

13   he was violating a law that was in effect at the

14   time.

15                   Certainly the City could disavow and

16   say they won't do that, and that would take away

17   the prospective harm, but that hasn't happened.

18                   THE COURT:  Yes, Mr. Young.

19                   MR. YOUNG:  Given the invitation

20   I'll stipulate that the City will disavow and

21   won't do that, Your Honor.  That's not what we're

22   here about, Your Honor.

23                   THE COURT:  If the City has

24   stipulated that they will not be charging

25   Mr. Ancona for that particular violation, if

1   that's not part of the issue, do you have -- what

2   other support do you have for standing to

3   challenge the earlier ordinance?

4              MR. ROTHERT:  Well, for preliminary

5   injunction purposes --

6              THE COURT:  Right.

7              MR. ROTHERT:  -- that would resolve

8   it.

9              THE COURT:  Okay.

10             MR. ROTHERT:  We do think we have

11  standing in the actual case for a damages claim.

12             THE COURT:  Okay.

13             MR. ROTHERT:  All right.  And

14  standing in general -- you know, I don't know if

15  it's being disputed that there's standing to

16  challenge the second ordinance, but the testimony

17  was that it will be enforced.  It does cover what

18  my clients do.  And they're not going and

19  distributing literature because of the existence

20  of the ordinance.  So I think that's sufficient

21  showing effect to show and it's not unreasonable

22  given that it's a newly passed ordinance with

23  penalties of jail.  It's not unreasonable for

24  them to refrain from distributing literature if

25  they enter into the street.

1          THE COURT:  And it's only

2   distribution that they're engaging in.  It's not

3   solicitation; correct?

4          MR. ROTHERT:  So in our view it's

5   just distribution, yes.

6          THE COURT:  Okay.

7          MR. ROTHERT:  And, you know, the

8   City officials -- solicitation is not defined in

9   the new ordinance.  It describes certain types of

10  solicitation that are prohibited, but it doesn't

11  define solicitation.  The City has previously --

12  Mr. Ancona testified and we have a letter where

13  they say in that they include -- they thought

14  that distributing literature might be

15  solicitation.  So that's the concern there.

16          And even if specifically what

17  Mr. Ancona does and other members do could be

18  considered -- might not be considered

19  solicitation, I think they still have standing on

20  behalf of third parties not before the Court to

21  bring an overbreadth claim that the Supreme Court

22  has made an exception for First Amendment cases

23  where there's a claim of overbreadth, most

24  recently in the United States v. Stevens, which

25  had to do with crush videos.  Yeah.

1              Even though Mr. Stevens probably

2    wasn't protected he was able to bring a claim on

3    behalf of people whose speech was protected such

4    as hunters who wanted to videotape their hunting.

5              For the First Amendment purposes,

6    you know, the burden, of course, is on the

7    government official.  I'll just very briefly say

8    we don't think the solicitation portion is

9    content neutral because it does not apply to all

10   solicitation.

11             The National Federation of the Blind

12   v. Arkansas is distinguishable.  That's cited in

13   the sur-reply.  The statute issue there allowed a

14   person receiving the phone call in their home to

15   say they didn't want to hear -- they didn't want

16   to hear anything more from a caller, and it

17   didn't matter what the solicitation was about it

18   applied.  The difference here is that the law

19   does make a distinction, and the intent is to

20   have certain types of solicitation be prohibited

21   and certain types not be.

22             Second, the Court in the National

23   Federation of the Blind of Arkansas distinguished

24   the situation before it, which was the intrusion

25   into the privacy of the home from expressive

1   activity in a public forum.  It said this is

2   different.  And this is the street, which is a

3   public forum.

4            As to -- I think the real crux here

5   is whether or not at this stage is whether or not

6   this ordinance is narrowly tailored.  And I'd

7   like to make six points about that.

8            The first is the distinction between

9   distribution and solicitation.  Aside from the

10  Ohio case and Ater all cases on the topic of

11  distributing or soliciting were limited to

12  solicitation as opposed to distribution of

13  literature on the roadway.

14           In the earlier case Judge Fleissig

15  made that distinction in distinguishing the Baton

16  Rouge case precisely because it was limited to

17  solicitation.  I think that makes this case

18  different.  The Supreme Court has said there's a

19  difference in the level of distraction or

20  disruption caused by distribution of literature

21  versus solicitation and just handing a leaflet to

22  someone is different than engaging them in a

23  business conversation.

24           The second reason we believe that

25  we're likely to show the ordinance is not

1  narrowly tailored is that it applies at all times

2  at all streets and all intersections.

3            The conclusion that they just

4  shouldn't do it anywhere or shouldn't have

5  pedestrians anywhere on the street is

6  inconsistent with Desologe's own rules for

7  governing other -- other activity other than

8  expressive activity.  So, for example, you know,

9  there are bus stops and taxi stands where an

10  individual stands by the road, a vehicle stops

11  and that individual enters the road.

12            THE COURT:  They have a taxi stand

13  in Desologe?

14            MR. ROTHERT:  Well, they have an

15  ordinance.  They have an ordinance that

16  requires --

17            THE COURT:  I just -- I'm sorry.  I

18  just wondered --

19            MR. ROTHERT:  They have an ordinance

20  that requires them to have one.  I don't -- you

21  know, they also ban distributing on medians and

22  have no medians.

23            THE COURT:  Right.  And they didn't

24  have a median either.  Okay.

25            MR. ROTHERT:  But the ordinance says

1    that.  You know, there do have to be bus stops,

2    and bus stops are similar to, you know,

3    individual stands by the road a vehicle stops and

4    an individual enters the roadway.

5                   Also, streets are sometimes

6    sidewalks by rule -- by ordinance where there is

7    no sidewalk, and that's inconsistent with the

8    blanket rule that it's never safe for anyone ever

9    to enter a street.

10                  And the conclusion that there should

11   be a blanket rule that it's never safe anywhere

12   is not the product of -- the type of analysis

13   that traffic engineers and government officials

14   do on a daily basis.  One of our affidavits says

15   that, but it's also common sense that officials

16   have to make -- look at specific incidents and

17   make decisions.  That's why there are stop signs

18   at some intersections, stop lights at others and

19   neither at others.  Intersections are different,

20   and the ordinance treats them all the same.

21                  The third reason while it's not

22   narrowly tailored is because it includes all

23   parts of the road, including parking lanes.  The

24   pictures show there are parts of the road that

25   are designated for parking, but the ordinance

1    prohibits distributing literature from those.

2              The Defendant's expert said no when

3    asked if it's possible to distribute literature

4    from a sidewalk to a parked vehicle.  So the fact

5    that that's allowed, you know, isn't much help.

6    That distinguishes this case from ACORN v.

7    St. Louis County where the ordinance did not

8    forbid solicitors -- those were solicitors -- did

9    not forbid them from seeking and collecting funds

10   from occupants of vehicles if they remained on

11   the median or along the shoulder.

12              So related to this I guess the

13   fourth --

14              THE COURT:  I do have a question

15   since you mentioned ACORN, which found that in

16   the roadway solicitation was dangerous, and I

17   know that the courts have made this distinction

18   between distribution and solicitation, but why

19   doesn't distribution pose the same risk as

20   solicitation?

21              MR. ROTHERT:  The reason -- and I

22   don't want to suggest there's no government

23   interest in support of it.  We haven't contested

24   that there's no government interest and you could

25   put some regulation on it.  But solicitation --

1    the main reason solicitation is different is

2    because it takes longer, and it involves back and

3    forth.  And I think even their expert testified

4    to that, there's a back and forth and back again.

5              Distribution of literature is a --

6    it's a one-way transaction, and if it's refused,

7    it's over.  So it takes a shorter amount of time.

8    That's why courts have frequently made the

9    distinction in other contexts including at

10   airports, and, you know, parks and elsewhere.

11             THE COURT:  Uh-huh.

12             MR. ROTHERT:  Also, the ordinance is

13   not narrowly tailored because it's under

14   inclusive.  That's something the Eighth Circuit

15   pointed out today.  The ordinance allows lots of

16   equally disruptive or distracting or dangerous

17   behavior, so it allows you to stand with a sign

18   in a roadway.  It allows you to enter a roadway

19   to put distribution -- to distribute a leaflet by

20   putting it on a car that's in the parking area.

21   It allows people in vehicles to distribute

22   literature to people to come off the sidewalk and

23   distribute literature to the person.

24             These are all examples of how the

25   ordinance is under inclusive to its stated goal

1   and that that's a relevant factor in considering

2   whether something is narrowly tailored.  And it's

3   also narrowly tailored in -- not narrowly

4   tailored in that the ordinance places the burden

5   on the distributor to prevent the driver from

6   being distracted, and, you know, this is

7   misplacing the burden.

8               In Krantz v. City of Fort Smith, I

9   believe, the Eighth Circuit -- this had to do

10  with putting leaflets on parked cars.  The Eighth

11  Circuit noted that when someone hands a leaflet

12  to an individual and that individual litters, we

13  punish the litterbug and not the leaflet holder.

14  And Mr. Camp testified that that's the same in

15  Desologe.

16              If someone is distracted while

17  driving, we should punish the person who's not

18  keeping control or not focusing on the road, not

19  the picketer or the billboard or the distributor

20  of literature that might have distracted them.

21              Here -- I mean, drivers have an

22  obligation to not be distracted while driving,

23  and it's their responsibility not to hit people

24  who are, you know, parking in the parking lane or

25  walking on the road where there's no sidewalk or

1    distributing literature or crossing the road or

2    being a crossing guard.  It's the driver's

3    burden.

4             And finally, closely related to that

5    is there are -- the law is not narrowly tailored,

6    because there are other laws in Desologe.  It's

7    relevant to consider the other ways that the

8    government could meet its interest.  And there

9    are numerous obvious ones here, including maybe

10   limiting distribution at problem intersections or

11   at problem times or requiring people be 18 to

12   distribute literature or requiring them to wear

13   bright vests.  There are many narrower ways other

14   than completely banning it throughout the City.

15            I want to mention Heffron v.

16   International Society For Krishma Consciousness.

17   That's a case relied on heavily by the Defendant.

18   And it was somehow distinguished -- I don't know

19   how -- in today's case from the Eighth Circuit.

20            I think it's distinguishable from

21   what we have here, though, because Heffron

22   involved a limited public forum, not a

23   traditional public forum.  And the Supreme Court

24   specifically distinguished streets from

25   fairgrounds.

1            And I just wanted to repeat a little
2    of what they said.  "Consideration of a forum's
3    special attributes is relevant to the
4    constitutionality of a regulation since the
5    significance of the governmental interest must be
6    assessed in light of the characteristic nature
7    and function of the particular forum involved.
8    This observation bears particular import in the
9    present case since respondents make a number of
10   analogies between the fairgrounds and city
11   streets, which have 'immemorially been held in
12   trust for the use of the public and have been
13   used for the purposes of assembly, communicating
14   thoughts between citizens and discussing public
15   questions.'"

16            "But it is clear that there are
17   significant differences between a street and the
18   fairgrounds.  A street is continually open, often
19   uncongested and constitutes not only a necessary
20   conduit in the daily affairs of a locality's
21   citizens, but also a place where people may enjoy
22   the open air or the company of friends and
23   neighbors in a relaxed environment."
24            You know, the Minnesota State Fair
25   is different the Eighth Circuit said -- or the

1    Supreme Court said, and any comparison to a

2    public street is necessarily an exact.  You know,

3    here we are talking public streets, so it's

4    different than the fair.

5                    And finally, I just wanted to

6    note -- well, no, I don't.  The evidence -- the

7    photographs that were entered into evidence too I

8    think -- I don't think we need to suspend

9    comments -- the Court doesn't need to completely

10   especially at this early stage suspend its

11   reliance on its own experience.

12                   The photos that are attached to the

13   consultant's report from Defendants and the ones

14   we've admitted into evidence, you know,

15   demonstrate that this is not a high traffic area

16   or at least not all streets in Desologe are high

17   traffic.  It's, in fact, very light.  And,

18   therefore, the government interest is less.

19                   I think that, you know, the

20   consultant for the Defendants made a point that

21   there are lots of reasons why by tradition we

22   allow people onto streets even though it might

23   not be safe.  And what he has overlooked is that

24   as the US Supreme Court said in 1938 in the

25   Jamison case that one of the traditional purposes

1    of streets is to allow communication of ideas,

2    including for the distribution of literature and

3    handbills.  And also this should be an exception

4    to the rule, and if it's not, any restriction

5    should be narrowly tailored.

6              I'm not going to -- I think we

7    agree, perhaps, that whether a preliminary

8    injunction should issue turns on the likelihood

9    of success on the merits.  If we do disagree,

10   I'll come talk about those later, but for those

11   reasons we'd ask for entry of a preliminary

12   injunction.  Thank you.

13             THE COURT:  All right.  Thank you.

14   Mr. Young.

15             (Defendant's Argument.)

16             MR. YOUNG:  Thank you, Your Honor.

17   I'll start off first by noting that the 1938

18   Jamison case presented streets that were

19   completely different than modern day streets with

20   completely different volumes of vehicles, types

21   of vehicles.

22             And so the context of that Supreme

23   Court case against the modern day concerns are

24   reflected in cases like ACORN v. St. Louis County

25   and Baton Rouge and the ACORN v. Baton Rouge.

1    There's a recognition that the governmental

2    interests of public safety and the injury to the

3    person is a much greater and higher problem today

4    than it would have been in 1938 when those

5    statements were made about streets.

6              Let me -- that was just my first

7    observation.  And my second observation is I've

8    got to tell the Court I don't know anything about

9    the case that was handed down today.

10             THE COURT:  Nor do I, so we'll be

11   learning about it at the same time.

12             MR. YOUNG:  Well, what I wondered

13   was if it made sense, because I have no way of

14   even trying to respond to the comments that were

15   made.

16             THE COURT:  Right.

17             MR. YOUNG:  If it made sense just on

18   that case that we have a very short briefing

19   schedule for each side to try and tell the Court

20   why we think it is or isn't relevant on any of

21   these points.

22             THE COURT:  Do you have any concern

23   about that?  If -- obviously, if there was a

24   briefing schedule allowed, we would still need to

25   hold -- the ordinance would need to be held in

 1   abeyance while we did that.  I mean, that would

 2   be my concern about that.

 3              MR. YOUNG:  Well, I guess I

 4   understand that.

 5              MR. ROTHERT:  It could be very

 6   short.  It's just analyzing one case.

 7              THE COURT:  Right.

 8              MR. YOUNG:  Do you have any idea how

 9   long the opinion is even?

10              MR. ROTHERT:  It's not very long.

11              MR. YOUNG:  Even better.

12              MR. ROTHERT:  It's about two pages.

13   It's not very long.

14              MR. YOUNG:  If I might have a

15   minute.  Your Honor, we don't have a problem

16   agreeing to a continued abeyance until we can

17   complete a reasonable briefing schedule so the

18   Court can get the benefit of our thoughts.

19              THE COURT:  That would be --

20              MR. YOUNG:  However relevant they

21   may be.

22              THE COURT:  Okay.

23              MR. YOUNG:  So we'll just --

24              MR. ROTHERT:  Just one

25   clarification.  Could we hold it until we -- I

1    mean, not until we are done briefing, but until
2    --
3              THE COURT:  How about until I rule?
4    That would be really good.  And --
5              MR. YOUNG:  And that's what we
6    really set up first, and that's what I meant.
7    Yes, Your Honor.  That's fine.
8              THE COURT:  All right.
9              MR. YOUNG:  Let me kind of get to
10   the heart of the legal argument.  Obviously,
11   there's the four Dataphase factors.  Likelihood
12   of success is the real key here on these.  I'll
13   just note that I think the other factors if the
14   Court considers that the sole and significant
15   governmental interest here is public safety of
16   pedestrians and drivers and occupants in motor
17   vehicles, that's a pretty important governmental
18   interest to be involved in the balancing.
19              But let's talk about the likelihood
20   of success.  The real crux of the KKK's position
21   here is that they contend they should be able to
22   stand in any roadway within Desologe to
23   distribute leaflets to vehicles that are being
24   operated in the roadway.  That's -- as the Court
25   has seen -- and it may be slowly, but we've

1    gotten to the point where we have an ordinance

2    here that is directly aimed at not allowing

3    distribution or solicitation within the roadway.

4    That's the problem.

5                The Court has heard the public

6    safety information from the expert witness, and

7    that is the real crux of the issue.

8                THE COURT:  Let me ask you a

9    question about that.

10               MR. YOUNG:  Sure.

11               THE COURT:  Because obviously the

12   distribution versus solicitation is a major --

13   that's -- the good distinction we're looking at.

14   There are cases on the solicitation ground, but

15   in looking at distribution can you tell me what

16   is your strongest argument for banning

17   distribution from a roadway for safety reasons,

18   because, you know, I'm looking at the case, and I

19   see solicitation, but I'm just --

20               MR. YOUNG:  The Ater case out of the

21   Sixth Circuit is the --

22               THE COURT:  That's what I thought

23   you would say.

24               MR. YOUNG:  Yeah, that's the

25   distribution case, Your Honor.

1             THE COURT:  Okay.

2             MR. YOUNG:  There's a state statute

3  that doesn't allow distribution in the state

4  highways that was at issue there.  And I think

5  it's squarely on point.  The court there

6  concluded it was narrowly tailored.

7             So we have one -- you know, we have

8  each -- an example of each situation.  We have

9  Ater, and then we have a whole series starting --

10  for our purposes the most relevant being ACORN --

11             THE COURT:  ACORN, right.

12             MR. YOUNG:  -- v. St. Louis County,

13  the Eighth Circuit case, that covers the

14  solicitation.  And so I think we've got both

15  covered with cases that are directly on point.

16             Your -- the Court's obviously -- I

17  mean, it's literally on point.  ACORN v. St.

18  Louis County includes language on solicitation

19  that's virtually identical to what was passed

20  here.  And I think subject to whatever today's

21  case may have said, but it wasn't a solicitation

22  in the roadway case, so I don't think it

23  overrules ACORN v. St. Louis County in any way.

24  I think the Court is really bound by ACORN v. St.

25  Louis County on that.

```
 1                    THE COURT:  On the issue of
 2   solicitation?
 3                    MR. YOUNG:  On the issue of
 4   solicitation, correct.
 5                    THE COURT:  Right.
 6                    MR. YOUNG:  I'm not trying to extend
 7   that --
 8                    THE COURT:  If they're able to
 9   challenge the solicitation part of it.
10                    MR. YOUNG:  I'll get to that in a
11   moment.
12                    THE COURT:  Sorry.  I'm confusing
13   you here.
14                    MR. YOUNG:  No, no, no.  That's
15   okay.  But that's part of the other argument.
16                    THE COURT:  Okay.
17                    MR. YOUNG:  But what I want to do is
18   get to --
19                    THE COURT:  I want to talk about
20   narrowly tailored.  Can we go there?
21                    MR. YOUNG:  Okay.  Because that's
22   where I was going to go.
23                    THE COURT:  Okay.  That would be
24   great.
25                    MR. YOUNG:  Do you want me to talk,
```

1    or do you want to ask questions?

2              THE COURT:  You can go ahead and

3    talk about it.

4              MR. YOUNG:  All right, Your Honor.

5              THE COURT:  And I might interrupt

6    you.

7              MR. YOUNG:  That's fine.

8              THE COURT:  Okay.

9              MR. YOUNG:  Before I get to narrowly

10   tailored I just want to make one comment.

11             THE COURT:  Okay.

12             MR. YOUNG:  In Heffron, the

13   Minnesota State Fair U.S. Supreme Court case,

14   that covered both solicitation and distribution

15   within pedestrian crowds at the Minneapolis State

16   Fair.  And the court there concluded that there

17   was a valid governmental objective just

18   controlling the safety and the traffic flow, so

19   to speak, of pedestrians on foot.  There were no

20   motor vehicles involved.

21             If that is a sufficient governmental

22   objective, clearly it's a situation that can

23   involve life and death for pedestrians, for

24   drivers or occupants depending on what happens in

25   the roadway is even a higher level safety risk

1    that rises to a higher governmental objective.
2    And so I just point that out as we go into the
3    narrow tailoring aspect.
4                    THE COURT:  Can I ask you to pause
5    just a second?
6                    (A discussion was held off the
7    record.)
8                    THE COURT:  We have manpower issues,
9    so I'm going to let them go.  I don't think it
10   will be necessary, because all we have is lawyers
11   left, right, for who are here?  Okay.  We're
12   good.
13                   MR. YOUNG:  Right.  And the city
14   administrator.
15                   THE COURT:  I think I can trust
16   you-all.  Okay.
17                   MR. YOUNG:  Thank you, Your Honor.
18   I appreciate that.
19                   THE COURT:  All right.  Earlier we
20   just had so many people.  That's why I had the
21   CSO here.
22                   MR. YOUNG:  Understood.
23                   THE COURT:  So I'm sorry to
24   interrupt.
25                   MR. YOUNG:  Oh, no.  Not a problem.

1          THE COURT:  But I just wanted to

2   give them the opportunity --

3          MR. YOUNG:  The only additional

4   point I'll make on a significant governmental

5   interest in public safety and roadways is that

6   that's confirmed by ACORN v. St. Louis County and

7   Ater v. Armstrong, The City of Baton Rouge, ACORN

8   v. The City of Phoenix, which we contend was not

9   overruled by Redondo Beach, but we'll get to

10  that.

11          Okay.  Narrowly tailored.  The

12  amended ordinance here prohibits pedestrians from

13  soliciting or distributing within the roadway,

14  and that roadway is defined strictly as the

15  surface that the motor vehicles travel on.  It

16  does not cover curbs, sidewalks, areas outside

17  the roadways or areas where a parked vehicle is

18  sitting when you can hand it from the adjacent

19  sidewalk.

20          Consistent with the identified

21  governmental interest of public safety the

22  amended ordinance only precludes certain

23  expressive conduct within the areas in its town

24  where motor vehicles operate on the roadway.

25          The Court should recognize from the

1    ACORN v. St. Louis County case that the
2    regulation -- albeit it's narrowly tailoring, but
3    for purposes of narrowed tailoring ACORN v. St.
4    Louis County says the regulation doesn't have to
5    be the least restrictive or the least intrusive
6    means of serving public safety interests.
7    Instead the narrowly tailored requirement is
8    satisfied under the ACORN v. St. Louis County
9    case so long as it promotes a substantial
10   governmental interest that would be achieved less
11   effectively absent the regulation.  That's
12   basically an exact quote from ACORN v. St. Louis
13   County.
14               We go on to state the validity of
15   time, place or manner regulations do not turn on
16   the Judge's agreement with the responsible
17   decision maker concerning the significant -- I'm
18   sorry, concerning the most appropriate method for
19   promoting significant governmental interest or
20   the greed at which those interests should be
21   promoted.
22               And that's Ater v. Armstrong states
23   that and picks that quote straight out of the
24   U.S. Supreme Court case of Ward v. Rock Against
25   Racism.  So what we're saying here is that the

1   narrow tailoring doesn't require the City to find

2   the most -- or the least restrictive and least

3   intrusive, most beneficial interpretation of an

4   ordinance for the party attacking it.

5              What it says is that so long as the

6   Court concludes that there is a substantial

7   governmental interest, which I don't think

8   there's any question here there's a substantial

9   governmental interest in public safety in the

10  roadway, ACORN v. St. Louis County and following

11  this concept in Ater v. Armstrong basically the

12  Court is not supposed to substitute its view, or

13  it doesn't have to agree with the responsible

14  decision makers concerning the most appropriate

15  method for promoting that significant

16  governmental interest, because once the

17  municipality demonstrates a real need for the

18  Government to act to protect the public

19  interest -- and this is a quote straight from

20  ACORN v. St. Louis County -- the Government's

21  choice among the means to accomplish its end is

22  entitled to deference from the Court.

23             So what I'm saying is in this

24  instance, because we've got a very significant

25  public interest in the form of the concern for

1    public safety that's the only concern that this

2    Court has, and the evidence is clear on that.

3    We're not worried about traffic congestion or

4    this or that.  We're trying to save people's

5    lives in the street.

6              That is significant enough once the

7    Court determines that is a valid governmental

8    significant interest, then the Court basically

9    doesn't get to rewrite the ordinance or restrict

10   it and pick and choose, almost blue line the

11   ordinance the way that the Plaintiffs have

12   suggested with -- and that that's not a fault in

13   the ordinance.  The Court must defer to the way

14   the government has chosen to regulate the

15   ordinance.  And so I think that's where we end up

16   on narrow tailoring, and that's straight out of

17   ACORN v. St. Louis County.

18             The amended ordinance is entitled to

19   that deference because there is that governmental

20   interest.  If there's any doubt about the

21   Government's regulation for public safety, this

22   Court need only look to the precedent of the U.S.

23   Supreme Court in Heffron, which said it was

24   important enough with a bunch of pedestrians in a

25   state fair location to meet the level of a

1    significant governmental interest, certainly a

2    location of individuals within the roadway must

3    meet that.

4            So this Court looking to the

5    precedent within the Eighth Circuit of ACORN v.

6    St. Louis County should recognize that an

7    ordinance prohibiting solicitation within the

8    streets under a virtually identical ordinance

9    that -- that ordinance basically said you can't

10   solicit for rides -- literally it's right down

11   the line on that.

12           So we think that the Court is bound

13   by ACORN v. St. Louis County on narrow tailoring,

14   and it's supported by cases like Baton Rouge, the

15   ACORN v. St. Louis -- ACORN v. City of Baton

16   Rouge -- it's a 5th Circuit Case -- U.S. Labor

17   Party v. Oremus, a 7th Circuit case, ACORN v.

18   City of Phoenix, 9th Circuit case, that all

19   uphold the regulation of solicitation.  Now,

20   admittedly those are all just solicitation cases,

21   as we talked about earlier.

22           But they're all basically based on

23   very, very similar language on solicitation.  And

24   it's not a total anti-solicitation situation that

25   the Courts have approved there.

217

1           And then the Court can also look to

2   the decision and reasoning upholding the ban on

3   distribution, as I said, under Ater v. Armstrong.

4   So we suggest you have -- even though ACORN v.

5   St. Louis County only applies to solicitation the

6   logic applies where there's a significant

7   governmental interest to the Court giving

8   deference when there's a narrow tailoring in the

9   distribution setting.  And the 6th Circuit there

10   concluded that the state ordinance that -- or the

11   state statute prohibited distribution in the

12   roadways was constitutional against an attack

13   basically along the same lines as we're talking

14   about here.

15           In response to this plethora of

16   decisions supporting the constitutionality of the

17   amended ordinance, the KKK points to the Redondo

18   Beach case, the 9th Circuit case.  And then they

19   plug in an incorrect statement that Redondo Beach

20   reversed the City of Phoenix case.  Well, Redondo

21   Beach very clearly only reversed the City of

22   Phoenix decision to the extent it was

23   inconsistent with the Redondo Beach decision.

24           And that inconsistency if you look

25   at the cases only occurred regarding issues

1    surrounding prohibitions on the sidewalks, not

2    what was going on in the street.  What happened

3    is Redondo Beach concluded that there was an

4    overbreadth that went to sidewalks and other

5    issues relating to vandalism and nuisance and

6    other governmental purposes that were trying to

7    be served.

8              And we suggest to you that the only

9    part of the City of Phoenix which was overruled

10   was where that ordinance in the City of Phoenix

11   case extended to sidewalks beyond streets.  And

12   we're not -- we very clearly delineated sidewalks

13   here.  They're perfectly free to do whatever they

14   want on sidewalks.  It's only within the roadway

15   where that safety issue exists that we're trying

16   to regulate.

17             So we suggest the City of Phoenix

18   case still stands as a valid decision on the

19   constitutionality of the prohibition concerning

20   pedestrians in the street and regulating them.

21             So once we've shown this narrow

22   tailoring through this whole series of cases,

23   then the next question is what are the ample

24   alternative means that are available to them, or

25   are there ample alternative means?  And the

1    evidence clearly shows that KKK can solicit or

2    distribute -- particularly their concerns of

3    distribution -- from sidewalks, from grassy areas

4    right beside the street to parked cars, from the

5    city park, in the city park, from trails and the

6    city parking lot.

7                  There's a myriad of possibilities

8    where they're not posing the substantial personal

9    injury risks that are associated with individuals

10   darting out into traffic trying to talk to

11   somebody stopped at a stop sign or a traffic

12   light engaging them in the way we oftentimes see

13   that happen.

14                  THE COURT:  Now, they can -- if I

15   recall, they can step into the roadway to place a

16   leaflet onto a car -- a parked car; is that

17   right?

18                  MR. YOUNG:  I think that's right,

19   Your Honor.

20                  THE COURT:  Okay.  But it becomes

21   unlawful if they step into the same roadway to

22   hand a leaflet to some -- to an occupant of a

23   car?

24                  MR. YOUNG:  Well, let me say this:

25   I think the ordinance would say you can put the

1     leaflet on the windshield from the roadway right
2     beside the --
3                  THE COURT:  It's just says the
4     road -- I mean --
5                  MR. YOUNG:  -- adjacent to the
6     sidewalk.  That's right.  And you can't go out
7     into the road -- around to the other side, I
8     guess, to that person.  You're supposed to do it
9     from the sidewalk is what I'm trying to say.
10    You're not supposed to get out into the traffic
11    area.
12                 THE COURT:  And so let's say, for
13    example, someone lives in a neighborhood on a
14    street that's not traveled very much, and someone
15    sees her neighbor out there, and her neighbor is
16    pulling out of her driveway into the street, and
17    she wants to go over and hand her some literature
18    about breast cancer awareness.  At that point she
19    is violating the ordinance; correct?
20                 MR. YOUNG:  I don't think there's
21    any question that's a technical violation, Your
22    Honor.  The problem is that there's a public
23    safety issue there no matter what.  I mean, kids
24    handing something to each other in the street,
25    toys or something, passing them along.  That's a

1   public safety issue.

2               THE COURT:  Actually, if two kids

3   are in the street with their bicycles -- one is

4   on a bicycle and one is on the street and hands

5   him something, that doesn't violate this

6   ordinance, does it?

7               MR. YOUNG:  I'm trying to --

8               THE COURT:  I know.  That's the --

9               MR. YOUNG:  I mean --

10              THE COURT:  Maybe there's another

11  ordinance that says you can't do that, but it

12  doesn't violate this ordinance the way this

13  ordinance is written.  If a kid is on a bicycle

14  in the street -- and bicycles can be in the

15  street or an adult on a bicycle in the street,

16  and a kid walks up and hands a leaflet to the

17  person on the bicycle from the roadway, that does

18  not violate this ordinance.

19              MR. YOUNG:  Let me look at the

20  ordinance real quick, but before I get to that

21  what strikes me about this what if game --

22              THE COURT:  I know.

23              MR. YOUNG:  I mean, there were a lot

24  of what ifs posed to the witness.

25              THE COURT:  Right.

1        MR. YOUNG:  And Mr. Rothert has

2  presented them in his argument.  That's exactly

3  the reason why ACORN v. St. Louis County says the

4  Court -- if it's narrowly tailored to meet the

5  significant governmental interest, the Court

6  gives deference, because the Court isn't in the

7  job of trying to second guess the City on all

8  those instances.  And that is true -- these what

9  ifs are almost true in every criminal -- you

10  know, every criminal law we have in the country.

11  It's part of the nature of legislating, because

12  somebody can always come up with an example of

13  something that well, what if, is it in or out.

14  Now, let me get back to your question that you

15  really posed.

16        THE COURT:  Okay.

17        MR. YOUNG:  The bicycle is not a

18  vehicle.

19        THE COURT:  Right.  Yeah.

20        MR. YOUNG:  So I think that's not a

21  motor vehicle.  So I think you're right.  Your

22  conclusion is correct.

23        THE COURT:  All right.  Okay.

24        MR. YOUNG:  All right.  So the last

25  thing I really want to address is the amended

1    ordinance is content neutral.  That raises the

2    lack of standing issue that the Court has asked

3    about.

4              And I think that the standing issue

5    is pretty clear.  I mean, the evidence is clear

6    that the KKK has not pled, nor does it claim that

7    it's really involved in any solicitation as

8    defined in this ordinance that's at issue today.

9              The ordinance calls for

10   severability, which is important in the case law.

11   The adopting ordinance over the whole code calls

12   for severability.  When we look at the

13   controlling cases, which would be Lujan and the

14   Republican Party of Minnesota case, what we

15   basically say is the Plaintiff has an obligation

16   to show injury, causation and redressability with

17   respect to each provision and challenges as

18   overbroad to meet the Article III standing

19   requirements, and that's Advantage Media that

20   says that looking through the Lujan language.

21             So the Court goes on -- or actually,

22   a different court goes on to say that -- no, I'm

23   sorry, it is Advantage Media -- to establish

24   causation a Plaintiff must show that the injury

25   is fairly traceable to a challenged statutory

1    provision.  They've got no injury that relates

2    back to solicitation, which is the only provision

3    they're challenging as content based.

4              And so they don't have standing.

5    They can't meet the standing test that the

6    Supreme Court has established with respect to

7    solicitation -- or the solicitation portion of

8    the ordinance, I should say.  They have never

9    done solicitation that's at issue here.  And

10   there's no evidence before the Court that they

11   will do it.

12             So we think they lack standing for

13   that reason; and, therefore, the Court doesn't

14   even have to go into the whole content neutral

15   versus content based analysis, but if we get into

16   it, we still contend that the amended ordinance

17   is content neutral.

18             What they've brought up late is the

19   Whitton 8th Circuit case -- Whitton v. The City

20   of Gladstone -- and the Neighborhood Enterprises

21   v. The City of St. Louis cases, but both those

22   cases are sign cases.  They don't have anything

23   to do with roadways or what could be done in the

24   roadway, and they don't have anything to do with

25   solicitation or distribution either.

1           What we suggest to the Court is that

2     they don't stand for this -- I mean, if you would

3     take the argument made to its logical extent, by

4     implication somehow these cases may reverse ACORN

5     v. St. Louis County, which is ludicrous, they

6     don't even come close to the content.

7           What we suggest to the Court that is

8     more important is that you've got ACORN v.

9     St. Louis County.  You've got this whole series

10    of cases that we talked about that look at the

11    entire subject of the -- or the subject language

12    of the ordinance, the content of the ordinance,

13    and they say -- in every one there's never a

14    content -- a suggestion that they're not content

15    neutral even though they're virtually identical

16    language on the solicitation.

17           And then when you -- the Court

18    considers the case we cited in our sur-reply,

19    which is the 8th Circuit case that came in after

20    the Whitton case and before the Neighborhood

21    Enterprises case that's the National Federation

22    of the Blind of Arkansas v. Pryor we suggest that

23    that case upheld an Arkansas statute that placed

24    restrictions specifically and exclusively on

25    anyone placing a telephone call to an Arkansas

1    resident to solicit a charitable contribution or

2    to offer any commercial product or service.  And

3    the court there concluded it was content neutral.

4              So we suggest to the Court that even

5    if the Court wants to look at this content based

6    versus content neutral issue, the closest case

7    for purposes of this solicitation language that

8    they're challenging is this telephone call

9    statute that covers charitable contribution,

10   covers commercial products and services, and it

11   concludes it covers only those things.  It didn't

12   cover or prohibit phone calls, say, related to

13   political campaigns, which is the big example

14   that they give.  And the court there didn't find

15   any problem with content neutrality, that statute

16   passed muster.  So for those reasons we think

17   that this is a content neutral ordinance.

18             And the only final thing I'll say on

19   this point of the content based versus content

20   neutral question is ultimately the main inquiry

21   into deciding content neutrality, especially in

22   time, place or manner cases, should be whether

23   the government has adopted a regulation of speech

24   because of the disagreement with the message it

25   conveys.  If that's what the government has done,

1    that's content neutrality.

2           The government's purpose is the

3    controlling consideration.  A regulation that

4    serves purposes unrelated to the content of the

5    expression is deemed neutral even if it as an

6    incidental effect -- even if it has an incidental

7    effect on some speakers or messages but not on

8    others.

9           The government regulation of

10   expressive activity is content neutral so long as

11   it is justified without reference to the content

12   of the speech.  And we suggest here that this

13   ordinance doesn't make any reference to the

14   content of the speech as to solicitation.

15          And, in any event, they don't have

16   standing.

17          Thank you, Your Honor.

18          THE COURT:  Thank you, Mr. Young.

19          Do you have a little more?

20          MR. ROTHERT:  Sure.

21          THE COURT:  Okay.

22          MR. ROTHERT:  I didn't mention

23   Redondo Beach.  I hoped we were going to skip it,

24   but I'd like to -- but I will.

25          First of all, just to clarify, what

1    we're arguing is what's protected

2    constitutionally is not standing in the middle of

3    the roadway distributing literature it's stepping

4    into the street to distribute a leaflet to the

5    occupant of a stopped vehicle, you know, that's

6    not moving.

7              And as far as deference to be paid

8    in the narrowly tailored analysis, you know, in

9    the First Amendment context we do -- we have to

10   play the what if game.  Overbreadth -- the

11   overbreadth doctrine that requires us to describe

12   areas in which protected speech would be made

13   unconstitutional by the ordinance.

14             Redondo Beach, for example, and

15   United States v. Stevens provided a long list of

16   hypotheticals about Girl Scouts going into a

17   residential street to sell cookies.  And so that

18   is appropriate here.

19             The government doesn't just get

20   deference.  They have to provide evidence showing

21   that the law is narrowly tailored.  I think the

22   8th Circuit said that in Phelps-Roper v. Koster

23   earlier this year.  The 7th Circuit has said it

24   in Heffron v. City of Granite City, Illinois,

25   which involved leaflets on parked cars.  There

229

1    has to be some kind of nexus between the

2    restriction and the governmental interest, some

3    kind of causation.

4              I won't -- obviously, we disagree a

5    little bit on whether the City of Phoenix was

6    overruled or to what extent it was overruled.  I

7    think it's at footnote 5 of Redondo Beach which

8    explains that it's overruling and limiting it to

9    solicitation.  The Phoenix decision is about

10   solicitation and Redondo Beach is about

11   distribution and solicitation.  Redondo Beach did

12   apply on sidewalks and streets, but

13   the overbreadth analysis was applicable as it

14   applied on streets and on sidewalks.

15             THE COURT:  With regard to the issue

16   of solicitation --

17             MR. ROTHERT:  Yes.

18             THE COURT:  -- do you really feel

19   that you have standing to challenge the

20   solicitation aspect of this ordinance?  Really

21   truly?

22             MR. ROTHERT:  When I -- if I read

23   the ordinance, Mr. Ancona does not intend to

24   solicit.

25             THE COURT:  Right.

1          MR. ROTHERT:  But he does intend to

2     distribute leaflets.  The City of Desologe

3     officials have told him that's solicitation.

4          THE COURT:  Right.

5          MR. ROTHERT:  That's why.

6          THE COURT:  Okay.

7          MR. ROTHERT:  And they didn't define

8     it.

9          THE COURT:  Okay.

10          MR. ROTHERT:  So that's the reason

11    we think we have standing.  If the Court were to

12    say there's no way the solicitation applies to

13    distributing literature, then there would be no

14    standing.

15          THE COURT:  Okay.  All right.

16          MR. ROTHERT:  And I just want to say

17    solicitation could be banned in a content neutral

18    way the same way that distribution was.  It could

19    just ban all solicitation --

20          THE COURT:  Right.

21          MR. ROTHERT:  -- instead of saying

22    certain parts.  And the fact that the City has

23    chosen not to do that shows that the ordinance is

24    another way in which it's under inclusive because

25    it still allows a lot of activity.

1            All right.  I have nothing further.

2            THE COURT:  Okay.  All right.  Thank

3    you.

4            One more thing and that's it.

5            MR. YOUNG:  Just one more point,

6    because I think there's confusion on -- just so

7    we're clear, the City of Desologe didn't -- when

8    it said solicitation is distribution or

9    distribution constituted solicitation, it was

10   under the prior ordinance --

11           THE COURT:  I know.

12           MR. YOUNG:  -- language, totally

13   different, not distinguished the way it is in the

14   current ordinance.

15           THE COURT:  I do understand.  Yes.

16   I think we made that clear in the process.

17           Thank you, all.  This has been quite

18   interesting today.

19           And with regard to timing today is

20   the 11th, and I don't -- do you think two

21   weeks -- do you think you need that long?  Well,

22   I mean, if you -- I don't know that you need to

23   do -- I mean, I think you can both file -- do it

24   simultaneously.

25           MR. YOUNG:  I was going to suggest

1    the same thing to expedite it.

2                THE COURT:  I don't think that's

3    necessary.  So, yeah, that's fine.

4                So by like next Friday?

5                MR. YOUNG:  I was just going to say

6    what about a week from Friday, which is the --

7                THE COURT:  A week from Friday.  The

8    20th.

9                MR. YOUNG:  The 20th?

10               THE COURT:  It's the 20th.

11               MR. YOUNG:  Okay.  The 20th.

12               THE COURT:  Okay.  All right.  That

13   will be great.

14               MR. ROTHERT:  Can we agree on a time

15   that you want us to file by, so we don't stay up

16   until 11:59?

17               THE COURT:  Can we pick a time?

18               MR. YOUNG:  My secretary leaves at

19   4:30.

20               MR. ROTHERT:  So how about like by

21   4:30?

22               THE COURT:  4:30 on Friday the 20th.

23               MR. YOUNG:  And we don't want to

24   have who can read the fastest and respond.

25               THE COURT:  Okay.  4:30 by Friday

1    the 20th.

2                    And, just for the record, the

3    ordinance will be held in abeyance until the

4    Court issues a ruling regarding the --

5                    MR. YOUNG:  For the record, that's

6    understood.

7                    THE COURT:  Yes.

8                    MR. YOUNG:  And the city

9    administrator has acknowledged that for the City

10   of Desologe.

11                   THE COURT:  Yes.  Okay.

12                   Is there anything else we need to

13   talk about while we have everyone here?

14                   MR. ROTHERT:  I don't think so.

15                   THE COURT:  Okay.  Great.  Thank you

16   all.

17                   (PROCEEDINGS CONCLUDED AT 4:21 P.M.)

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Alison M. Garagnani, Registered Merit

4     Reporter, hereby certify that I am a duly

5     appointed Official Court Reporter of the United

6     States District Court for the Eastern District of

7     Missouri.

8              I further certify that the foregoing is a

9     true and accurate transcript of the proceedings

10    held in the above-entitled case.  And I further

11    certify that the foregoing pages contain an

12    accurate reproduction from taped proceedings had

13    on that date, transcribed to the best of my

14    ability.

15             I further certify that this transcript

16    contains pages 1 through 235 inclusive and that

17    this reporter takes no responsibility for missing

18    or damaged pages of this transcript when same

19    transcript is copied by any party other than this

20    reporter.

21                  Dated Cape Girardeau, Missouri, this

22    18th day of September, 2013.

23

24    ------------------------------------------
      /s/Alison M. Garagnani
25    Alison M. Garagnani, CCR, CSR, RMR.
      Official Court Reporter